UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Vandroth Backus, Willie Harrison Brown, Charlesann Buttone, Booker Manigault, Edward McKnight, Moses Mims, Jr., Roosevelt Wallace, and William G. Wilder, on behalf of themselves and all other similarly situated persons,<br><br>     Plaintiffs,<br><br>*vs.*<br><br>The State of South Carolina, "Nikki" R. Haley, in her capacity as Governor, Ken Ard, in his capacity as Lieutenant Governor, Glenn F. McConnell, in his capacity as President Pro Tempore of the Senate and Chairman of the Senate Judiciary Committee, Robert W. Harrell, Jr., in his capacity as Speaker of the House of Representatives, James H. Harrison, in his capacity as Chairman of the House of Representatives' Judiciary Committee, Alan D. Clemmons, in his capacity as Chairman of the House of Representatives' Election Law Subcommittee, Marci Andino, in her capacity as Executive Director of the Election Commission, John H. Hudgens, III, Chairman, Cynthia M. Bensch, Marilyn Bowers, Pamella B. Pinson, and Thomas Waring, in their capacity as Commissioners of the Elections Commission,<br><br>     Defendants. | Case No.: 3:11-cv-03120-PMD-HFF-MBS |

**DEFENDANT ROBERT W. HARRELL, JR., JAMES H. HARRISON, AND ALAN D. CLEMMONS' REPLY MEMORANDUM**

### Introduction

Pursuant to Local Rule 7.07, D.S.C., Defendants Robert W. Harrell, Jr, James H. Harrison, and Alan D. Clemmons hereby submit the following Reply to Plaintiffs' Memorandum of Law in Opposition to All Defendants' Motions to Dismiss.

### Argument

**I.    Plaintiffs Concede That Their Section 2 Claim Fails as a Matter of Law.**

Section 2 of the Voting Rights Act requires a showing that minority voters "have less opportunity to . . . elect representatives of their choice." *Bartlett v. Strickland*, 556 U.S. 1, ___, 129 S. Ct. 1231, 1249 (2009). That language has expressly been interpreted to require a showing that the three pre-conditions to relief set out in *Thornburg v. Gingles*, 478 U.S. 30, 48 (1986) are present prior to any further consideration of whether under the totality of the circumstances vote dilution has occurred. It is well established that "a Section 2 claim cannot proceed unless all three *Gingles* preconditions are satisfied." *Cousin v. Sundquist*, 145 F.3d 818, 823 (6th Cir. 1998); *Growe v. Emison*, 507 U.S. 25, 40-41 (1993). "[T]he failure of a minority group to satisfy all of the *Gingles* preconditions means that it cannot sustain a claim under Section 2 that the challenged electoral practice 'impede[s] the ability of minority voters to elect representatives of their choice.'" *Hall v. Virginia*, 385 F.3d 421, 426 (4th Cir. 2004) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 48 (1986)). Because the first *Gingles* precondition requires that there be a group of minority voters sufficient to constitute a majority in a single member district, it is incontrovertible that a Section 2 claim fails unless Plaintiffs allege and ultimately prove that the challenged plan omits to create one or more majority-minority districts. In the present case, Plaintiffs admit that they are not seeking the creation of additional majority black districts, expressly concede that they are not even attempting to satisfy the *Gingles* standard, and disclaim

any necessity to do so. (*See* Pls' Mem. of Law in Opp'n 18, ECF No. 59 ("Defendants are correct that the Amended Complaint makes no attempt to satisfy the *Gingles* preconditions . . . .").)

Plaintiffs' disavowal of *Gingles* is not excused by any principle of existing law. Contrary to Plaintiffs' assertion, the *Gingles* preconditions do not apply only in cases in which the "creation of a majority-minority district is *the only way* to give minority voters an opportunity." (ECF No. 59 at 17 (emphasis in original).) No court has ever so held. Instead, the *Gingles* preconditions serve as the "baseline" of Section 2 jurisprudence. *Bartlett*, 129 S. Ct. at 1244. Under existing authority, "a vote dilution claim under Section 2 must be cast solely in terms of an allegation that a particular practice 'impede[s] the ability of minority voters to elect more representatives of their choice.'" *Hall*, 385 F.3d at 428 (quoting *Gingles*, 478 U.S. at 48). The ability of a minority group to elect a candidate is a function of whether the minority group constitutes a majority within the electoral district. *Id*. at 429 ("[M]inority voters have the potential to elect a candidate *on the strength of their own ballots* when they can form a majority of the voters in some single-member district.") (Emphasis in original). Political coalitions and "crossover" districts do not permit the minority group itself to elect candidates, and therefore do not enjoy protection under the Voting Rights Act. *Id*. at 431 ("A redistricting plan that does not adversely affect a minority group's potential to form a majority in a district, but rather diminishes its ability to form a political coalition with other racial or ethnic groups, does not result in vote dilution "on account of race" in violation of Section 2."). Likewise, the creation of majority-minority districts at the expense of crossover districts does not violate Section 2. This claim has been squarely rejected by the Supreme Court. *See Bartlett*, 129 S. Ct. at 1243-46 (declining to depart from "the uniform interpretation of § 2" that finds the first *Gingles* factor to

3

require a majority-minority standard, and rejecting the notion that Section 2 requires the creation of coalition districts).

Plaintiffs cannot avoid the requirement of *Gingles* through conclusory allegations of a discriminatory purpose. According to Plaintiffs, Defendants engaged in purposeful discrimination by "insist[ing] on creating majority-black districts."[1] By creating those districts, Plaintiffs contend, "Defendants effectively and purposefully minimize the value of the Plaintiffs' votes and deny them equal access to the political process." (ECF No. 59 at 18.)  But the fact that a particular case allegedly "bears the mark of intentional discrimination" (*see id*.) in no way absolves Plaintiffs from their burden to allege and ultimately prove the *Gingles* preconditions. *See Johnson v. DeSoto County Bd. of Comm'rs*, 72 F.3d 1156, 1561-62 (11th Cir. 1996) (finding that district court's conclusion that proof of discriminatory intent alone is sufficient to establish a Section 2 violation to be inconsistent with *Voinovich*). Plaintiffs in this case make no pretense of having alleged the second and third factors (that a minority group is politically cohesive and that there is sufficient racial block voting to prohibit the minority group from electing candidates of its choice) but instead premise their entire case on the allegation that there is sufficient crossover voting to permit hypothetical coalitions of voter groups (including white voters) to elect candidates of their collective choice. (*See* Am. Compl. ¶¶ 79, 80, 83, 84, ECF No. 6.) *See also Comm. For a Fair & Balanced Map v. Illinois*, No. 1:11-CV-5065, 2011 WL 5185567, 4 (N.D. Ill. Nov. 1, 2011) (noting that while it may be appropriate to relax the first *Gingles* factor when intentional discrimination is shown, plaintiff still must allege and establish the second and third *Gingles* factor). Because Plaintiffs allege that crossover voting requires the formation of a

---

[1] The Plaintiffs' conclusion that intentional discrimination can be shown simply by the creation of majority-minority district is itself highly questionable since it would mean that compliance with the Voting Rights Act is itself a constitutional violation.

4

district in which majority and minority voters may be able to form a coalition, the Amended Complaint sets out the antithesis of a Section 2 claim.

Finally, in the absence of the objectivity provided by the *Gingles* standard, the scope of judiciable issues under Section 2 would be vastly expanded. Virtually every majority-minority district could be challenged as "packed" and an endless number of hypothetical crossover districts could be posited. That would place the courts "in the untenable position of predicting many political variables and tying them to race-based assumptions." *Bartlett*, 129 S. Ct. at 1244. Specifically, "[t]he judiciary would be directed to make predications or adopt premises that even experienced polling analysts and political experts could not assess with certainty, particularly over the long term." *Id*. at 1244-45. As the *Bartlett* court concluded, "[t]hough courts are capable of making refined and exacting factual inquiries, they 'are inherently ill-equipped' to 'make distinctions based on highly political judgments' of the sort that crossover-district claims would require." *Id*. at 1245 (quoting *Holder v. Hall*, 512 U.S. 874, 894 (1994) (Thomas, J. concurring)).

Because Plaintiffs have not pleaded and do not contend that the preconditions necessary to state a claim under Section 2 are present, their second cause of action should be dismissed with prejudice.

## II. Plaintiffs Inappropriate Attempt to Bolster Their Fourteenth and Fifteenth Amendment Claims Does Not Save Them.

Plaintiffs' claims under the Fourteenth and Fifteenth Amendments fail as a matter of law because they do not allege legally cognizable vote dilution, and therefore have not shown any recognized discriminatory effect. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). In the absence of such harm, allegations of discriminatory purpose are not

5

sufficient to sustain a claim under the Fourteenth or Fifteenth Amendments. *City of Mobile v. Bolden*, 446 U.S. 55, 69 (1980).

In their opposition to the motions to dismiss, Plaintiffs do not address this terminal deficiency, but instead attempt to justify their constitutional claims through conclusory allegations that race was the predominant factor in shaping the districts. (ECF No. 59 at 7-8 (citations omitted)). Although Plaintiffs are required to allege an intentional or purposeful racial motivation for the Redistricting Plans to advance a discrimination claim under the constitution, *Arlington Heights*, 429 U.S. at 265, they have yet to make any plausible claim that race was "the predominant factor motivating the legislature's districting decision." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001). Indeed, Plaintiffs' own assertion that there is a high level of racial polarization and high correlation between black voters and the Democratic Party is itself sufficient to defeat any Fourteenth or Fifteenth Amendment claims that may arise out of the Redistricting Plans. *See id.* at 257 ("The basic question is whether the legislature drew [the district boundaries] because of race *rather than* because of political behavior.").

Instead, in an effort to cure the fatal deficiencies of the Amended Complaint, Plaintiffs attempt improperly to amend their allegations by making new factual claims in their memorandum in opposition in an effort to salvage their otherwise deficient pleading. For the first time Plaintiffs provide "examples" of districts they contend are racially motivated, and identify statements purportedly demonstrating improper purpose. These assertions, however, appear nowhere in the original or Amended Complaint. "It is . . . well-settled that a complaint cannot be amended by the plaintiff's briefs in opposition to a motion to dismiss." *Bessinger v. Food Lion, Inc.*, 305 F. Supp. 2d 574, 581 (D.S.C. 2003) *aff'd sub nom. Bessinger v. Food Lion,*

6

*LLC*, 115 F. App'x 636 (4th Cir. 2004) (citing *Myland Labs., Inc. v. Akzo*, 770 F. Supp. 1053, 1068 (D. Md. 1991)).

Even with the additional information provided in the memorandum, Plaintiffs' claims are not based on any allegations sufficient to sustain recovery under some viable legal theory. Instead, they ask the Court to accept their "footless conclusions of law," *Ryan v. Scoggin,* 245 F.2d 54, 57 (10th Cir.1957), by assuming that the shape of certain districts or the statements of public officials in limited respects amount to factual allegations that race was the **predominant** factor in drawing election districts. However, Plaintiffs do not allege any facts that would support a claim that race predominated over traditional redistricting principles or that the consideration of race was unnecessary to comply with the Voting Rights Act.

Plaintiffs' claims at most demonstrate that race was merely **a** factor considered by the General Assembly. "Redistricting legislatures will almost always be aware of racial demographics; but it does not follow that race **predominates** in the redistricting process." *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (emphasis supplied); *see also Colleton County Council v. McConnell*, 201 F. Supp. 2d 618, 637 (D.S.C. 2002) ("[T]he legislature is always aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic facts. That sort of race consciousness does not lead inevitably to impermissible race discrimination . . . ."). For instance, Plaintiffs cite to statements by Defendants Harrison and Clemmons urging rejection of amendments affecting District 82, a majority-minority district, to avoid retrogression. Contrary to Plaintiffs' claims, these statements do not demonstrate that race predominated in drawing the plans, but instead show that the House considered race in a narrowly tailored effort to achieve a compelling state interest: avoiding the retrogression prohibited by Section 5 of the Voting Rights Act. *See, e.g.*,

7

*Shaw v. Hunt*, 517 U.S. 899, 904 (1996). Consequently, Plaintiffs have not presented factual allegations sufficient to maintain an unconstitutional racial gerrymander claim. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) require more than Plaintiffs' generalized attacks, and their reliance upon these limited statements simply does not support a claim of racial predominance.

Plaintiffs' vague references to certain districts "as examples of election districts that have an irregular shape," (ECF No. 59 at 12), also do not provide facts that support the conclusion that the districts are so bizarre that they are unexplainable on grounds other than race." *Shaw v. Reno*, 509 U.S. 630 (1993). To the contrary, the exhibits incorporated by Plaintiffs demonstrate that the shape of each district is substantially similar to the districts drawn by the *Colleton* court and set forth in the Benchmark plans. *See* **Ex. A (maps reflecting the districts in the *Colleton* and benchmark plans compared to the districts in Act 72); Ex. B (map reflecting the 6th Congressional district in the *Colleton* and benchmark plans compared to the district in Act 75).** *See Colleton*, 201 F. Supp. 2d at 647 ("[T]raditional redistricting principles in South Carolina have directed courts to maintain, where possible, cores of existing districts . . . by altering old plans only as necessary to achieve the requisite goals of the new plan.") (citing *South Carolina State Conference of Branches of the NAACP v. Riley,* 533 F. Supp. 1178, 1180 (D.S.C.), *aff'd,* 459 U.S. 1025 (1982)). Any modification was done to achieve compliance with "One Person, One Vote" and the Voting Rights Act and to ensure that minority voters continue to have an equal opportunity to elect representatives of their choice. *See* 42 U.S.C. § 1973(a). A Section 2 "compactness inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries." *Colleton County*, 201 F. Supp. 2d at 639 (quoting *Abrams v. Johnson,* 521 U.S. 74, 91 (1997) (emphasis added; internal

8

quotation marks and citations omitted)); *see also Bush v. Vera,* 517 U.S. 952, 977 (1996) ("A § 2 district that is *reasonably* compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries, may pass strict scrutiny without having to defeat rival compact districts designed by plaintiffs' experts in endless 'beauty contests.'"). "[B]ecause the cores [were] drawn with other traditional districting principles in mind," the fact that Acts 71, 72 and 75 maintain these cores "necessarily incorporates the state's other recognized interests in maintaining political boundaries." *Colleton*, 201 F. Supp. 2d at 649. Consequently, it is apparent that traditional redistricting principles were followed, and race did not predominate as asserted by Plaintiffs.

Plaintiffs' additional suggestion that race must have predominated because the plans "fail to keep political subdivisions such as counties and municipalities intact" is similarly unavailing. (ECF No. 59 at 12). Although Plaintiffs accurately state that South Carolina has a "strong preference for minimizing the splits of counties within her borders," *id.* at 12 (quoting *Colleton*, 201 F. Supp. at 648), this principle "occupies a subordinate role to the federal directives embodied in the United States Constitution and the Voting Rights Act. *Colleton*, 201 F. Supp. at 648. Furthermore, county splits may be justified because "[d]ifferent parts of a county may also lack commonality of interests" including divisions upon "rural/resort or rural/urban lines."[2] *Id.*

---

[2] Interestingly, Plaintiffs bemoan the fact that Act 75 "splits 11 counties" in support of an assertion that the plan does not follow traditional redistricting principles. However, the benchmark Congressional plan drawn by the *Colleton* court contained 12 split counties. Therefore, Act 75 actually enhances the protection of political subdivisions as demanded by Plaintiffs.

Similarly, Plaintiffs' assertion that "Act 72 splits 37 counties into two or more districts" is simply wrong. A review of Act 72 demonstrates that nine counties are wholly contained within one House district. In addition, a tenth county, Oconee County, contains exactly two House districts thus resulting in an effective "whole county." Finally, an 11th county, Abbeville, is wholly contained within District 11 with the exception of a very small portion of the county,

9

Plaintiffs have not pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and rely instead on "[t]hreadbare recitals of the elements of a cause of action supported by mere conclusory statements," *Ashcroft*, 129 S. Ct. at 1940, 1949 (citing *Twombly*, 550 U.S. at 556). Plaintiffs ask the court to make unwarranted factual deductions and to accept legal conclusions masquerading as facts as a basis upon which to advance their Amended Complaint. *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003). "Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### III. Challenging the Redistricting Plan as a Whole Does Not Confer Standing on any of the Plaintiffs Who Do Not Live in a District Challenged in the Amended Complaint.

In response to the contention that most of the Plaintiffs lack standing to maintain this action because they do not live in any of the allegedly infirm districts identified in the Complaint, Plaintiffs now aver that they all may challenge the districts in which they reside. (ECF No. 59 at 24.) The problem with this position is that Plaintiffs did not allege infirmities in many of those districts in the Amended Complaint and, thus, have not alleged a cognizable injury associated with those districts. *United States v. Hays*, 515 U.S. 737, 744 (1995) (holding that plaintiffs who do not live in a racially gerrymandered district lack standing to complain

---

populated by 66 people, that is drawn into District 7. The persons in this area are residents of the Town of Honea Path that is predominantly located in Anderson County. However, a small portion of the Town falls over the county line into Abbeville County. Contrary to the Plaintiffs admonition that the House "fail[ed] to respect county and municipal boundaries," Act 72 followed the boundaries of the Town in crafting Districts 7 and 11. Alternatively, the House could have divided the Town, separating this small portion of population from a clear municipal community of interest and engaging in exactly the type of redistricting conduct the Plaintiffs condemn. Therefore, when considering these issues, Act 72 contains the exact same number of whole counties as the plan ordered in *Colleton County* and as set forth in the 2003 Benchmark House plan.

about that district). Thus, the claims brought by Plaintiffs who do not live in a district expressly challenged in the Amended Complaint must be dismissed for lack of standing.

Although they do so for the first time in their opposition memorandum, Plaintiffs never alleged in the Amended Complaint a packing or other problem with House districts 59, 62, 67, 101, or 119, thus leading to Defendants' response that the Out-of-District House Plaintiffs[3] should be dismissed from the action. Plaintiffs also did not allege in the Amended Complaint a packing problem with any Congressional district other than district 6, leading to the response that the Out-of-District Congressional Plaintiffs[4] should be dismissed from the action.[5] Therefore, because the Amended Complaint lacks a factual basis to support standing for the Out-of-District Plaintiffs, they must be dismissed from the action. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("[I]it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."); *see also, e.g., Schneider v. Cal. Dept. of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (same); *Morgan Distrib. Co., Inc. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989) (same); *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (same); *see also Casa de Cambio Comdiv S.A., de C.V. v. United States*, 291 F.3d 1356, 1366 (Fed. Cir. 2002) (same).

Moreover, Plaintiffs' efforts to amend the Complaint through their opposition memorandum suffer from another, equally fatal infirmity: they have failed to allege any injury relating to the Newly-Identified Districts beyond a generalized grievance. Plaintiffs do not

---

[3] Defined as those plaintiffs who did not live in any of the House districts challenged in the Amended Complaint. (ECF No. 50 at 26.)

[4] Defined as those plaintiffs who did not live in Congressional district 6, the only Congressional district challenged in the Amended Complaint. (ECF No. 50 at 26.)

[5] Collectively, these districts raised in Plaintiffs' opposition memorandum but not in the Amended Complaint are referenced as the "Newly-Identified Districts."

challenge the Newly-Identified Districts on the basis that they have been gerrymandered, but rather that they have been impacted because the other districts identified in the Amended Complaint were allegedly racially gerrymandered. (*See* ECF No. 59 at 25 ("[B]y packing [the districts identified in the Amended Complaint] with BVAP, this scheme also impacts all districts *neighboring* the packed or manipulated districts.")). (Emphasis added). In other words, Plaintiffs' claim of an actual, concrete injury pertaining to the Newly-Identified Districts is based on the general claim that the redistricting plan involves racial gerrymandering rather than anything particular about those districts, which are not the focus of the gerrymandering claim. *See id*. at 25-26.

The Supreme Court, however, has expressly rejected this standing argument. In *United States v. Hays*, 515 U.S. 737 (1995), the Court held that Plaintiffs who did not live in the district that was the primary focus of their racial gerrymandering claim had not suffered a sufficient Constitutional injury to maintain an action against that district. *Id*. at 745-46 (holding that an allegation that the composition of the district in which plaintiffs resided would have been different if the allegedly gerrymandered district had been drawn another way did "not allege a cognizable injury under the Fourteenth Amendment"). Plaintiffs' reliance on *Miller v. Johnson*, 515 U.S. 900 (1995), is unavailing because that case held that the plaintiffs had standing to bring a racial gerrymandering claim ***about the district in which they lived***. *Id*. at 909 ("As residents of the challenged Eleventh District, all appellees had standing.") (citing *Hays*, 515 U.S. at 744-45).[6]

---

[6] Notably, *Hays* was argued on the same day and decided on the same day during the same term of the Supreme Court as was *Miller*. Thus, contrary to Plaintiffs' assertion that a "plaintiff may demonstrate individualized harm in two ways," (ECF No. 59 at 24), *Miller* does not set up another option for the Out-of-District Plaintiffs—or any plaintiff—to maintain an action against this redistricting plan. Rather, *Hays* and *Miller* together show that a plaintiff suffers the required Constitutional harm only by living in a district that is the primary focus of the challenge.

Furthermore, the *Hays* court expressly held that challenging the legislative act as a whole[7] does not permit plaintiffs to allege injury "as a direct result of having *personally* been denied equal treatment." *Id*. at 746 (internal quotation marks omitted) (emphasis in original). In short, just as the Supreme Court has rejected the same arguments made by Plaintiffs, so, too, must this Court.[8] The claims of the Out-of-District Plaintiffs should be dismissed with prejudice.

IV.     **Defendants Harrison and Clemmons are Entitled to Legislative Immunity.**

In opposing Defendants Harrison and Clemmons' motion to dismiss, Plaintiffs confuse the distinct concepts of absolute legislative immunity and sovereign immunity. As argued in their motion, Harrison and Clemmons are entitled to dismissal of the Amended Complaint on the ground of legislative immunity.[9] In response, Plaintiffs cite *Ex Parte Young*, which held that for a state official may be stripped of *sovereign* immunity if he has a connection with the enforcement of the act. 209 U.S. 123 (1908). Plaintiffs then argue that Defendants Harrison and Clemmons have this "'special relationship' to the challenged laws," (ECF No. 59 at 28) and therefore cannot assert sovereign immunity as a defense. However, this argument misses the mark because even if the alleged special relationship were to exist, it would not operate to deprive these elected members of the South Carolina House of Representatives from absolute immunity arising from their capacity as legislators.

---

[7] *See* ECF No. 59 at 25-26 ("Because the amended complaint challenges the legality of the redistricting laws in their entirety . . . .").

[8] Defendants continue to maintain that, for the reasons more fully set forth in the memorandum supporting their motion to dismiss and in other sections of this memorandum, all the Plaintiffs lack standing because all of their claims are generalized grievances not supported by sufficiently specific allegations.

[9] Defendant Harrell does not assert legislative immunity as a defense to the claims in the Amended Complaint.

Plaintiffs also misstate the law in arguing that legislative immunity does not apply when legislators are sued in their official capacities. Indeed it is precisely because they are sued in their official capacities that Harrison and Clemmons are entitled to be dismissed.[10]  "[S]tate and regional legislators are entitled to absolute immunity from liability . . . for their legislative activities." *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998). Plaintiffs argue that Harrison and Clemmons are subject to suit because they are the "architects of the laws at issue here," and chair the "Committee and Subcommittee . . . responsible for drafting the redistricting plans." (ECF No. 59 at 28). These actions, of course, are the very essence of their service as legislators, and are therefore the basis for, not an exception to, their immunity. *See also Supreme Court of Virginia v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 732 (1980) ("We have also recognized that state legislators enjoy common-law immunity from liability for their legislative acts, an immunity that is similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause . . . .").

Absolute immunity for legislators exists to protect legislators from the time, cost, and results of litigation. *See, e.g., Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 503 (1975); *Goldstein v. Moatz*, 364 F.3d 205, 212 (4th Cir. 2004) (providing "the purpose of absolute immunity 'is not to protect an erring official, but to insulate the decision making process from the harassment of prospective litigation.'" (citation omitted)). That is precisely the case here, and Plaintiffs concede the point by admitting that "[l]egislators engaged in legislative activity 'should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.'" (ECF No. 59 at 28) (citing *Dombrowski v. Eastland*, 387

---

[10] Plaintiffs cite two cases in which legislators were not sued in their official capacities and draw the incorrect conclusion that legislative immunity protects only against personal liability. (ECF No. 59 at 27) (citing *United States v. Johnson*, 383 U.S. 169 (1966) and *Tenny v. Brandhove*, 341 U.S. 367 (1951)).

U.S. 82, 85 (1967)). Harrison and Clemmons agree, and ask that the amended Complaint be dismissed as to them.

## Conclusion

For the reasons stated herein and in the Motions to Dismiss, Defendants Harrell, Harrison, and Clemmons respectfully request that the Court dismiss the Amended Complaint with prejudice.

        Respectfully submitted,

        SOWELL GRAY STEPP & LAFFITTE, L.L.C.

        By:    s/ Robert E. Stepp
                Robert E. Stepp
                Fed. I.D. No.: 4302.
                rstepp@sowellgray.com
                Robert E. Tyson, Jr.
                Fed. I.D. No.: 7815
                rtyson@sowellgray.com
                1310 Gadsden Street
                Post Office Box 11449
                Columbia, South Carolina 29211
                (803) 929-1400

                -and-

        WILLOUGHBY & HOEFER, P.A.

        Benjamin P. Mustian
        Fed. I.D. No.: 9615
        bmustian@willoughbyhoefer.com
        Tracey C. Green
        Fed. I.D. No.: 6644
        tgreen@willoughbyhoefer.com
        930 Richland Street
        Post Office Box 8416
        Columbia, South Carolina 29202
        (803) 252-3300

Columbia, South Carolina
January 4, 2012