IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| VANDROTH BACKUS, WILLIE HARRISON BROWN, CHARLESANN BUTTONE, BOOKER MANIGAULT, EDWARD MCKNIGHT, MOSES MIMS, JR, ROOSEVELT WALLACE, and WILLIAM G. WILDER, on behalf of themselves and all other similarly situated persons, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) | Civil Action No. |
| v. | ) | 3:11-cv-03120-PMD-HFF-MBS |
| | ) | |
| THE STATE OF SOUTH CAROLINA, NIKKI R. HALEY, in her capacity as Governor, KEN ARD, in his capacity as Lieutenant Governor, GLENN F. MCCONNELL, in his capacity as President Pro Tempore of the Senate and Chairman of the Senate Judiciary Committee, ROBERT W. HARRELL, Jr., in his capacity as Speaker of the House of Representatives, JAMES H. HARRISON, in his capacity as Chairman of the House of Representatives' Judiciary Committee, ALAN D. CLEMMONS, in his capacity as Chairman of the House of Representatives' Elections Law Subcommittee, MARCI ANDINO, in her capacity as Executive Director of the Election Commission, JOHN H. HUDGENS, III, Chairman, CYNTHIA M. BENSCH, MARILYN BOWERS, PAMELLA B. PINSON, and THOMAS WARING, in their capacity as Commissioners of the Elections Commission, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**REPLY IN SUPPORT OF DEFENDANT GLENN F. MCCONNELL'S
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM
UPON WHICH RELIEF CAN BE GRANTED
AND FOR LACK OF STANDING**

## INTRODUCTION

Plaintiffs' Memorandum in Opposition confirms that each of their claims is inescapably and fatally flawed as a matter of law. Plaintiffs admittedly make no attempt to satisfy the necessary preconditions for their vote dilution claims under Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973. *See Thornburg v. Gingles*, 478 U.S. 30 (1986). Thus, those claims necessarily fail. Even more fundamentally, Plaintiffs refuse to offer any hypothetical alternative plans that allegedly better satisfy the Voting Rights Act or the Constitution. This persistent failure necessarily forecloses *all* of their claims. All of Plaintiffs' claims are premised on the allegation that the challenged Plans dilute minority voting strength, and it is impossible to show vote dilution without showing what an *undiluted* districting scheme would look like.

The constitutional question is not, as Plaintiffs mistakenly believe, whether race was considered in drawing district lines—even Plaintiffs concede that such race-conscious line-drawing is required by Section 2 and (especially) Section 5 of the Voting Rights Act, as amended, 42 U.S.C. § 1973c. *See* Pls.' Mem. in Opp. to all Defs.' Mot. to Dismiss at 21 ("Pls.' Opp."). Rather, the question is whether race was considered in order to *purposefully dilute* black voting strength or, rather, to *avoid dilution* through the standard, statutorily-required creation of majority-black districts. Plaintiffs cannot maintain their allegation of purposeful dilution because they do not allege what the districts would look like if drawn by a Legislature without such an invidious purpose; that is, they have not alleged how the black population that is allegedly "packed" into majority districts should have been redistributed to create additional opportunities for black voters to elect their preferred candidates. Absent the presentation of such race-neutral alternatives, or any reference to such alternatives being presented to the Legislature,

1

it is impossible to infer that the enacted Plans are actually dilutive, much less that the Legislature selected the Plans *because of* this hypothetical dilutive effect.

Moreover, at a purely practical level, Plaintiffs' decision to eschew establishing the *Gingles* preconditions and the existence of a non-dilutive alternative renders it impossible to fairly adjudicate or remedy their claims. The Court will have no idea whether Plaintiffs' vague desire for dismantling some black-majority districts will actually result in Plans that harm minority voting strength and violate the Voting Rights Act, or, indeed, what remedy should be required to "cure" Plaintiffs' undefined "dilution." If such unfocused lawsuits are allowed to proceed, every jurisdiction that satisfies its obligations under the Voting Rights Act, particularly those jurisdictions covered by Section 5, will face the specter of similarly baseless, intrusive, and amorphous litigation simply because they *avoided* vote dilution. All of Plaintiffs' claims must therefore be dismissed or, at a minimum, virtually all must be dismissed for lack of standing.

## ARGUMENT

Plaintiffs' Complaint entirely fails to state a claim. *First*, Plaintiffs *concede* that their Complaint "makes no attempt to satisfy the *Gingles* preconditions" required to state a valid vote dilution claim under Section 2 of the Voting Rights Act. Pls.' Opp. at 18. This concession alone is fatal to their Section 2 claims. And even if they had not conceded as much, Plaintiffs in fact *cannot* state a valid Section 2 claim. They do not allege it was possible to create any additional *majority*-minority district, as required by the first *Gingles* precondition. In fact, Plaintiffs assert that the *Gingles* preconditions do not apply to their Section 2 claims. *See* Pls. Opp. at 18. In any event, they affirmatively allege that white voters in the challenged districts *do not* vote as a bloc to defeat black candidates, and thus allege that the third *Gingles* precondition is *not* present. *See* Am. Compl. at ¶¶ 43(c), 45(b), 47(b), 79-80; Pls.' Opp. at 18. Indeed, the Supreme Court has

squarely rejected the precise arguments that Plaintiffs advance.  *See Bartlett v. Strickland*, 556 U.S. 1, 129 S. Ct. 1231, 1236, 1244 (2009) (opinion of Kennedy, J.); *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).

*Second*, even if Plaintiffs had alleged the *Gingles* preconditions, all of their claims nevertheless fail because they have not alleged any hypothetical alternative plans that would have better satisfied the Voting Rights Act or the Constitution.  *See, e.g.*, *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 480 (1997) (*Bossier I*); *Hall v. Va.*, 385 F.3d 421, 428 (4th Cir. 2004).  Because Plaintiffs have chosen to argue that the State devised its redistricting scheme to dilute minority voting strength, they must set forth an alternative undiluted plan that the State *should have* adopted.  But they have not even attempted to do so—and have offered no cognizable reason to excuse this fatal absence.

In any event, Plaintiffs lack standing to bring their claims.  Because Plaintiffs have alleged no hypothetical alternatives, they have failed to allege that the challenged Plans have actually injured them or how any alleged injury could be redressed by this Court.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  In addition, Plaintiffs openly admit that they reside in only a handful of the districts they attack.  And clear Supreme Court precedent holds that Plaintiffs have standing to challenge only those districts.  *See United States v. Hays*, 515 U.S. 737, 742-42 (1995).

I.    **PLAINTIFFS' VOTE DILUTION CLAIMS UNDER § 2 OF THE VOTING RIGHTS ACT MUST BE DISMISSED BECAUSE THEY ADMITTEDLY MAKE NO ATTEMPT TO SATISFY THE REQUIREMENTS FOR SUCH CLAIMS**

For Plaintiffs to state a Section 2 vote dilution claim, their allegations must satisfy three preconditions originally articulated by the Supreme Court in *Thornburg v. Gingles*.  *See* 478 U.S. at 50-51; *see also* Mem. in Support of  Def. McConnell's Mot. to Dismiss at 10 ("Def.'s Mem.");

Pls.' Opp. at 17.  Specifically, under the *Gingles* requirements: "(1) The minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district, (2) the minority group must be politically cohesive, and (3) the majority must vote sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Bartlett*, 129 S. Ct. at 1241 (quoting *Gingles*, 478 U.S. at 50-51) (internal quotation marks and alterations omitted).  Most important here, the Supreme Court has squarely held that "[o]nly when a geographically compact group of minority voters could form a *majority* in a single-member district has the first *Gingles* requirement been met," and that the third *Gingles* requirement cannot be met where "white voters join in sufficient numbers with minority voters to *elect* the minority's preferred candidate." *Bartlett*, 129 S. Ct. at 1236, 1244 (emphases added); *see also Hall*, 385 F.3d at 429-30.

Despite the need to allege these essential elements, Plaintiffs openly concede "that the Amended Complaint makes no attempt to satisfy the *Gingles* preconditions." Pls.' Opp. at 18.  Specifically, Plaintiffs admit they "are not asking for the creation of any majority-black districts." *Id.* at 3.  Indeed, as Plaintiffs themselves explain, the "creation of majority-black districts is the offense" alleged, "not the remedy" sought. *Id.* at 18.  This admission contradicts the clear holding in *Bartlett* and thus confirms that Plaintiffs' allegations cannot meet the first *Gingles* precondition. *See* 129 S. Ct. at 1236; *Hall*, 385 F.3d at 429-30.  In addition, Plaintiffs affirmatively allege that white voters in the challenged districts do not vote as a bloc to defeat black candidates. *See* Am. Compl. at ¶¶ 43(c), 45(b), 47(b), 79-80; Pls.' Opp. at 18  (alleging the existence of "bi-racial coalitions").  This admission confirms that Plaintiffs cannot meet the third *Gingles* precondition. *See Bartlett*, 129 S. Ct. at 1244; *Voinovich*, 507 U.S. at 158; *see also*

4

*Abrams v. Johnson*, 521 U.S. 74, 92-93 (1997).  Thus, under Plaintiffs' own explanation of their Section 2 claims, those claims *necessarily* fail.

       1.      Plaintiffs' principal response to this black-letter law is to blithely assert that the "*necessary preconditions*," 478 U.S. at 50, of *Gingles* somehow do not apply when the allegation is that dilution is caused through "packing" into majority-minority districts.  *See* Pls.' Opp. at 18.  But this assertion is directly contrary to Supreme Court and Fourth Circuit precedent, which plainly establishes, as this Court recognized when addressing an identical "packing" argument in *Colleton County Council v. McConnell*, 201 F. Supp. 2d 618, 624, 644 (D.S.C. 2002), that the three *Gingles* "factors must be proven in each case," *id.* at 640.

       Bizarrely, Plaintiffs chiefly rely on *Voinovich v. Quilter*, 507 U.S. 146 (1993), for the existence of this alleged exemption from the *Gingles*' preconditions, but that case squarely holds just the opposite.  There, the district court accepted *precisely* the Section 2 dilution claim advanced here—*i.e.*, that the plan "'packed' black voters by creating districts in which they would constitute a disproportionately large majority," *id.* at 149, which allegedly had "a dilutive effect on black votes" because "coalitional voting between whites and blacks" ensured that "black candidates" could be "elected from districts with only a 35% black population," *id.* at 151-52.  *See also id.* at 158 ("The complaint in [this] case is not that black voters have been deprived of the ability to constitute a *majority*, but of the possibility of being a sufficiently large *minority* to elect their candidate of choice with the assistance of cross-over votes from the white majority.").  The Supreme Court unanimously reversed, holding that the *Gingles* preconditions applied and that the "packing dilution" claim had to be dismissed for failure to satisfy them.  *See id.* at 157-58.  The Court assumed, pre-*Bartlett*, that the first *Gingles* precondition, the "majority-in-a-district" requirement, "would have to be modified or eliminated" if influence-dilution claims

were cognizable under Section 2.  *Id.* at 158.  The Court nonetheless held that the plaintiffs failed to satisfy the third precondition, the white bloc voting requirement.  *Id.*  The plaintiffs' allegations that the white majority *supported* minority candidates in sufficient numbers to elect them in mere 35% black districts ran headlong into the need to allege that there was "sufficient white majority bloc voting to *frustrate* the election of the minority group's candidate of choice." *Id.* (emphasis added).  Plaintiffs' Section 2 claims in this case suffer from the same fundamental flaw: By contending that less-than-majority black districts will elect black-preferred candidates through significant white support, they are unable to allege or prove white bloc voting, as required by the third *Gingles* precondition.

The Fourth Circuit has also held that the *Gingles* preconditions must be satisfied in "packing" cases.  Specifically, in *Hall v. Virginia*, the Fourth Circuit affirmed the dismissal of "packing" claims that sought to create crossover districts, on the basis that the plaintiffs had "failed to satisfy all of the 'necessary preconditions' for a Section 2 claim established by the Supreme Court in *Thornburg v. Gingles*."  385 F.3d at 426.  In reaching this conclusion, the *Hall* court explained that the "size, compactness, and cohesiveness requirements of the *Gingles* preconditions are at the heart of the measure of undiluted voting strength that the Supreme Court has adopted for vote dilution claims."  *Id.* at 428.

2.     Plaintiffs also maintain, Pls.' Opp. at 18, that the first *Gingles* precondition as interpreted in *Bartlett* may not be required when purposeful discrimination is alleged.  *See Bartlett*, 129 S.Ct. at 1246 (holding open the possibility that a Section 2 plaintiff could challenge the failure to create, for example, a 49% minority district if done purposefully to dilute).  But even assuming Plaintiffs are correct, this means only that the *first* precondition may not apply, which would be the same situation as *Voinovich*, where the Court assumed that the first

6

precondition was inapplicable.  Thus, like the *Voinovich* plaintiffs, Plaintiffs here still must

establish the *third* precondition by showing "white bloc voting."  Their failure even to *allege*

such voting dooms their claims.  *See Voinovich*, 507 U.S. at 158.  Indeed, *Voinovich* dismissed

the dilution claim for failure to satisfy the third precondition even though *purposeful*

discrimination was alleged and found by the district court.  *See id.* at 149, 152.  The same result

must therefore obtain here regardless of Plaintiffs' "purpose" allegation.

   This rule makes perfect sense.  If Plaintiffs are pursing the atypical and counter-intuitive

claim that, *because of overwhelming white support*, black voters are better off in districts where

they are a *minority* than in districts where they *control* the electoral outcome as a *majority*, this is

in obvious, irreconcilable tension with the third precondition's requirement that bloc voting by

the white majority *defeats* minority candidates.  Thus, it is incumbent upon Plaintiffs to, at a

minimum, somehow reconcile the seemingly conflicting allegations that minority-preferred

candidates are electable in minority-black districts (where electability is possible only because of

the *absence* of white bloc voting) and that there is nonetheless white bloc voting.  The failure to

credibly meet this burden thus defeats Plaintiff's claim.  (And in all events, as explained below,

the presence of a "purpose" allegation certainly does not somehow exempt Section 2 plaintiffs

from identifying a non-dilutive alternative).

   Thus, on their own terms, Plaintiffs' Section 2 claims unavoidably fail.

## II. ALL OF PLAINTIFFS' CLAIMS MUST BE DISMISSED BECAUSE THEY FAIL TO ALLEGE ANY HYPOTHETICAL ALTERNATIVES TO THE CHALLENGED PLANS

  Even if the *Gingles* preconditions did not doom Plaintiffs' case, their failure to present

alternative plans for the three challenged redistrictings certainly does so.  The Fourth Circuit and

the Supreme Court have repeatedly made clear that such a proposed alternative is necessary for a

dilution claim, whether the dilution allegation is the typical failure to create majority-minority districts or Plaintiffs' atypical claim that such districts harm minorities. Those courts have repeatedly ruled that "[a]ny claim that the voting strength of a minority group has been 'diluted' *must* be measured against some reasonable benchmark of 'undiluted' minority voting strength." *Hall*, 385 F.3d at 428 (emphasis added); *accord Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 (2000) (*Bossier II*) ("[T]he comparison *must* be with a hypothetical alternative . . . ." (emphasis added)); *Bossier I*, 520 U.S. at 480 ("[T]he very concept of vote dilution implies— and, indeed, *necessitates*—the existence of an 'undiluted' practice against which the fact of dilution may be measured." (emphasis added)); *Holder v. Hall*, 512 U.S. 874, 880 (1994) (opinion of Kennedy, J.); *Colleton Cnty.*, 201 F. Supp. 2d at 635. And for an alternative to be undiluted, as compared to the enacted plan, it must provide "the possibility of creating more than the existing number" of compact minority districts. *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399, 430 (2006) (opinion of Kennedy, J.) (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994)) (emphasis added).

Here, Plaintiffs have alleged no hypothetical alternative plans at all, and thus all of their claims necessarily fail. Indeed, the need for such a non-dilutive alternative proposal is even greater under Plaintiffs' atypical contention that there are *too many* majority-black districts than it is in the typical case alleging that there are *too few* districts. Majority-black districts are the traditional method of empowering minority voters and can possibly harm their overall voting strength only if creating such majority districts *forecloses additional districts* where minorities can have electoral success. For instance, a plan with 5 "safe" majority-black districts containing more black voters than "necessary" to elect a black-preferred candidate obviously does not dilute black voting strength as compared to a plan which also has 5 districts, but where the black

population is smaller and it is more difficult to elect a black-preferred candidate. Thus, a 5 "minority safe seat" plan can possibly be dilutive or constitute "packing" only if there is an alternative which would contain more than 5 opportunity districts. Consequently, an allegation that there is an alternative plan available containing a greater number of performing districts is necessary to support a "packing" claim. That being so, it is particularly incumbent upon Plaintiffs in these circumstances to show how minority voting strength would somehow be enhanced by dismantling existing majority-black districts and, equally important, how such dismantling can be successful if there is *white bloc voting*—which would seem to be at war with the notion that there is very significant white voting support for minority candidates.

This requirement for a non-dilutive alternative simply applies the common-sense rule that federal courts are "required to determine the consequences of [an] apportionment plan before ruling on its validity; the failure to do so [is] error." *Voinovich*, 507 U.S. at 155. One cannot assess the "consequences" of a plan without considering potential alternatives. And, as *Voinovich* also emphasized, Section 2 is only "violated if '*it is shown*' that a state practice has [a prohibited] effect" and the "burden of 'show[ing]' the prohibited effect, of course, is on the plaintiff." *Id.* at 155-156 (emphasis in original). Here, Plaintiffs have expressly eschewed undertaking the burden of alleging or showing hypothetical alternative plans that mitigate the adverse consequences of the enacted Plans, and thus all of their claims necessarily fail.

1.      While Plaintiffs' complete failure to allege any non-dilutive alternatives most obviously precludes their Section 2 claims, it necessarily forecloses Plaintiffs' constitutional claims as well. Plaintiffs stake both their Section 2 claims *and* their constitutional claims on their theory that the enacted Plans dilute minority voting strength. *See* Am. Compl. at ¶¶ 63(e), 64(e), 65(e) ("Defendants' purpose in passing" the enacted Plans "was to reduce the number of

election districts where black voters could determine or could help determine the winner.").
Having chosen that path, Plaintiffs must satisfy the elements of their theory, including the need
to allege hypothetical alternative plans in order to demonstrate the existence of dilution.

As explained in Defendant McConnell's opening brief, the purposeful vote dilution
claims that Plaintiffs assert under the Equal Protection Clause cannot succeed unless Plaintiffs
first show *actual* vote dilution. *See Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 771 (9th Cir.
1990) ("[P]laintiffs must show that they have been injured as a result" of the allegedly
"intentional discrimination."); Def.'s Mem. at 23.  It cannot be inferred that a redistricting plan
has the purpose of diluting minority voting strength unless it is possible to dilute minority voting
strength, and that possibility exists only if an undiluted alternative exists—but Plaintiffs have not
alleged or offered any such alternative.  In fact, to establish purpose, plaintiffs need to do even
more than show that a undiluted alternative exists; they must also show that this alternative was
presented to the Legislature, such that it could conceivably have affected their purposeful
decision to adopt the "dilutive" alternative. *See City of Mobile v. Bolden*, 446 U.S. 55, 69
(1980); *Shaw v. Hunt*, 517 U.S. 9899, 910 (1996) (*Shaw II*) (rejecting use of post-enactment
evidence to show legislative intent).

There is particular need for non-dilutive alternatives where, as here, the alleged dilution
is allegedly caused by majority-black districts, which Plaintiffs themselves contend guarantee
black electoral *success* here, Pls.' Opp. at 21, and which are at least presumptively required by
Section 2 and Section 5 of the Voting Rights Act.  Districts that guarantee *success* are inherently
non-dilutive absent a showing that they came at the expense of additional districts.  Moreover,
acceptance of unfocused claims like Plaintiffs' would also mean that all plans complying with
the Voting Rights Act would presumptively violate the Constitution—a result that could only

serve to deter voluntary and effective compliance with the Act.  Such undermining of the Act might serve the policy agenda of Plaintiffs' counsel, given his oft-repeated view that the Voting Rights Act is an outmoded statute that causes minority voting strength to "atrophy,"[1] but it would certainly not be in the best interests of minority voters.

2.      Contrary to Plaintiffs' mistaken impression, their repeated allegation that district lines were "irregularly shaped" for racial reasons does not state a purposeful dilution claim in the absence of proposing a race-neutral alternative with less dilutive effect.  First, of course, it is quite impossible to determine that "irregular shapes" caused dilution without any allegation or showing that a plan with "regular shapes" would provide more opportunities for minority voters. Second, and in any event, having alleged dilution, it is not sufficient for Plaintiffs to state that consideration of race caused district lines to be drawn in a certain way.  This is because race can be considered both in order to *dilute* black voting strength and in order to *avoid* such dilution. Normally, race-conscious creation of majority-black districts is done to avoid dilution, in compliance with the Voting Rights Act, so Plaintiffs' allegation that the Legislature deliberately created majority-black districts hardly suggests an effort to dilute—if anything, it equally suggests the opposite.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009) ("[W]here the well-pleaded facts do not permit the court to infer more than the mere *possibility*

---

[1] *See* Naftali Bendavid, *Jagged Maps Slice Up Old Alliances*, Wall St. J., Dec. 17, 2011, http://online.wsj.com/article/SB10001424052970204844504577100602517296674.html (quoting Plaintiffs' counsel as saying: "[The Voting Rights Act was] a remedial measure, like a cast. If a cast is on too long, the leg atrophies. Now, the legislation is atrophying."); Joshua Miller, *Redistricting Spurs Debate Over Voting Rights Act*, Roll Call, Jan. 1, 2012, http://www.rollcall.com/news/redistricting_spurs_debate_voting_rights_act-211299-1.html?pos=hln (quoting Plaintiffs' counsel as stating "that major parts of the [Voting Rights Act] ha[ve] outlived its usefulness").

11

of misconduct, the complaint . . . has not shown . . . that the pleader is entitled to relief" (internal quotation and alteration marks omitted)); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567-68 (2007) (holding that the complaint must be dismissed because there was an equally plausible, lawful explanation for defendants' behavior). Thus, unlike plaintiffs bringing claims under the *Shaw v. Reno*, 509 U.S. 630 (1993) (*Shaw I*), line of cases, Plaintiffs here must allege not only that race predominated over traditional principles in drawing majority-black districts, but that the purpose of this race-consciousness was to harm black voters. There is no such specific allegation and, in fact, most of the Memorandum in Opposition's new elaboration on Plaintiffs' allegations affirmatively refute any such notion.

*First*, at least for the Senate, Plaintiffs seem to concede that the primary purpose of the majority-black districts was to comply with Section 5 by avoiding retrogression. *See* Pls.' Opp. at 20-21. Compliance with Section 5's mandate to *preserve* minorities' "ability to elect," cannot rationally be squared with a  purpose to *decrease* minorities' "ability to elect."[2]

*Second*, as noted, Plaintiffs affirmatively allege that the Legislature's districts *guarantee* minorities' *success*. The creation of guaranteed beneficial election results cannot possibly harm

---

[2] Plaintiffs correctly note that not every *claimed* effort to comply with Section 5 avoids discriminatory purpose liability. *See* Pls.' Opp. at 21 (citing *Bush v. Vera*, 517 U.S. 952 (1996)). But *Bush v. Vera* simply made the obvious point that increasing a 35% minority district to a 51% minority district had nothing to do with compliance with Section 5. *Id.* (citing *Bush*, 517 U.S. at 982-83 (controlling opinion). Here there is no allegation that the Legislature could have complied with Section 5 by dismantling the majority-black districts, or that the Justice Department would have ever precleared such a facial violation. And a majority of the Supreme Court has opined that compliance with the Voting Rights Act does defeat any showing of liability. *See Bush*, 517 U.S. at 1004 (Stevens, J., dissenting, joined by Ginsberg and Breyer, J.J.); *id.* at 1065 (Souter, J., dissenting, joined by Ginsberg and Breyer, J.J.); *LULAC*,  548 U.S. at 518-19 (Scalia, J., concurring in the judgment in part and dissenting in part, joined by Roberts, C.J., Thomas, J., and Alito, J.); *see also Bush*, 517 U.S. at 992 (O'Connor, J., concurring).

minority voters unless, again, it leads to fewer opportunities than presented in a non-discriminatory alternative which, again, Plaintiffs have failed to proffer.

*Third*, while the Memorandum in Opposition, unlike the Complaint, finally deigns to identify allegedly "irregular" Senate Districts—Districts 20, 22, 25, 26, 29, 30, 31, 35 and 36—the vast majority (seven out of nine) of these districts are *not* majority-black. *See* Pls. Opp. at 12. Moreover, this general *post hoc* allegation says nothing about how these "irregular" lines subordinate traditional redistricting principles to race or dilute minority voting strength. *See* Plaintiffs' Opp. at 12. Similarly, Plaintiffs offer no explanation as to how Congressional District 6's lines are unconstitutionally "irregular" or fail to follow traditional principles. *See id.* at 13.

*Fourth*, Plaintiffs continue to fail to distinguish between race and politics. This distinction is required because, when "racial identification is highly correlated with political affiliation," *Easley v. Cromartie*, 532 U.S. 234, 243 (2001), as Plaintiffs affirmatively allege here, Am. Compl. at ¶ 41, plaintiffs must demonstrate that race, *rather than politics*, predominated over traditional redistricting principles. *Easley*, 532 U.S. at 243. And to do so, they must posit alternative plans that would have achieved "significantly greater racial balance" while satisfying traditional redistricting principles and legitimate political objectives to the same degree as in the challenged Plans. *Easley*, 532 U.S. at 258. Because Plaintiffs have offered *no* alternative plans, they quite obviously fail to satisfy this requirement.

In light of these myriad shortcomings, Plaintiffs cannot be allowed to proceed. Indeed, if a trial were to be held on the basis of Plaintiffs' unfocused allegations, it would be essentially meaningless. There could be no serious liability findings because there is no true alternative that purportedly would have been followed by a Legislature not intent on diluting minority voting strength. Moreover, the absence of a proposed alternative not only precludes any realistic

13

determination of the reasons why the Legislature adopted its alternative, it wholly foreclosures the entry of any remedy. This is particularly true since Plaintiffs refuse to clarify such basic issues as whether they are seeking "influence" or "crossover" (or both) districts to substitute for the majority-black districts they have concerns about. *See* Def.'s Mem. at 14-15. Since Plaintiffs will not and cannot identify what Defendants would have done absent the alleged unconstitutional purpose, or what plan is needed to avoid the statutorily impermissible dilutive "result," there are simply no cognizable fact issues to adjudicate.[3]

## III. PLAINTIFFS LACK STANDING BECAUSE THEY HAVE FAILED TO ALLEGE ANY COGNIZABLE INJURY TRACEABLE TO THE DISTRICTS IN WHICH THEY RESIDE

Finally, Plaintiffs lack standing to bring any of their claims. *First*, Plaintiffs do not reside in the vast majority of the districts they challenge. As a general rule, plaintiffs must reside in a district to have standing to challenge that district under Section 2 or the Constitution. *See Hays*, 515 U.S. at 745; *Hall v. Virginia*, 276 F. Supp. 2d 528, 531 (E.D. Va. 2003), *aff'd*, 385 F.3d 421; Pls.' Opp. at 24. The only exception to this rule is when a plaintiff can show that he "has *personally* been subjected to a racial classification." *Hays*, 515 U.S. at 745 (emphasis added). Plaintiffs make no attempt to satisfy this exception, but instead contend that "[a] plaintiff is harmed by the entire redistricting law if the predominant factor in drafting the law is race." Pls.' Opp. at 24. This amounts to nothing more than a bald assertion that racial gerrymander claims

---

[3] Plaintiffs' last-ditch effort to bootstrap their claims under the Fifteenth Amendment likewise fails. As explained in Defendant McConnell's opening brief, the Fifteenth Amendment adds nothing to the Fourteenth Amendment gerrymander analysis. *See Shaw I*, 509 U.S. at 645. Indeed, the Supreme Court has never "held any legislative reapportionment inconsistent with the Fifteenth Amendment." *Voinovich*, 507 U.S. at 159. This is because the Fifteenth Amendment seems to reach nothing beyond "access to the ballot," not the vote dilution alleged here. *Nw. Austin Mun. Util. Dist. v. Holder*, 557 U.S. 193, 129 S. Ct. 2504, 2520 (2009).

present a special exception to the universal rule against generalized grievances—an argument *Hays* explicitly rejected.  *See* 515 U.S. at 743.  At most, therefore, Plaintiffs can challenge only the districts in which they reside.  Of those districts, Plaintiffs' Complaint attacks only three Senate Districts (Districts 19, 22, and 29) and five Congressional Districts (Districts 1, 2, 5, 6, and 7).

*Second*, and more fundamentally, Plaintiffs have failed to allege that they have suffered any injury causally connected to the enacted Plans, or that a decision in their favor would redress any injury they have suffered.  Because Plaintiffs have not alleged an undiluted alternative showing how the Plans *ought to* have been drawn, Plaintiffs cannot show, as they must to possess standing, that failure to draw the Plans in that way caused them any "injury in fact" or that there is "a causal connection between the injury and the conduct complained of," *Hays*, 515 U.S. at 742-43 (internal quotation marks omitted).  Likewise, without any alleged alternatives to guide the Court in crafting a remedy, it is not at all "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.*   For this reason, Plaintiffs lack standing to bring *any* of their claims as to *any* districts in *any* of the enacted Plans.

## CONCLUSION

For the foregoing reasons,  Defendant McConnell's Motion to Dismiss should be granted.


*Signature Page Follows.*

Respectfully submitted,


/s/ William W. Wilkins
William W. Wilkins    Fed ID No. 4662
Kirsten E. Small        Fed ID No. 10005
NEXSEN PRUET, LLC
55 East Camperdown Way (29601)
Post Office Drawer 10648
Greenville, SC 29603-0648
PHONE: 864.370.2211
BWilkins@nexsenpruet.com


Michael A. Carvin (admitted *pro hac vice*)
Louis K. Fisher (admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001-2113
PHONE: 202.879.3637
macarvin@jonesday.com


*Attorneys for Defendant Glenn F. McConnell*

January 4, 2012
Greenville, South Carolina

16