THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| VANDROTH BACKUS, WILLIE HARRISON BROWN, CHARLESANN BUTTONE, BOOKER MANIGAULT, EDWARD MCKNIGHT, MOSES MIMS, JR, ROOSEVELT WALLACE, and WILLIAM G. WILDER, on behalf of themselves and all other similarly situated persons,<br><br>             Plaintiffs,<br><br>SENATOR DICK ELLIOTT<br><br>             Intervener-Plaintiff<br><br>v.<br><br>THE STATE OF SOUTH CAROLINA, NIKKI R. HALEY, in her capacity as Governor, GLENN F. MCCONNELL, in is capacity as President Pro Tempore of the Senate and Chairman of the Senate Judiciary Committee, ROBERT W. HARRELL, JR, in his capacity as Speaker of the House of Representatives, MARCI ANDINO, in her capacity as Executive Director of the Election Commission, JOHN H. HUDGENS, III, Chairman, NICOLE S. WHITE, MARILYN BOWERS, MARK BENSON, and THOMAS WARING, in their capacity as Commissioners of the Election Commission,<br><br>             Defendants. | Case No.: 3:11-cv-03120-HFF-MBS-PMD<br><br><br><br>AFFIDAVIT OF THE HONORABLE<br>JAMES E. CLYBURN |

I, James E. Clyburn, being duly sworn, state as follows:

    1. I represent South Carolina's Sixth Congressional District in the United States House of Representatives. I was first elected in 1992 and have served the people of the Sixth District ever

since. During my service in the Congress, I have had the privilege of serving as the Majority Whip, Chairman of the Congressional Black Caucus, and Vice Chair and Chairman of the House Democratic Caucus. I am currently serving as the Assistant Democratic Leader in the 112th Congress.

2. I currently reside in Columbia, South Carolina. I was born and raised in Sumter, South Carolina. Prior to running for public office, I was involved in the Civil Rights movement as a student leader and member of the NAACP. As a young community organizer, I helped organize marches and demonstrations in an effort to repeal Jim Crow laws in the South. In 1971, in the aftermath of the "Orangeburg Massacre" and Charleston Hospital Strike, Governor John West appointed me as the first black South Carolinian to serve in the inner circle of South Carolina government since Reconstruction. In 1974, Governor West appointed me to lead the South Carolina Human Affairs Commission, a post I held until 1992 when I first ran and was elected to the United States Congress.

3. During my lifetime, I have witnessed dramatic progress toward greater racial equality in South Carolina and all across America. Much of this progress came at great cost during the Civil Rights efforts of the 1960's and 1970s. Many brave Americans suffered personal intimidation and physical violence at the hands of their white neighbors for seeking access to the rights secured them by our Constitution. That progress has been made cannot be seriously doubted, but neither should it be taken for granted. I am proud to serve in the Congress during the presidency of President Barack Obama. I am also proud to be one of two black Congressmen from South Carolina. While I often disagree with my friend, Congressman Tim Scott (CD-1), our elections prove that voters in our state, both white and black, are increasingly willing to look to the content of one's character rather than skin color when choosing a candidate, although I think it is rather safe to say that neither one of us could get elected in the other's District.

4. Much of this political progress black candidates and voters have made in our state was made possible by the Voting Rights Act of 1965. Congress understood in passing the Voting Rights Act that it was necessary to give black voters an opportunity to elect candidates who would represent their common interests. This often required the creation of super-majority black districts with 65 percent or more of the population being black. At that time, this was the only way to ensure that black voters would have a chance to compete. A black candidate could not expect to win many white votes. The black community was under-registered to vote and often would not turnout to vote in the same numbers as whites due to decades of Jim Crow laws and voter suppression.

5. South Carolina has made great progress in race relations since the Voting Rights Act was first passed. While old prejudices about race are often slow to change, many things have clearly changed for the better. We have elected many black candidates to all levels of South Carolina government. Many of these black office holders are elected with the help of white voters, including some in districts where black voters are not a majority of the district's population. State Senators Floyd Nicholson and Gerald Malloy, for example, were both elected in districts that were not majority black districts. Many black members of the state House of Representatives are also elected with less than fifty percent of their district comprised of black voters.

6. In light of the progress we have made in race relations, I am very concerned that South Carolina's adopted redistricting laws, particularly Act 75 of 2011 drawing election districts for the United States Congress, is a substantial step backward for black voters in our state. I believe Act 75 is a discriminatory effort to unlawfully "pack" black voters into the Sixth Congressional District.

7. When the Federal Court drew South Carolina's Congressional Districts in 2002, the Sixth District had a Black Voting Age Population (BVAP) of 53.55 percent. Between 2002 and 2010, the BVAP of the District fell, as a result of natural population shifts, to 52 percent.

8. I believe black voters in the Sixth District will continue to choose me as their preferred representative in Congress. I also believe I have earned the trust of many of my white constituents who have also voted for me as their preferred member of Congress. Despite the reduction in the BVAP of the Sixth Congressional District between 2002 and 2010, I was reelected five times, with between 62.9 percent and 67.5 percent of the vote. On average, I received 65.8 percent of the vote during this period. In spite of these facts, Act 75 increases my BVAP to 55.18 percent.

9. I did not ask the General Assembly to increase the BVAP of the Sixth Congressional District. I also believe doing so is unnecessary to comply with the Voting Rights Act where the previous five elections demonstrate that a BVAP of 52 percent seems sufficient for black voters to elect their candidate of choice.

10. I believe the Congressional Redistricting plan is an intentional effort to decrease black voters' political influence in South Carolina outside of the Sixth Congressional District. I believe the General Assembly packed as many black voters as possible into the Sixth District in order to prevent them from influencing elections in districts adjacent to the one in which I serve.

11. As a member of Congress, I cannot represent the interests of every South Carolinian who happens to be black. I can only represent the interests of the communities in my district, whether they are black or white. The new Sixth District is the largest of all the new districts in terms of geography. It includes very diverse communities, many of which have little in common with one another. For example, the Sixth District has expanded further north into Columbia's mixed-race northeastern suburbs but it also adds more of the city of Charleston by running down to the

4

Charleston Peninsula then turning north to add densely populated black neighborhoods on the northern portion of the Peninsula. The new district also adds Allendale, Hampton, and Jasper Counties, some of our state's poorest rural black areas. All of these communities have distinct needs and desires regardless of the race of the people who reside in them.

12. I also object to the manner in which the Congressional Plan trades white former constituents for new black constituents. In many of the areas where the new Congressional Plan engages in these trades it is completely unnecessary in order to accommodate the new Seventh Congressional district in the Pee Dee or to accommodate another redistricting goal like improving the shape or compactness of the district or keeping communities of interest intact.

13. For example, the adopted plan trades an area I previously represented in Orangeburg County for a different piece of geography in the southern part of Orangeburg County. The new area has a higher concentration of black voters. This is objectionable because I had cultivated relationships with many of the voters who were taken out of my district. This trade also does not serve any legitimate purpose since the new plan still divides Orangeburg County between the Sixth and Second Congressional Districts. Similarly, the Congressional Redistricting plan also trades white areas for black areas in Charleston and Berkeley Counties. This has the effect of making an already unusual looking protrusion into the Sixth District even more unusual as the adopted Sixth District now hooks around the eastern side of Berkeley County then hooks northward up the Charleston Peninsula.

14. Other areas in the new Sixth District also appear to have been driven by packing black voters in and keeping white voters out. For example, the new Sixth District gives up a substantial portion of Sumter County. However, it retains the easternmost portion of Sumter County that includes a predominantly black area on the eastern side of the City of Sumter. In order for me to

reach my new constituents in Sumter County, I will have to drive through the Fifth Congressional District.

15. My objections to Act 75 have nothing to do with the particular voters or areas of the state that I am happy to represent if I am fortunate enough to win another term in Congress. I have represented the Midlands, the Pee Dee and the Low Country as a member of Congress and I have great affection for the people and places in each of these regions. However, the adopted Sixth District cannot represent the interests of any of these areas adequately if it only includes neighborhoods where black voters live.

16. I believe the adopted Congressional Plan harms my constituents, both black and white, by further separating them on the basis of race. Act 75 blatantly trades a great number of my white constituents for black constituents in what I believe is an intentional effort to re-segregate our citizens politically. I believe this is a step backwards for South Carolina. The purpose of the Voting Rights Act is to level the playing field for minority candidates and voters, not to re-segregate our society along strictly racial lines. Black voters want results on issues that matter in their daily lives. Because black voters are a minority in our state, they must, at some point, work together with white voters to elect representatives that both white and black voters agree will represent their interests. Packing black voting power into the Sixth Congressional District ensures this will never happen.

17. Any suggestion that the Voting Rights Act requires this type of segregation is an affront to the very purpose of the Voting Rights Act, and I encourage this Court to reject it. I believe South Carolina is demonstrating an ability to look beyond skin color in our politics. Until some of our political leaders catch up with the people, this Court must step in and fix this unconscionable racial gerrymander.

_____
Affiant

Sworn to and subscribed before me
This ___14th___ day of February 2012.

_____
Notary Public of South Carolina

My Commission Expires: April 22, 2015

7