IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| Vandroth Backus, Willie Harrison Brown, Charlesann Buttone, Booker Manigault, Edward McKnight, Moses Mims, Jr., Roosevelt Wallace and William G. Wilder, on behalf of themselves and all other similarly situated persons,<br><br>Plaintiffs,<br><br>vs.<br><br>The State of South Carolina, Nimrata "Nikki" R. Haley, in her capacity as Governor, Ken Ard, in his capacity as Lieutenant Governor, Glenn F. McConnell, in his capacity as President Pro Tempore of the Senate and Chairman of the Senate Judiciary Committee, Robert W. Harrell, Jr., in his capacity as Speaker of the House of Representatives, James H. Harrison, in his capacity as Chairman of the House of Representatives' Judiciary Committee, Alan D. Clemmons, in his capacity as Chairman of the House of Representatives' Election Law Subcommittee, Marci Andino, in her capacity as Executive Director of the Election Commission, John H. Hudgens, III, Chairman, Nicole S. White, Marilyn Bowers, Mark Benson, and Thomas Waring, in their capacity as the Commissioners of the Elections Commission,<br><br>Defendants. | Case No. 3:11-cv-3120 – PMD-HFF-MBS |

**AFFIDAVIT OF PATRICK G. DENNIS**

Pursuant to 28 U.S.C. 1746, and Order of the Court dated February 15, 2012, I, Patrick G. Dennis, hereby affirm as follows:

1.      I am an American citizen, a resident of Richland County, South Carolina.

2.      I have served as Chief Counsel to the Judiciary Committee for the South Carolina House of Representatives (House Judiciary Committee) since October 2006.

3.      From January 2011 to the present, I also have served as counsel to the Election Laws Subcommittee of the House Judiciary Committee (Election Laws Subcommittee).

4.      In conjunction with my position as counsel to both the House Judiciary Committee and to the Election Laws Subcommittee, I assisted the General Assembly with its consideration of House Bill 3991 (State House Plan), later enacted as Act 72 of 2011, and House Bill 3992 (Congressional Plan), later enacted as Act 75 of 2011 (collectively referred to herein as the Redistricting Plans).

5.      In this capacity, I was tasked with the responsibility to assist the Election Laws Subcommittee with developing criteria and guidelines that would be used by the House of Representatives to develop the State House Plan and the Congressional Plan.

6.      Prior to the release of the P.L. 94-171 data on March 23, 2011, the House of Representatives prepared for the redistricting process and released preliminary information to both legislators and members of the public. At the beginning of the process, the Speaker of the House assigned the task of redistricting primarily to the House Judiciary Committee, chaired by the Honorable James H. Harrison. Chairman Harrison, along with his staff, were charged with the responsibility of overseeing the redistricting process and assisting members with modifying their districts in a manner which complied with the U.S. Constitution, the VRA, and applicable federal and state law.

7.    Beginning in December 2010, the House Judiciary Committee began organizing and equipping staff with the necessary equipment to redraw the district lines. In addition to acquiring the necessary computers and technical staff to facilitate this process, the House employed the Maptitude for Redistricting software, published by the Caliper Corporation, as the medium through which the districts would be drawn. Following the organization of the redistricting procedures, the House released information on the current districts to the public and its membership. House legislators received maps of their current districts as well as corresponding demographic data for the districts statewide. As well, the House made available data from the American Community Survey for legislator review and incorporation into the mapping software. Election data was also provided including voter registration information as well as election returns from 2006 through 2010.

8.    On March 17, 2011, the House published a website containing similar information, along with proposed meeting schedules, transcripts as they became available, points of contact, district maps and statistics, and any plans submitted to the House for its consideration. This information was routinely updated throughout the process to encourage public participation and to ensure public availability of information concerning redistricting.

9.    In addition to these procedures, Chairman Harrison selected the Election Laws Subcommittee, chaired by the Honorable Alan D. Clemmons, to manage the initial redistricting proposals and to direct the drafting of an initial plan which met all legal requirements. The Subcommittee members, which consisted of three Republicans and two Democrats (both of whom are members of the Legislative Black Caucus), received and reviewed substantial statistical information, case law, research papers, DOJ guidelines, and other pertinent documentation to further their understanding of the requirements of redistricting.

10.    The Election Laws Subcommittee began the redistricting process with public hearings held across the state of South Carolina. In all, the Subcommittee held nine hearings in the major regions of the state: Columbia, Beaufort, Florence, Rock Hill, Myrtle Beach, Aiken, Denmark, Greenville, and Summerville.

11.    Following the conclusion of the public hearings, the Subcommittee convened on April 28, 2011 to discuss proposed redistricting criteria and guidelines that would be followed in drafting a redistricting plan for the 124 legislative and seven congressional districts in the state. RWH 000005-10.

12.    Among other things, the Criteria specified that the Redistricting Plans shall:

    a.  comply with the United States Constitution and opinions of the United States Supreme Court;

    b.  comply with the Voting Rights Act of 1965;

    c.  in the case of the Congressional districts, be strictly equal in population;

    d.  in the case of the State House districts, range in deviation no more than five percent (plus or minus two and one-half percent);

    e.  contain districts comprised of contiguous territory;

    f.  contain districts compact in form judge, in part, by the configuration of prior plans.

    g.  Avoid bizarrely shaped districts except when required by census geography, to achieve equal population, or to comply with the Voting Rights Act;

    h.  Consider communities of interest including a variety of factors such as economic, social and cultural, historic influences, political beliefs, voting behavior, governmental services, commonality of communications, and geographic locations and features.

i.  Consider county boundaries, municipal boundaries, and precinct lines in determining communities of interest; and

j.  Consider incumbency protection.

13.  In developing the criteria and the guidelines, as well as the Redistricting Plans, the Election Laws Subcommittee had available to it various information set forth in the *Election Laws Subcommittee 2011 Redistricting Notebook* (Notebook). Among other things, the Notebook contained maps and demographics of the existing districts, case law and other legal authorities, pertinent articles, and previous redistricting criteria adopted by the House.

14.  Articles in the Notebook state that:

a.  There is a history of official discrimination against African Americans in South Carolina.  RWH 000704-24; RWH 001019-87; RWH 001152-80; RWH 1223-35.

b.  There is racially polarized voting in South Carolina.  RWH 000704-24; RWH 001022;

c.  South Carolina has historically used voting practices that enhance the opportunity for discrimination. RWH 000704-24; RWH 001019-87; RWH 001152-80; RWH 1223-35.

d.  African Americans in South Carolina historically have been denied access to the candidate slating process. RWH 000704-24; RWH 001019-87; RWH 001152-80; RWH 1223-35.

e.  The effects of discrimination against African Americans in South Carolina have hindered their effective participation; RWH 000704-24; RWH 001019-87; RWH 001152-80; RWH 1223-35.

f. The court in *Colleton County v. McConnell*, 201 F.Supp.2d 618 (D.S.C. 2002) recognized that the cores of districts 12, 23, 25, 31, 41, 49, 50, 51, 57, 59, 62, 64, 66, 70, 73, 74, 76, 77, 82, 91, 95, 101, 102, 109, 111, 116, and 121 satisfy the criteria set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986). RWH 000805-806;

g. The court in *Colleton County v. McConnell* found that Section 2 and Section 5 of the Voting Rights Act require the maintenance of the Sixth District as a majority-minority district. RWH 000812;

h. The court in *Colleton County v. McConnell* found that the minority population in the core areas of the Sixth District is sufficiently compact and shares a sufficiently strong community of interest to warrant being a majority-minority district. RWH 000812;

i. The court in *Colleton County v. McConnell* cited Congressman James Clyburn's testimony that "a BVAP of 53% or above would be sufficient to allow the minority constituency a fair opportunity to elect a non-incumbent black candidate of choice in the district. RWH 000812;

j. The court in *Colleton County v. McConnell* found that the Voting Rights Act protects the minority voters' opportunity to elect their candidate of choice, not just a minority incumbent and not just the minority's opportunity to elect an incumbent of any race. RWH 00795;

k. High levels of racially polarized voting drives the need for majority or near-majority African-American districts. RWH 001022.

15.     On March 23, 2011, the House of Representatives received the P.L. 94-171 data and began incorporating that information into the Maptitude software. Over the ensuing days, House staff tested the data and software program to ensure that it could be used accurately and effectively. In addition, maps of the current districts updated to reflect demographic data from the 2010 Census were developed and distributed to the House members for their initial review. On March 29, 2011, House staff began reserving appointments for legislators to begin reviewing and drawing their districts and the Map Room first opened to legislators on April 4, 2011.

16.     Over the ensuing months, all House members, except for Representative Patsy Knight, visited the map room to propose revisions their districts.

17.     Congressman James E. Clyburn's Chief of Staff, Dalton Tresvant, also visited the map room on at least four occasions.  During these visits, Mr. Tresvant reviewed the Congressional Districts and, in particular, the Sixth Congressional District.

18.     Mr. Tresvant asked that the Sixth Congressional District be revised in the following ways:

    a. Expanded into specific precincts in Richland County;

    b. Specific precincts and census blocks in Sumter County be retained in the Sixth Congressional District;

    c. Specific areas in Charleston County be added and removed from the Benchmark Sixth Congressional District;

    d. Berkeley County be divided between the First and Sixth Congressional Districts largely following the same boundaries between House Districts 100 and 102;

    e. The town of Orangeburg be made whole within the Sixth Congressional District.

19.     The areas of Sumter County Mr. Tresvant requested be retained in the Sixth Congressional District included:

    a.  A car dealership north of Highway 378;

    b.  Congressman Clyburn's father's church;

    c.  The school at which Congressman Clyburn's mother taught;

    d.  Congressman Clyburn's boyhood home.

20.     The areas of Charleston County Mr. Tresvant requested be retained in the Sixth Congressional District included the residence of a golfing partner of Congressman Clyburn.

21.     On March 30, 2011, Speaker Harrell filed H. 3991 as a skeleton bill; i.e., a bill to be amended and given content by the House Election Laws Subcommittee and Judiciary Committee. The bill was given first reading on that same date and referred to the House Judiciary Committee. On May 18, 2011, the Election Laws Subcommittee convened a meeting to review and distribute to members of the subcommittee the redistricting plan developed under the direction of Chairman Clemmons and Chairman Harrison. Each of the Subcommittee members were provided detailed maps and demographics of the proposal and were afforded the opportunity to review the plan in detail before any substantive debate on the plan began.

22.     On May 18, 2011, the Election Laws Subcommittee convened a meeting to review and distribute to members of the subcommittee the initial State House and Congressional redistricting plans developed under the direction of Chairman Clemmons and James H. Harrison, Chairman of the House Judiciary Committee. Each of the Subcommittee members were provided detailed maps and demographics of the proposals and were afforded the opportunity to review the plans in detail before any substantive debate on the plans began.

23.     The following week, on May 23, 2011, the Subcommittee convened a public hearing to discuss H. 3991 and any amendments to be offered thereto. Chairman Clemmons

sponsored Amendment No. 1 to H. 3991 consisting of a statewide plan redistricting each of the 124 house districts. Representative Clemmons explained the plan, which thereafter was passed unanimously by the five-member committee consisting of three Republicans and two African American Democrats.

24.    On May 23, 2011, the Subcommittee also discussed H. 3992.    Chairman Clemmons sponsored Amendment No. 1 to H. 3992 consisting of a statewide plan redistricting each of the existing six Congressional districts in addition to the creation of the newly apportioned seventh Congressional seat.  Several amendments were offered by the Subcommittee members and on May 18, 2011, the Subcommittee reported H. 3991 favorably with amendments.

25.    Representative Clemmons expressed his belief that the plans complied with federal constitutional equal population requirements, compliance with equal protection and Voting Rights Act requirements, and resulted in a plan that was contiguous and compact and that maintained communities of interest. Several amendments were offered by the Subcommittee members and on May 18, 2011, the Subcommittee reported H. 3991 and H. 3992 favorably with amendments.

26.    On Monday, June 6, 2011, the Full House Judiciary Committee convened to consider the Subcommittee report on H. 3991. The plan, as amended by the subcommittee, was adopted unanimously by the Full House Judiciary Committee which consists of 15 Republicans and 10 Democrats, five of whom are African Americans. Following adoption of the statewide plan, a total of 55 amendments were offered by committee members. That same day, the Full Committee favorably reported the bill to the full House.

27.    On June 6, 2011, the Full House Judiciary Committee also convened to consider the Subcommittee report on H. 3992. Again, the plan, as amended by the subcommittee was adopted unanimously by the Full House Judiciary Committee. Following adoption of the statewide

plan, a total of six amendments were offered by committee members. That same day, the Full Committee favorably reported the bill to the full House.

28.     On Tuesday, June 14, 2011, the full House convened to consider H. 3991. By a vote of 85 to 27, the plan recommended by the House Judiciary Committee was adopted by the House. Individual members sponsored 33 amendments and the bill received second reading by a vote of 92-24 including twenty-three Democrats voting for the plan which included ten members of the Legislative Black Caucus.

29.     On Tuesday, June 15, Representative Harrison sponsored a technical amendment to H. 3991 which corrected the population deviations of two districts resulting from the adoption of competing amendments during the previous day's debate. Following the adoption of this technical amendment, the House gave third reading to H. 3991 by a vote of 82-23 and sent the bill to the Senate for its consideration.

30.     On June 14, 2011, the full House also considered H. 3992. By a voice vote, the plan recommended by the House Judiciary Committee was adopted. Thereafter, individual members sponsored five amendments and the bill received second reading by a vote of 83-25 including 23 Democrats voting for the plan which included ten members of the Legislative Black Caucus. On June 15, 2011, the House gave third reading to H. 3992 and sent the bill to the Senate for its consideration.

31.     On June 16, 2011, the Senate received H. 3991 from the House, gave it first reading and placed the bill on its calendar without reference to a committee. On June 21, 2011, the Senate voted on the bill, giving the bill second reading by a vote of 37 to 5. On June 22, the Senate amended the bill and gave the bill third reading.

32.     On the same day that the Senate approved the plan, H. 3991 was returned to the House for consideration of Senate Amendments. The House then proposed additional

amendments to the bill and returned it to the Senate, which concurred with the House Amendments and passed the bill by a vote of 35-1. The bill was enrolled and ratified the same date, June 22, 2011, and was sent to Governor Nikki Haley for consideration. Governor Haley signed the bill on June 28, 2011.

33.     On June 16, 2011, the Senate also received H. 3992 from the House, gave it first reading and referred the bill to the Senate Judiciary Committee. On June 20, 2011, the Senate Judiciary Redistricting Subcommittee convened to discuss H. 3992 and adopt amendments thereto. On June 21, 2011, the Senate Judiciary Committee reported the bill out favorably with an amendment.

34.     On June 23, 2011, the Senate began debating the bill, adopting the Senate Judiciary Committee Amendment by a vote of 20-19. Debate ensued in the Senate over the course of the next three legislative days, with the Senate considering a total of 19 amendments to H. 3992. On June 28, 2011, the Senate gave second reading to H. 3992 by a vote of 22-20 and, the next day, gave the bill third reading by a vote of 25-15.

35.     On the same day that the Senate approved the plan, H. 3992 was returned to the House for consideration of Senate Amendments. The House then proposed additional amendments to the bill on July 26, 2011, and returned it to the Senate, which concurred with the House Amendments and passed the bill by a vote of 24-16. The bill was enrolled and ratified the same date, July 26, 2011, and was sent to Governor Nikki Haley for consideration. Governor Haley signed the bill on August 1, 2011.

36.     As adopted by the General Assembly, both the State House Plan and the Congressional Plan achieve substantial population equality among the districts.

37.    Prior to the modification of the district lines, the House districts had an overall deviation of 105.75% ranging from -24.63% to +81.12%. As adopted in H. 3991, the districts achieve an overall deviation of 4.99% with a range of -2.49% to +2.50%.

38.    Prior to the modification of the district lines, the Congressional districts had an overall deviation of 129.69% ranging from -100.00% to +29.69%. As proposed in H. 3992, the districts achieve an overall deviation of 0.00% with only two districts having one person more than the ideal population of 660,766.

39.    These deviations comport with the Guidelines adopted by the Election Laws Subcommittee.

40.    Prior to the modification of the district lines, the House districts:

    a.    Maintained eleven whole counties;

    b.    Split 35 counties

    c.    Maintained 1,560 whole precincts (or voter tabulation districts);

    d.    Split 562 precincts;

    e.    Maintained 29 cities as whole;

    f.    Split 40 cities;

    g.    Maintained 176 towns as whole;

    h.    Split 24 towns;

    i.    Maintained 72 Census Designated Places as whole;and

    j.    Split 54 Census Designated Places.

41.    As set forth in H. 3991, the House districts:

    a.    Maintain nine whole counties;

    b.    Split 37 counties

    c.    Maintain 1,697 whole precincts;

    d.  Split 425 precincts;

    e.  Maintained 29 cities as whole;

    f.  Split 40 cities;

    g.  Maintained 173 towns as whole;

    h.  Split 27 towns;

    i.  Maintained 76 Census Designated Places as whole; and

    j.  Split 50 Census Designated Places.

42.    Of the 37 split counties in H. 3991, one county is comprised of exactly two districts, thereby making that county effectively whole. Another county, Abbeville, is whole with the exception of a small portion of the county, containing 60 persons, thereby respecting the municipal boundary of the Town of Honea Path.

43.    Considering these issues, H. 3991 splits the same number of counties as the Benchmark Plan. H. 3991 also splits 137 fewer precincts than the Benchmark Plan. With respect to municipal boundaries, H. 3991 splits the same number of cities, three more towns, and four less Census designated places.

44.    Prior to the modification of the district lines, the Congressional districts:

    a.  Maintained 12 whole counties;

    b.  Split 34 counties

    c.  Maintained 2,019 whole precincts;

    d.  Split 103 precincts;

    e.  Maintained 58 cities as whole;

    f.  Split 11 cities;

    g.  Maintained 193 towns as whole;

    h.  Split 7 towns;

   i. Maintained 124 Census Designated Places as whole; and

   j. Split 2 Census Designated Places.

45. As set forth in H. 3992, the Congressional districts:

   a. Maintain 12 whole counties;

   b. Split 34 counties

   c. Maintain 2,065 whole precincts;

   d. Split 57 precincts;

   e. Maintain 58 cities as whole;

   f. Split 11 cities;

   g. Maintained 195 towns as whole;

   h. Split 5 towns;

   i. Maintained 117 Census Designated Places as whole; and

   j. Split 9 Census Designated Places.

46. H. 3992 splits the same number of counties as the Benchmark Plan.  H. 3992 also splits 46 fewer precincts than the Benchmark Plan. With respect to municipal boundaries, H. 3992 splits the same number of cities, two less towns, and seven more Census designated places.

47. With respect to House District 12 in H. 3991:

   a. The district boundaries encompass largely the same areas as those contained within District 12 as set forth in the Benchmark House Plan;

   b. 77.86% of the population contained within House District 12 as set forth in H. 3991 was also contained within House District 12 as set forth in the Benchmark House Plan;

c.  90.17% of the population contained in House District 12 as set forth in the Benchmark House Plan District remains in House District 12 as set forth in H. 3991.

d.  District 12's portion of Greenwood County is substantially the same as that in the Benchmark Plan;

e.  House District 12 was underpopulated by approximately 5,700 people;

f.  The State House Plan maintains McCormick County as whole within House District 12;

g.  Bradley Precinct is kept whole;

h.  Verdery Precinct is split along census designated boundaries keeping the census designated place of Promised Land whole;

i.  The district boundaries also follow water bodies and place population on both sides of Rock House Road in the district;

j.  The district boundaries also follows precinct lines up to Highway 67/25;

k.  Other portions of the district follow major state roads, water boundaries, and precinct lines;

l.  Laurens County did not experience substantial population growth;

m. House District 13 expands into areas of Greenwood County previously represented by House District 12, and achieves a population within the acceptable population deviation as set forth in the Criteria;

n.  Lake Greenwood and the surrounding areas are primarily contained within House District 14;

o.  House District 12 follows the Edgefield County border.

p.  House District 12 and 13 follow the Abbeville County border;

q. House District 13 follows the Saluda and Newberry County borders;

r. House District 12 as drawn has a 51.01% black voting age population.

48. With respect to House District 23 in H. 3991:

a. The district boundaries encompass largely the same areas as those contained within District 23 as set forth in the Benchmark House Plan;

b. 73.14% of the population contained within House District 23 as set forth in H. 3991 was also contained within House District 23 as set forth in the Benchmark House Plan;

c. 87.12% of the population contained in House District 23 as set forth in the Benchmark House Plan District remains in House District 23 as set forth in H. 3991.

d. House District 23 was underpopulated by approximately 6,800 people;

e. House District 26 was merged with House District 10 resulting in excess population on the western end of Greenville County;

f. House District 23 shifts west into Parker, previously contained within District 26;

g. House District 23 shifts east into an area surrounding I-385, bounded by the major roads of Haywood Road and Pelham Road, and containing large apartment complexes including Magnolia Road Apartments;

h. Portions of House District 23's boundaries under H. 3991 follow old district boundaries of House District 22 and 24 under the Benchmark House Plan;

i. House District 22 in the Benchmark House Plan was substantially underpopulated;

      j.  Areas around North Main Street in the City of Greenville shift to House District 22.

      k.  Areas surrounding Cleveland Park in the City of Greenville shift to House District 24;

      l.  House District 19 in the Benchmark House Plan was substantially underpopulated;

      m.  House District 23 in H. 3991 does not take substantial population from House District 19.

49.    With respect to House District 25 in H. 3991:

      a.  The district boundaries encompass largely the same areas as those contained within District 25 as set forth in the Benchmark House Plan;

      b.  89.55% of the population contained within House District 25 a as set forth in H. 3991 was also contained within House District 25 as set forth in the Benchmark House Plan;

      c.  98.04% of the population contained in House District 25 as set forth in the Benchmark House Plan District remains in House District 25 as set forth in H. 3991.

      d.  House District 25 was underpopulated by approximately 3,800 people;

      e.  House District 26 was merged with House District 10 resulting in excess population on the western end of Greenville County;

      f.  House District 25 shifts northwest into areas previously contained within District 26 thereby gaining population;

      g.  The town of Piedmont, which straddles the Anderson/Greenville County border, is made largely whole within District 10;

h. Portions of the boundary of House District 25 follows the municipal boundaries of the Town of Piedmont;

i. House District 25 retains portions of the Town of Piedmont, the boundaries of which are defined by a railroad track, including the Kingswood, Shady Acres, and Oak Hill subdivisions;

j. The southern boundary of House District 25 largely follows bodies of water and major roads;

k. The southeastern boundary of House District 25 largely follows the boundaries of the Reedy Fork precinct and maintains the majority of the precinct contained within House District 25 under the Benchmark House Plan.

l. The Reedy Fork precinct is divided along a water boundary;

m. House District 25 in H. 3991 encompasses areas along the major road of Highway 25 primarily consisting of white population;

50. With respect to House District 49:

a. The boundaries of House District 49 are largely the same as those set forth in the Benchmark House Plan;

b. 93.29% of the population contained within House District 49 as set forth in H. 3991 was also contained within House District 49 as set forth in the Benchmark House Plan;

c. 91.08% of the population contained in House District 49 as set forth in the Benchmark House Plan District remains in House District 49 as set forth in H. 3991.

d. House District 49 in the Benchmark House Plan was within the ideal population;

e.  H. 3991 divides the Delphia precinct along three major roads – Cameron Road, Highway 321, and Turkey Creek Road – with a portion going to House District 49;

f.  House District 29 was underpopulated by approximately 4,300 people in the Benchmark House Plan;

g.  House District 29 adds population previously contained within House District 49;

h.  House District 49 and House District 46 exchanged certain neighborhoods including Grove Park and Tyson's Forest;

i.  The new boundary of House District 49 contains Representative John King's current residence.

51.  With respect to House District 57:

a.  The boundaries of House District 57 are largely the same as those set forth in the Benchmark House Plan;

b.  82.15% of the population contained within House District 57 as set forth in H. 3991 was also contained within House District 57 as set forth in the Benchmark House Plan;

c.  100.00% of the population contained in House District 57 as set forth in the Benchmark House Plan District remains in House District 57 as set forth in H. 3991.

d.  In the Benchmark House Plan, House Districts 58 and 105 were overpopulated by a total of approximately 20,000 people;

e.  In the Benchmark House Plan, House District 57 was underpopulated by approximately 7,200 people;

f.   As set forth in H. 3991, House District 57 extends into Horry County obtaining population;

g.   As set forth in H. 3991, House District 57's portion of Horry County is comprised largely of whole precincts;

h.   As set forth in H. 3991, split precincts in Horry County that are contained in House District 57 are divided along Highway 917;

i.   As set forth in H. 3991, portions of the boundary of House District 57 follow the boundary between House Districts 58 and 105 as set forth in the Benchmark House Plan;

j.   The boundaries of House District 57 in Marion County follow county borders and rivers;

k.   As set forth in the Benchmark House Plan, House District 61 was underpopulated by approximately 3,600 people;

l.   As set forth in H. 3991, House District 61 contains whole precincts in Marion County that were previously represented by House District 57;

m.   The current representative for House District 55 is the high school football coach for Dillon High School;

n.   The Town of Latta contains Latta High School;

o.   Latta High School and Dillon High School are football rivals;

p.   As set forth in H. 3991, House District 57 extends into Dillon County to encompass the Town of Latta, previously represented by House District 55.

52.   With respect to House District 59:

a.  55.87% of the population contained within House District 57 as set forth in H. 3991 was also contained within House District 57 as set forth in the Benchmark House Plan;

b.  62.48% of the population contained in House District 57 as set forth in the Benchmark House Plan District remains in House District 57 as set forth in H. 3991.

c.  As set forth in the Benchmark House Plan, House Districts 53, 54, 55, 56, 59, 62, and 65 were all underpopulated by a total of 29,000 persons – nearly the identical population size for a single district;

d.  As set forth in the Benchmark House Plan, House District 56 existed in the middle of these districts that were all underpopulated;

e.  As set forth in H. 3991, House District 56 was collapsed in the Pee Dee region and moved to a different area of the state;

f.  As set forth in H. 3991, the boundaries of the remaining Pee Dee districts are adjusted, absorb the population previously contained in House District 56, and to achieve populations within the acceptable range of deviations set forth in the Criteria;

g.  As set forth in H. 3991, House District 59 maintains largely the same boundary with House District 63 as existed in the Benchmark House Plan;

h.  As set forth in H. 3991, House District 59 largely maintains whole precincts and follows precinct boundaries;

i.  As set forth in H. 3991, the City of Florence is divided along precinct lines, major roads, and House District boundary lines as they existed in the Benchmark House Plan;

j.  As set forth in H. 3991, the Mechanicsville Precinct is divided along a major highway;

k.  As set forth in H. 3991, House District 59 contains population across Highway 34 in the Mechanicsville precinct and achieves a total population within the acceptable range of deviations set forth in the Criteria;

l.  As set forth in H. 3991, the Claussen and Mars Bluff No. 2 precincts are divided between House Districts 59 and 60 following major roads providing population to each district.

53.  With respect to House District 64

a.  The boundaries of House District 64 are largely the same as those set forth in the Benchmark House Plan;

b.  80.82% of the population contained within House District 64 as set forth in H. 3991 was also contained within House District 64 as set forth in the Benchmark House Plan;

c.  87.03% of the population contained in House District 64 as set forth in the Benchmark House Plan District remains in House District 64 as set forth in H. 3991.

d.  In the Benchmark House Plan, House District 64 was underpopulated by approximately 2,900 people;

e.  In the Benchmark House Plan, House District 101 was underpopulated by approximately 7,300 people;

f.  As set forth in H. 3991, House District 67 withdraws from Clarendon County and is contained wholly within Sumter County;

g.  As set forth in H. 3991, Clarendon County is maintained as substantially whole with the exception of a portion located near Lake Marion that is placed in District 101;

h.  As set forth in H. 3991, House District 64 largely follows the Clarendon County border;

i.  As set forth in H. 3991, House District 60 withdraws from Sumter County;

j.  As set forth in H. 3991, House District 64 extends into Sumter County absorbing population previously contained within House District 60;

k.  As set forth in H. 3991, House District 64 adds whole precincts in Sumter County.

54.  With respect to House District 70:

a.  The boundaries of House District 70 are largely the same as those set forth in the Benchmark House Plan;

b.  74.76% of the population contained within House District 70 as set forth in H. 3991 was also contained within House District 70 as set forth in the Benchmark House Plan;

c.  93.85% of the population contained in House District 70 as set forth in the Benchmark House Plan District remains in House District 70 as set forth in H. 3991.

d.  In the Benchmark House Plan, House District 70 was underpopulated by approximately 8,300 people;

e.  As set forth in H. 3991, House District 70 adds the Hunting Creek precinct following the precinct line and Highway 378;

f.  As set forth in H. 3991, House District 70 adds additional population in areas following the boundary between House Districts 75 and 80 as set forth in the Benchmark House Plan;

g.  As set forth in H. 3991, House District 70 adds additional areas in Sumter County thereby making previously split precincts whole;

h.  As set forth in H. 3991, other boundaries between House District 70 and 67 in Sumter County follow major roads.

55.  With respect to House District 74:

a.  The boundaries of House District 74 are largely the same as those set forth in the Benchmark House Plan;

b.  74.50% of the population contained within House District 74 as set forth in H. 3991 was also contained within House District 74 as set forth in the Benchmark House Plan;

c.  97.46% of the population contained in House District 12 as set forth in the Benchmark House Plan District remains in House District 12 as set forth in H. 3991.

d.  In the Benchmark House Plan, House District 74 was underpopulated by approximately 9,200 people;

e.  As set forth in H. 3991, House District 74 adds the Westminster and Ward 22 precincts maintaining them as whole precincts;

f.  As set forth in H. 3991, areas around Columbia College are contained within House District 74;

g.  As set forth in H. 3991, House District 74 extends into the Ward 31, Keenan, and Oakwood precincts largely following precinct lines;

    h. As set forth in H. 3991, areas added into District 74 largely comprise neighborhoods and subdivisions;

    i. As set forth in H. 3991, the University of South Carolina Horseshoe is contained within House District 72;

    j. As set forth in H. 3991, portions of the boundaries of House District 74 follow Interstate 20.

56. With respect to House District 76:

    a. The boundaries of House District 76 are largely the same as those set forth in the Benchmark House Plan;

    b. 66.94% of the population contained within House District 76 as set forth in H. 3991 was also contained within House District 76 as set forth in the Benchmark House Plan;

    c. 72.17% of the population contained in House District 76 as set forth in the Benchmark House Plan District remains in House District 76 as set forth in H. 3991.

    d. In the Benchmark House Plan, House District 76 was underpopulated by approximately 1,900 people;

    e. As set forth in the Benchmark House Plan, House District 74 was underpopulated;

    f. As set forth in the Benchmark House Plan, House District 79 was overpopulated;

    g. As set forth in H. 3991, House District 74 obtained population from House District 76;

h.  As set forth in H. 3991, House District 76 shifted to the northeast obtaining sufficient population to achieve a total population falling within the range of deviations adopted in the Criteria;

i.  As set forth in H. 3991, House District 76 adds areas making previously split precincts whole;

j.  As set forth in H. 3991, House District 76 contains the majority of the Keels precinct;

k.  As set forth in H. 3991, House District 76 adds the North Springs 2 and Woodfield precincts and withdraws from the Rice Creek, North Springs No. 1 and Valley State Park precincts by following the precinct lines, previous dividing lines, and major roads;

l.  As set forth in H. 3991, portions of the boundary of House District 76 follows the boundaries between House Districts 78 and 79 as set forth in the Benchmark House Plan.

57.  With respect to House District 77:

a.  The boundaries of House District 77 are largely the same as those set forth in the Benchmark House Plan;

b.  93.88% of the population contained within House District 77 as set forth in H. 3991 was also contained within House District 77 as set forth in the Benchmark House Plan;

c.  79.53% of the population contained in House District 77 as set forth in the Benchmark House Plan District remains in House District 77 as set forth in H. 3991.

d.  In the Benchmark House Plan, House District 77 was overpopulated by approximately 7,800 people;

e.  In the Benchmark House Plan, House District 73 was underpopulated by approximately 6,300 people;

f.  As set forth in H. 3991, House District 77 withdrew from the Monticello precinct and part of Blythewood No. 1, divided along major roads, providing this population to House District 73;

g.  In the Benchmark House Plan, House District 41 was underpopulated by approximately 6,200 people;

h.  As set forth in H. 3991, House District 77 withdrew from the Kelly Mill precinct providing this population to House District 41;

i.  Following House District 77's withdrawal from these precincts House Districts 41 and 73 were closer to an ideal deviation; however House District 77 was then underpopulated;

j.  As set forth in H. 3991, House District 77 shifted east adding additional population to achieve a total population that falls within the range of deviations adopted in the Criteria;

k.  As set forth in H. 3991, House District 77 adds areas in the Rice Creek precinct making the precinct whole;

l.  As set forth in H. 3991, House District 77 adds areas in the North Springs No. 1, Spring Valley West, and the Valley State Park precincts following bodies of water and precinct boundaries.

58.  With respect to House District 79:

a. In the Benchmark House Plan, House District 79 was overpopulated by approximately 21,800 people;

b. In the Benchmark House Plan, House District 79 contained areas in both Richland and Kershaw Counties;

c. In the Benchmark House Plan, the portion of House District 79 contained within Kershaw County was 21,917;

d. Withdrawing House District 79 from Kershaw County and following the Richland County border provided House District 79 with a total population closer to the ideal deviation;

e. The boundaries of House District 79 in Richland County are largely the same as those set forth in the Benchmark House Plan;

f. 80.21% of the population contained within House District 79 as set forth in H. 3991 was also contained within House District 79 as set forth in the Benchmark House Plan;

g. 51.82% of the population contained in House District 79 as set forth in the Benchmark House Plan District remains in House District 79 as set forth in H. 3991;

h. After removing the Kershaw County portion of House District 79, 82.34% of the Richland County population contained in House District 79 as set forth in the Benchmark House Plan District remains in House District 79 as set forth in H. 3991.

i. As set forth in H. 3991, the Valley State Park and North Springs No. 1 precincts are divided along a water boundary;

j.  As set forth in H. 3991, the North Springs 2 precinct is maintained as whole and shifted into House District 76;

k.  As set forth in H. 3991, the Lake Carolina precinct is divided along Lake Carolina Drive, enabling House District 41 and 79 to achieve an acceptable population deviation;

l.  As set forth in H. 3991, the division of the Lake Carolina precinct maintains the Lake Carolina subdivision in House District 79 and the shape of the boundary dividing the precinct is due to the shape of certain blocks in the area.

59.  With respect to House District 82:

a.  The boundaries of House District 82 are largely the same as those set forth in the Benchmark House Plan;

b.  88.59% of the population contained within House District 82 as set forth in H. 3991 was also contained within House District 82 as set forth in the Benchmark House Plan;

c.  94.99% of the population contained in House District 82 as set forth in the Benchmark House Plan District remains in House District 82 as set forth in H. 3991.

d.  In the Benchmark House Plan, House District 82 was underpopulated by approximately 2,600 people;

e.  In the Benchmark House Plan, House District 81 was underpopulated by approximately 1,800 people;

f.  In the Benchmark House Plan, House District 83 was underpopulated by approximately 640 people;

g.  In the Benchmark House Plan and in H. 3991, McCormick County is wholly contained within House District 12;

h.  As set forth in H. 3991, the Merriweather No. 2 precinct is made whole within House District 83;

i.  In the Benchmark House Plan, the City of Aiken was divided between House Districts 81, 82 and 86;

j.  As set forth in H. 3991, House District 82 adds unincorporated areas of Aiken County and, following major roads and precinct lines, extends further into the City of Aiken, thereby keeping the unincorporated areas contiguous with the remaining portions of the district;

k.  As set forth in H. 3991, House District 82 extends into Saluda County enabling House District 82 to achieve an acceptable population deviation;

l.  As set forth in H. 3991, Saluda County is divided along major highways, municipal boundaries, water boundaries, and precinct lines;

m.  As set forth in H. 3991, the towns of Saluda and Ridge Springs are maintained as whole within House District 39;

n.  As set forth in H. 3991, the town of Ward is maintained as whole in House District 82.

60.  With respect to House District 91:

a.  The boundaries of House District 91 are largely the same as those set forth in the Benchmark House Plan;

b.  79.36% of the population contained within House District 91 as set forth in H. 3991 was also contained within House District 91 as set forth in the Benchmark House Plan;

c.  97.11% of the population contained in House District 91 as set forth in the Benchmark House Plan District remains in House District 91 as set forth in H. 3991.

d.  In the Benchmark House Plan, House District 91 was underpopulated by approximately 6,800 people;

e.  House District 91 abuts the South-Carolina-Georgia border on the west;

f.  As set forth in H. 3991, House District 91 extends further into Orangeburg obtaining population and making the Neese's-Livingston and Pine Hill precincts whole;

g.  As set forth in H. 3991, the towns of Neese's and Livingston are maintained wholly within House District 91;

h.  As set forth in the Benchmark House Plan, House District 90 was approximately 5,000 underpopulated;

i.  As set forth in H. 3991, House District 90 extends into the Blackville No. 2 precinct obtaining population;

j.  As set forth in H. 3991, the Blackville No. 2 precinct is largely contained within House District 90 with the exception of the portion of the precinct contained within the town of Blackville;

k.  As set forth in H. 3991, the town of Blackville is maintained wholly within House District 91;

l.  As set forth in H. 3991, the Hilda and Friendship precincts are maintained as whole within House District 90;

m.  As set forth in the Benchmark House Plan, the Barnwell 3 precinct was divided between House Districts 90 and 91;

n. As set forth in H. 3991, the Barnwell 3 precinct is divided between House Districts 90 and 91 following S. Toby Creek Road;

o. As set forth in H. 3991, House District 90 extends to encompass the town of Kline;

p. As set forth in H. 3991, Allendale County is maintained wholly within House District 91.

61. With respect to House District 102:

a. The boundaries of House District 102 are largely the same as those set forth in the Benchmark House Plan;

b. 73.50% of the population contained within House District 102 as set forth in H. 3991 was also contained within House District 102 as set forth in the Benchmark House Plan;

c. 74.74% of the population contained in House District 102 as set forth in the Benchmark House Plan District remains in House District 102 as set forth in H. 3991.

d. As set forth in H. 3991, the southern boundary of House District 102 remains unchanged from that set forth in the Benchmark House Plan;

e. As set forth in H. 3991, the Huger and Alvin precincts are made whole within House District 102;

f. As set forth in H. 3991, House District 102 extends into Dorchester County into the whole precincts of Four Hole and Harleyville;

g. As set forth in H. 3991, House District 102 extends into Dorchester County into a portion of the Rosinville precinct, divided along Highway 15;

h. As set forth in H. 3991, House District 102 withdraws from the Wassamaw No. 2 precinct thereby making the precinct whole within House District 100;

i. As set forth in H. 3991, the Whitesville precinct in Berkeley County is made whole within House District 100;

j. As set forth in H. 3991, House District 100 extends into the lakefront communities of Pinopolis, Macbeth, and Bonneau Beach.

62. With respect to House District 103;

a. The boundaries of House District103 are largely the same as those set forth in the Benchmark House Plan;

b. 68.36% of the population contained within House District 103 as set forth in H. 3991 was also contained within House District 103 as set forth in the Benchmark House Plan;

c. 81.63% of the population contained in House District 103 as set forth in the Benchmark House Plan District remains in House District 103 as set forth in H. 3991.

d. In the Benchmark House Plan, House District 103 was underpopulated by approximately 6,700 people;

e. As set forth in H. 3991, the town of Georgetown, comprising a total population of 9,163, is almost entirely placed within House District 103;

f. The removal of the town of Georgetown resulted in House District 108 being underpopulated by 7,942 people;

g. As set forth in H. 3991, House District 108 extends into areas previously contained in House District 103, thereby obtaining population necessary to achieve an acceptable population deviation;

h.  As set forth in H. 3991, House District 108 extends into Murrell's Inlet No. 3, Penny Royal, Black River, and Plantersville precincts, dividing the precincts along water boundaries and major roads;

i.  As set forth in H. 3991, House District 103 extends into Horry County by adding the whole precincts of Pawley's Swamp, Inland, Port Harrelson and a portion of the precinct of Toddville divided along a major road, thereby obtaining population necessary to achieve an acceptable population deviation;

j.  As set forth in the Benchmark House Plan, House District 101 was underpopulated by approximately 7,300 people;

k.  As set forth in H. 3991, House District 103 largely withdraws from Williamsburg County remaining in the whole precinct of Nesmith and a portion of the Morrisville precinct dividing the same along the boundary of House District 103 as set forth in the Benchmark House Plan.

63.  With respect to House District 109:

a.  The boundaries of House District 109 are largely the same as those set forth in the Benchmark House Plan;

b.  50.48% of the population contained within House District 109 as set forth in H. 3991 was also contained within House District 109 as set forth in the Benchmark House Plan;

c.  62.19% of the population contained in House District 109 as set forth in the Benchmark House Plan District remains in House District 109 as set forth in H. 3991.

d.  In the Benchmark House Plan, House District 109 was underpopulated by approximately 6,600 people;

e.  In the Benchmark House Plan, House District 111, to the south of House District 109, was underpopulated by approximately 6,300 people;

f.  In the Benchmark House Plan, House District 113, to the north of House District 109, was underpopulated by approximately 8,300 people;

g.  In the Benchmark House Plan, House District 110, to the east of House District 109, was underpopulated by approximately 1,100 people;

h.  In the Benchmark House Plan, House District 98, to the northwest of House District 109, was overpopulated by approximately 18,300 people;

i.  As set forth in H. 3991, more of the town of Mt. Pleasant is added to House District 110;

j.  As set forth in H. 3991, House District 109 withdraws from the northern end of the Charleston peninsula, thereby making that portion of the peninsula whole within House District 111 and allowing House District 111 to obtain population;

k.  As set forth in H. 3991, House District 109 extends northwestward obtaining population;

l.  As set forth in H. 3991, the North Charleston 22, North Charleston 23, Archdale, Archdale No. 2, Patriot, and Lincoln precincts are made whole within House District 109;

m. As set forth in H. 3991, the North Charleston No. 24 and Windsor precincts are divided allowing House District 109 to obtain an acceptable population deviation;

64.    With respect to House District 111:

a. The boundaries of House District 111 are largely the same as those set forth in the Benchmark House Plan;

b. 78.92% of the population contained within House District 111 as set forth in H. 3991 was also contained within House District 111 as set forth in the Benchmark House Plan;

c. 93.21% of the population contained in House District 111 as set forth in the Benchmark House Plan District remains in House District 111 as set forth in H. 3991.

d. In the Benchmark House Plan, House District 111 was underpopulated by approximately 6,300 people;

e. In the Benchmark House Plan, House District 109, to the north of House District 111 was underpopulated by approximately 6,600 people;

f. In the Benchmark House Plan, House District 113, to the north of House District 111, was underpopulated by approximately 8,300 people;

g. In the Benchmark House Plan, House District 110, to the east of House District 111, was underpopulated by approximately 1,100 people;

h. In the Benchmark House Plan, House District 98, to the northwest of House District 111, was overpopulated by approximately 18,300 people;

i. As set forth in H. 3991, House District 109 withdraws from the northern end of the Charleston peninsula, thereby making that portion of the peninsula whole within House District 111 and allowing House District 111 to obtain population;

j.  As set forth in H. 3991, House District 110 adds areas in the southern end of the Charleston peninsula previously represented by House District 111, thereby achieving and acceptable population deviation;

k.  As set forth in H. 3991, House District 111 adds areas up to Highway 642 previously represented by House District 109, thereby achieving and acceptable population deviation;

65. With respect to House District 113

a.  The boundaries of House District 113 are largely the same as those set forth in the Benchmark House Plan;

b.  74.62% of the population contained within House District 113 as set forth in H. 3991 was also contained within House District 113 as set forth in the Benchmark House Plan;

c.  95.12% of the population contained in House District 113 as set forth in the Benchmark House Plan District remains in House District 113 as set forth in H. 3991.

d.  In the Benchmark House Plan, House District 113 was underpopulated by approximately 8,300 people;

e.  In the Benchmark House Plan, House District 109, to the south of House District 113 was underpopulated by approximately 6,600 people;

f.  In the Benchmark House Plan, House District 98, to the northwest of House District 113, was overpopulated by approximately 18,300 people;

g.  As set forth in H. 3991, the southwestern boundary of House District 113 remains the same as that set forth in the Benchmark House Plan with the exception of a change making the North Charleston No. 18 precinct whole;

h. As set forth in H. 3991, the North Charleston No. 27 precinct is divided along Eagle Drive which is an extension of the precinct lines;

i. As set forth in H. 3991, House District 109 obtains population in North Charleston No. 24 precinct to obtain population;

j. As set forth in H. 3991, House District 113 expands into Dorchester County by adding the whole precincts of Linconville, Ladson, Carolina, and North Summerville No. 2;

k. As set forth in H. 3991, House District 113 expands into Dorchester County by adding portions of the North Summerville precinct, dividing the same along E. Doly Avenue, which also forms the boundary of the Carolina precinct.

66. With respect to House District 121:

a. The boundaries of House District 121 are largely the same as those set forth in the Benchmark House Plan;

b. 62.50% of the population contained within House District 121 as set forth in H. 3991 was also contained within House District 121 as set forth in the Benchmark House Plan;

c. 76.82% of the population contained in House District 121 as set forth in the Benchmark House Plan District remains in House District 121 as set forth in H. 3991.

d. In the Benchmark House Plan, House District 121 was underpopulated by approximately 7,600 people;

e. In the Benchmark House Plan, House District 120, to the north of House District 121 was underpopulated by approximately 3,900 people;

f.  In the Benchmark House Plan, House District 90, to the north of House District 121 was underpopulated by approximately 5,000 people;

g.  In the Benchmark House Plan, House District 116, to the east of House District 121 was overpopulated by approximately 600 people and within the range of deviations approved in the Criteria;

h.  In the Benchmark House Plan, House District 124, to the south of House District 124 was overpopulated by approximately 29 people and within the range of deviations approved in the Criteria;

i.  In the Benchmark House Plan, House District 118, to the west of House District 121 was overpopulated by approximately 30,300 people;

j.  As set forth in H. 3991, the town of Walterboro is made whole within House District 121;

k.  As set forth in H. 3991, the Walterboro No. 2 precinct is divided along a major powerline;

l.  As set forth in H. 3991, the Jacksonboro precinct is added to House District 121, dividing the precinct along Highway 64 and the Edisto River;

m.  As set forth in H. 3991, the Beaufort No. 2 and 3 precincts are made whole;

n.  As set forth in H. 3991, the Beaufort No. 1 precinct is divided along Boundary Street which forms the southern boundary of the Beaufort No. 2 precinct;

o.  As set forth in H. 3991, the new House District 120 extends into areas previously represented by House District 121 thereby achieving an acceptable population deviation;

p.  As set forth in H. 3991, the Sheldon 1 precinct is made whole within House District 121 with the exception of the portion of the precinct contained with the town limits of Yemassee;

q.  As set forth in H. 3991, the town of Yemassee is maintained as whole within House District 122;

r.  As set forth in H. 3991, the Hendersonville precinct is made whole within District 90;

s.  As set forth in H. 3991, the Peniel precinct is made whole within District 90, with the exception of the portion of the Peniel precinct contained within the town of Walterboro;

t.  As set forth in H. 3991, St Helena Island is added to House District 121 by adding whole precincts and dividing St. Helena 1A precinct along Highway 21.

67.  With respect to House District 122:

a.  The boundaries of House District 122 are largely the same as those set forth in the Benchmark House Plan;

b.  71.81% of the population contained within House District 122 as set forth in H. 3991 was also contained within House District 122 as set forth in the Benchmark House Plan;

c.  73.23% of the population contained in House District 122 as set forth in the Benchmark House Plan District remains in House District 122 as set forth in H. 3991.

d.  In the Benchmark House Plan, House District 122 was underpopulated by approximately 1,400 people;

e.  In the Benchmark House Plan, House District 120, to the east of House District 122 was underpopulated by approximately 3,900 people;

f.  In the Benchmark House Plan, House District 90, to the northeast of House District 122 was underpopulated by approximately 5,000 people;

g.  In the Benchmark House Plan, House District 91, to the north of House District 122 was underpopulated by approximately 6,800 people;

h.  In the Benchmark House Plan, House District 118, to the south of House District 122 was overpopulated by approximately 30,300 people;

i.  As set forth in H. 3991, the Sheldon 1 precinct is made whole within House District 121 with the exception of the portion of the precinct contained with the town limits of Yemassee;

j.  As set forth in H. 3991, the town of Yemassee is maintained as whole within House District 122;

k.  As set forth in H. 3991, the Okatie precinct is made whole within District 120;

l.  As set forth in H. 3991, a portion of the the Grahamville 1 precinct is contained within District 120, dividing the precinct along the municipal boundary of Ridgeland;

m.  As set forth in H. 3991, District 118 withdraws from the Sun City communities thereby creating a new House District 120;

n.  In the Benchmark House Plan, House District 123 was underpopulated by approximately 1,900 people;

o.  As set forth in H. 3991, House District 123 obtained population by adding Daufuskie Island, previously represented by House District 118;

p.  As set forth in H. 3991 and following House District 118's withdrawal from the Sun City Community and Daufuskie Island, House District 118 was underpopulated;

q.  As set forth in H. 3991, House District 118 extends into Jasper County obtaining population and achieve an acceptable population deviation.

68.   With respect to Congressional District 6:

a.  The boundaries of Congressional District 6 are largely the same as those set forth in the Benchmark Congressional Plan;

b.  68.60% of the population contained within Congressional District 6 as set forth in H. 3992 was also contained within Congressional District 6 as set forth in the Benchmark House Plan;

c.  66.43%% of the population contained in House District 122 as set forth in the Benchmark House Plan District remains in House District 122 as set forth in H. 3991.

d.  In the Benchmark Congressional Plan, Congressional District 6 was overpopulated by approximately 21,644 people;

e.  As set forth in H. 3992, Congressional District 6 expands in Richland County adding whole precincts;

f.  As set forth in H. 3992, Congressional District 6 adds the St. Andrews region of Richland County following precinct lines, city boundaries and major roads;

g.  As set forth in H. 3992, Congressional District 6 withdraws from much of Sumter County;

h.  As set forth in H. 3992, the portion of Sumter County remaining in Congressional District 6 is comprised largely of whole precincts;

i.   It is my understanding that the portion of Sumter County remaining in Congressional District 6 as set forth in H. 3992 reflects the preferences of Congressman James E. Clyburn as relayed to the House by his Chief of Staff Dalton Tresvant;

j.   As set forth in H. 3992, Lee County is made whole within Congressional District 5;

k.   As set forth in H. 3992, Congressional District 6 withdraws from much of Florence County, remaining in Lake City, South Carolina and surrounding precincts, maintaining most precincts as whole, and dividing the Hannah precinct along Highway 378;

l.   As set forth in H. 3992, Georgetown County is made whole within Congressional District 7;

m.   As set forth in H. 3992, the lake communities of Pinopolis, Bonneau Beach, and Macbeth are contained within Congressional District 1;

n.   As set forth in H. 3992, the Cross and Hilton Cross Roads precincts in Berkeley County; the Ridgeville 2, Beech Hill 2, and Saul Dam 1 precincts in Dorchester County, and the St. Pauls 3, St. Pauls 4, St. Pauls 5, St. Pauls 6, and Wadmalaw 1 precincts in Charleston County are made whole;

o.   As set forth in H. 3992, the Wadmalaw 2 precinct in Charleston County is divided along Highway 700;

p.   As set forth in H. 3992, the whole counties of Allendale, Hampton, and Jasper are added to Congressional District 6;

q.  As set forth in H. 3992, the coastal areas extending from Daufuskie Island in Beaufort County to McClellanville in Charleston County are contained within Congressional District 1;

r.  As set forth in H. 3992, Congressional Districts 1 and 6 divide Beaufort County along whole precincts;

s.  As set forth in H. 3992, Calhoun County is made whole within Congressional District 6;

t.  As set forth in H. 3992, the town of Orangeburg is made whole within Congressional District 6;

u.  As set forth in H. 3992, the Orangeburg and Pine Hill precincts in Orangeburg County are divided along Highway 4;

v.  Each of the requests made by Mr. Tresvant are to the best of my understanding and recollection reflected in the Congressional Plan set forth in H. 3992.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2 8 day of February, 2012.

Patrick G. Dennis, Esq.

Sworn and subscribed to before me
this 28th day of February, 2009. 2012

_____
Notary Public for South Carolina
My commission expires: 2/11/2018