# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

| | |
|---|---|
| **VANDROTH BACKUS, WILLIE HARRISON BROWN, CHARLESANN BUTTONE, BOOKER MANIGAULT, EDWARD MCKNIGHT**, **MOSES MIMS, JR, ROOSEVELT WALLACE**, and **WILLIAM G. WILDER**, on behalf of themselves and all other similarly situated persons**,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**THE STATE OF SOUTH CAROLINA**, **NIKKI R. HALEY**, in her capacity as Governor**, KEN ARD**, in his capacity as Lieutenant Governor**, GLENN F. CCONNELL**, in his capacity as President Pro Tempore of the Senate and Chairman of the Senate Judiciary Committee**, ROBERT W. HARRELL, JR**, in his capacity as Speaker of the House of Representatives, **JAMES H. HARRISON,** in his capacity as Chairman of the House of Representatives' Judiciary Committee, **ALAN D. CLEMMONS**, in his capacity as Chairman of the House of Representatives' Elections Law Subcommittee, **MARCI ANDINO**, in her capacity as Executive Director of the Election Commission, **JOHN H. HUDGENS, III**, Chairman, **NICOLE S. WHITE, MARILYN BOWERS**, **MARK BENSON**, and **THOMAS WARING**, in their capacity as Commissioners of the Elections Commission,<br><br>**Defendants.** | Case No.: 3:11-cv-03120-PMD-HFF-MBS<br><br><br><br><br><br><br><br><br><br><br>**MEMORANDUM OPPOSING DEFENDANT ROBERT W. HARRELL JR.'S OBJECTIONS TO PLAINTIFFS' AFFIDAVITS AND MOTION TO RECONSIDER** |

1

On February 22, 2012, Plaintiffs submitted the affidavits of Senator Bradley C. Hutto, Representative Mia Butler-Garrick and Congressman James Clyburn. By motion filed February 24, 2012, Defendant Robert W. Harrell, Jr., objected in part and moved to exclude portions of those affidavits from consideration at trial. The objections were based on various evidentiary claims; but primarily Defendant Harrell objected that portions of the affidavits were irrelevant, contained improper hearsay, improper opinion testimony, or were not based upon the affiant's personal knowledge.

Judge Duffy held a teleconference with the parties on February 28, 2012, and ruled on Defendant Harrell's objections. Judge Duffy indicated he would permit Plaintiffs to offer argument challenging his rulings provided Plaintiffs submitted those arguments by the close of business on February 29, 2012. Plaintiffs submit this memorandum pursuant to Judge Duffy's instructions. With all due respect, Plaintiffs, for the reasons set forth below, ask Judge Duffy to reconsider his ruling sustaining Defendant Harrell's objections to the following.[1]

**Affidavit of Senator Bradley C. Hutto: Objections Sustained**

> **5.    The redistricting process for both the Senate and Congressional plan was entirely driven by race and achieving certain black voting age population (BVAP) levels in certain districts.  [opinion]**

Plaintiffs submit that the above testimony is admissible even though it sets forth Senator Hutto's opinion. Rule 701 of the Federal Rules of Evidence permits lay witnesses to offer opinion testimony in certain circumstances.

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

---

[1] Plaintiffs address each sustained objection separately. The grounds for objection are set forth in brackets immediately following the objectionable portions of the Hutto and Butler-Garrick affidavits. All objections to Congressman Clyburn's affidavit were that the portions constituted improper opinion testimony being offered by a lay witness. (ECF Entry Number 155, page 2).

> **(a)** rationally based on the witness's perception;
> **(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> **(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. Those factors are all satisfied here. Senator Hutto is a member of the South Carolina Senate and he was heavily involved in the redistricting process. His opinion of the factors driving that process is based on his own perceptions and involvement therein. As one of the primary actors, his opinion is helpful, at least to some degree to determining the fact in dispute – whether race was the primary consideration in redistricting. Finally, the opinion is in no way based upon scientific, technical, or other specialized knowledge within the scope of Rule 702. Plaintiffs therefore ask the Court to overrule Defendant Harrell's objections to this statement.

> **6.** During the process of working on the maps, the Senate's lawyer and Leader were publicly insisting on a hardline rule for drawing a certain number of districts with 50 percent BVAP. However, they privately acknowledged that we could comply with Section 5 with an approach short of the rigid quota system that was adopted. [hearsay]

Plaintiffs submit that inasmuch as the Senate's leader is a party to this action, any statement attributed to him is not hearsay under Rule 801. The Rule provides that an opposing party's statement is not hearsay where:

> **(2) An Opposing Party's Statement.** The statement is offered against an opposing party and:
> **(A)** was made by the party in an individual or representative capacity;

Fed. R. Evid. 801. Further, lawyers for the Senate are agents of the Senate and their statements are likewise not considered hearsay. Rule 801(2)(D) (a statement is not hearsay where it is offered against an opposing party and was made by the party's agent or employee on a matter within the scope of that relationship and while it existed).

3

**13.    . . . . because I believe a federal court would not use race as the predominant factor in drawing a Congressional map or order a plan that intentionally attempted to marginalize black voting power by packing them into a single district. [opinion]**

Plaintiffs do not challenge the Court's ruling on this statement.

**18.    Republican Leaders in the General Assembly sought to prevent this from happening by using race to pack black voters into the Sixth District. . . . [I] believe Rep. Clemmons and the other Republican leaders believed they could improve their party's chances of winning the Seventh Congressional District by excluding as many black voters as possible from it. [personal knowledge]**

Plaintiffs do not challenge the Court's ruling on this statement.

**20.    Ironically, their elected leaders did precisely the opposite. [opinion]**

Plaintiffs incorporate their argument to Hutto Affidavit Paragraph 5, above. Rule 701 of the Federal Rules of Evidence permits Senator Hutto's non-scientific opinion.

**21.    I believe this is an incorrect statement of the law. Based on my experience in drawing the Senate Plan, I learned that Senator McConnell and our lawyer, Mr. Terrini both knew that the Voting Rights Act does not require this race-based approach. My experience with the Senate Plan, described below, illustrates this fact. [opinion]**

Plaintiffs incorporate their argument to Hutto Affidavit Paragraph 5, above. Rule 701 of the Federal Rules of Evidence permits Senator Hutto's non-scientific opinion.

**22.    When we first began drafting the Senate Plan, I had a private meeting with Mr. Terrini. During that meeting I reviewed my Senate district with him and discussed various options available to bring my district within population deviation. My district needed to add more than 14,000 voters to come within acceptable deviation. Mr. Terrini and I discussed where my district could move to add geography that would allow me to add sufficient population. My district (SD-40) borders the Savannah River to my west. To the east is District 39, represented by Senator John Matthews, and to the south is District 45, represented by Senator Clementa Pinckney. This meant there were a limited number of options for my district to grow to add sufficient population. [relevance]**

Plaintiffs do not challenge the Court's ruling on this statement.

**23.** Further complicating this task was the retrogression standard adopted by the Senate. Mr. Terrini and Senator McConnell decided at the outset to draw nine majority-black districts. I was told by Mr. Terrini that the Senate adopted this standard because we had nine majority-black districts under the 2003 plan (but not under the Benchmark) and that anything fewer than nine majority-black districts would be a "red flag" to the Department of Justice. I am unsure how they decided that 50 percent was the magic number for the Department of Justice but I was told that our plan would have to have nine districts with BVAP at 50 percent or higher. [relevance]

Plaintiffs do not challenge the Court's ruling on this statement.

**24.** The nine districts that were majority-black districts in 2003 were Senate Districts 19, 21, 30, 32, 36, 39, 40, 42, and 45. Black senators represent six of these districts and white senators represent three of these districts. All of these districts needed to add population except for District 19, represented by Senator John Scott (D-Richland). Many of these districts are also rural districts, located adjacent to one another. Four of them had also seen a natural decline in their BVAP between 2003 and 2010. [relevance]

Plaintiffs do not challenge the Court's ruling on this statement.

**25.** All of these factors made it difficult to abide by the 50 percent BVAP rule while drawing Senate districts. Abiding by the rule meant that under-populated districts needed to add population that would also maintain or raise their BVAP above 50 percent. In my region of the state, we found it nearly impossible because Districts 39 (Matthews), 40 (me), and 45 (Pinckney) were all adjacent to one another, all needed population, and all were subject to the rule adopted by Senator McConnell and Mr. Terrini. Senator Clementa Pinckney's (D-Jasper) district, District 45, was under populated by approximately 8,000 people. His BVAP in 2003 was 55 percent but it had fallen to 49 percent through natural population shift. Beaufort County also saw a significant population increase consisting of mostly white residents. This resulted in Senator Tom Davis's (R-Beaufort) district, District 46, shrinking and leaving behind many new white residents to be incorporated into another district. The obviously place to put these voters was District 45 (Pinckney), but this would push the district below the adopted 50 percent BVAP rule. [relevance]

Plaintiffs do not challenge the Court's ruling on this statement.

**26.** I worked with Mr. Terrini, Senator John Matthews (D-Orangeburg), and Senator Pinckney to trade population between our districts, but there

5

**was no way to get District 45 to a 50 percent BVAP without dropping Senator Matthews (SD-39) or myself (SD-40) below 50 percent. I was willing to drop my BVAP below 50 percent by moving black voters to Senator Pinckney and discussed this possibility with Mr. Terrini. However, this shift would require me to add geography in Aiken or Lexington County and would interfere with a deal already worked out between Districts 23, 24, 25, and 26 in those counties. After working unsuccessfully for some time on possible solutions with Mr. Terrini, Senator McConnell, and Senator Pinckney, I had a meeting that I believe evidences the arbitrary, race-based approach the General Assembly took when drawing election districts. [relevance]**

Plaintiffs do not challenge the Court's ruling on this statement.

**27.    I met with Senator McConnell, Senator Pinckney, Mr. Terrini, and Senator Malloy to discuss the problem we were having meeting the 50 percent BVAP rule. At that meeting we discussed drawing Senator Pinckney's district with a BVAP under 50 percent. This would result in eight districts with a BVAP of 50 percent or higher instead of the nine Senator McConnell and Mr. Terrini set out to draw at the outset. Specifically, we discussed drawing District 45 at 44 percent, 46 percent and 48 percent. Mr. Terrini advised against submitting a plan with District 45 at 44 percent. He thought it was possible to obtain preclearance at 46 percent or 48 percent. Senator McConnell and Mr. Terrini agreed to this plan as long as Senator Pinckney would support it and ask the Department of Justice to grant preclearance. [relevance]**

Plaintiffs submit that this paragraph is highly relevant to showing the Senate's 50% BVAP standard was an arbitrary rule of convenience and not necessity, and that Senate leadership was willing to break this rule when it suited their goals.

**28.    I am unaware of any basis for Mr. Terrini's conclusion that 44 percent BVAP would be unacceptable but that 46 or 48 percent BVAP might be acceptable to the Department of Justice's retrogression analysis. To my knowledge, the Senate did not conduct any analysis of what percentage of BVAP each district required in order to give the black voters in those districts the ability to elect. I am also unaware of any "ability to elect" analysis conducted by the Senate before or after we drew our districts. This deal was never adopted because Senator McConnell was able to persuade Senator Chip Campsen (R-Charleston) to support a plan that would bring his district (SD-43) down along the coast to absorb the white population that could not be put into District 45 without lowering the BVAP below 50 percent. These meetings and the compromise discussed demonstrate that the**

> **Republican leadership and our lawyers knew the BVAP percentages they unilaterally established were not required for Section 5 Preclearance, as they insisted publically. Instead the 50 percent BVAP rule was merely an arbitrary number used to justify race-based line drawing. [relevance]**

Plaintiffs submit that this paragraph is highly relevant to showing the Senate's 50% BVAP standard was an arbitrary rule of convenience and not necessity, and that Senate leadership was willing to break this rule when it suited their goals.

> **31.     Black voters in our state are also willing to elect white candidates as their candidate of choice. I believe I am the black community's candidate of choice. [opinion]**

Plaintiffs incorporate their argument to Hutto Affidavit Paragraph 5, above. Rule 701 of the Federal Rules of Evidence permits Senator Hutto's non-scientific opinion.

> **32.     The Congressional Redistricting Plan diminishes the voting power of the black community and attempts to divide our state along purely racial lines. This violates the Constitution and the Voting Rights Act and hurts both black and white voters. As such, I would respectfully urge the Court to declare Act 75 unconstitutional and order the General Assembly to draw a new Congressional map. [opinion]**

As to the firsts sentence in paragraph 32, Plaintiffs incorporate their argument to Hutto Affidavit Paragraph 5, above. Rule 701 of the Federal Rules of Evidence permits Senator Hutto's non-scientific opinion. As for the remainder of this paragraph, Plaintiffs do not challenge the Court's ruling.

**Representative Mia Butler-Garrick: Objections Sustained**

> **10.    It was not until the final House Judiciary Committee meeting on June 6, 2011, that Rep. Clemmons' prediction came to fruition. I was not able to attend the meeting but I received a call from Rep. James Smith (D-Richland) who was present. He described what I later learned was Amendment #35, introduced by Chairman Harrison, which would increase the BVAP of District 79 to 52 percent by trading mixed-race areas for areas containing a higher concentration of black voters. [Footnote: I have attached as Exhibit C what I believe is a fair and accurate map depicting Amendment #35 and a demographic summary created by the House of Representatives as part of**

> **their Preclearance Submission.] The other members of the committee were led to believe that I had, in fact, requested this change to increase my BVAP. This was not true. Rep. Smith, accurately, believed that I opposed this Amendment and called me just prior to the vote. I shared with Rep. Smith exactly what I had already shared with Reps. Harrison and Clemmons. He voiced my objections to the committee on my behalf but they ignored my objections and passed their Amendment anyway.  [personal knowledge; hearsay; opinion].**

Plaintiffs submit that the portions of paragraph ten documenting Representative Butler-Garrick's wishes as to how House District 79 should be drawn, and her statements to Representative Smith wherein she communicated those wishes, are based upon her own personal knowledge and should not be stricken.

Plaintiffs do not challenge the Court's ruling on the remaining portions of Paragraph 10.

> **15.   As a result of my floor speech, I got a lot of feedback from my colleagues—Republicans and Democrats alike. Former-Rep. Dan Cooper (R-Anderson) and others teased me about being the only African-American they have ever met, who didn't appreciate a higher BVAP.  Several House and Senate colleagues even told me that House Republicans were perplexed by my request to keep my community whole and maintain the diversity it had. Some even tried to solicit the help of my Democratic colleagues to "talk to me" and help me "understand" how the Republicans' map benefitted me so I would not fight it or bring unnecessary attention to it. I kept wondering why packing District 79 was so important to the Republicans and why my input did not seem relevant or welcomed by them. [hearsay; opinion].**

Plaintiffs do not challenge the Court's ruling on this statement.

> **16.   But it was Rep. Thad Viers (R-Horry) who let me in on the Republican redistricting strategy during our floor debates on redistricting. At that time, Rep. Viers was planning to run for the new Seventh Congressional District. We were having a very casual light-hearted discussion about his party's agenda in general, since I had openly taken issue with the divisiveness of some of the Republican Party's top agenda items and the amount of time the House was wasting on them. We were talking about race and I shared my view that their priorities seemed to be an intentional effort to divide South Carolinians along racial lines. As the conversation turned to redistricting, Rep. Viers told me that race was a very important part of the Republican redistricting strategy. At first, I thought he was joking because of the lighthearted nature of the conversation, but then I realized he**

> **was being candid with me. Rep. Viers said that Republicans were going to get rid of white Democrats by eliminating districts where white and black voters vote together to elect a Democrat. He said the long-term goal was a future where a voter who sees a "D" by a candidate's name knows that the candidate is an African-American candidate. As I carefully considered what they were doing to my District, the "game-plan" Rep. Viers described suddenly made perfect sense. And after my proposed Amendment came closer to passing than any other Amendment that day, Rep. Viers whispered in my ear, "that was way too close. I've gotta keep my eyes on you." Then he chuckled and said, "Well now, South Carolina will soon be black and white. Isn't that brilliant?" [hearsay].**

Plaintiffs submit the above statement made by Representative Viers is not hearsay under Fed. R. Evid. 801, <u>supra</u>, because Rep. Viers' statement constitutes a party admission. Assuming Rep. Viers is not considered a party opponent by reason of his membership in the House of Representatives, the statement he made to Representative Butler-Garrick are still admissible under two exceptions to the rule against hearsay. Rule 804 provides an exception for the following where the declarant is unavailable.

> **(3) Statement Against Interest.** A statement that:
>
> **(A)** a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
> **(B)** is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804. At the time Representative Viers made the statement, he was publicly contemplating a run for the newly drawn Seventh Congressional District. Thus, he had an obvious pecuniary and proprietary interest in seeing that the district, as drawn, was adopted. By making the above statement, Representative Viers was not only calling into question his own qualifications to hold public office, but he was jeopardizing the viability of the house district he

intended to seek. A reasonable person in Representative Viers' position would not have made the statements unless he believed or knew them to be true. Finally, Representative Viers is unavailable as a witness by reason of the Defendant Harrell's successful assertion of legislative privilege.

Rule 807 of the Federal Rules of Evidence provides a further grounds for admitting Representative Viers' statement admissible. The rule provides

> **(a) In General.** Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:
> **(1)** the statement has equivalent circumstantial guarantees of trustworthiness;
> **(2)** it is offered as evidence of a material fact;
> **(3)** it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
> **(4)** admitting it will best serve the purposes of these rules and the interests of justice.
> **(b) Notice.** The statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it.

Fed. R. Evid. 807. All of the requirements set forth in Rue 807 are met and Plaintiffs submit paragraph 16 of Representative Butler-Garrick's affidavit should be admitted.

> **17.    I subsequently realized that my Democratic colleagues were also complicit in this racial gerrymander. Most of them did not seem to understand my objection and would never take issue with a higher BVAP. The Democratic Caucus' view in large part appears to be motivated by individual and collective short-sightedness. Many of my Democratic colleagues believed their districts were "better than [they] thought they would be" and that "this redistricting plan is about the best that [they] could have hoped for." I understood these comments to be motivated by their desire—which is common knowledge among Republicans—to have as many black voters as possible. [personal knowledge; hearsay; opinion].**

Plaintiffs do not challenge the Court's ruling on this statement.

> **18.    Several of my Democratic colleagues have tried to convince me that the Republicans' map benefits me greatly, by "strengthening" the District so**

10

**that I have a better, more secure chance of keeping the seat "as long as I want." If anything, they suggest that I need only be concerned about Primary opposition. This self-interest appears to be the most compelling motivation for the majority of them. I believe this hurts all of our voters by separating us along purely racial lines and weakens competition so that incumbents become complacent in their "safe" districts. [personal knowledge; hearsay; opinion].**

Plaintiffs do not challenge the Court's ruling on this statement.

**19.    I remember when Rep. Bill Clyburn (D-Aiken, Edgefield) came to me after he heard me speak about my amendment and why it was necessary. He said he did not know that upping my BVAP would actually hurt my District. And although he and other Democrats seemed shocked that I would actually propose or support anything other than a higher BVAP, he told me he would support my efforts to restore my District back to the original proposed version. [personal knowledge; hearsay].**

Plaintiffs do not challenge the Court's ruling on this statement.

**United States Congressman James Clyburn: Objections Sustained**
        **[all objections based on improper opinion testimony]**

**3.    During my lifetime, I have witnessed dramatic progress toward greater racial equality in South Carolina and all across America. Much of this progress came at great cost during the Civil Rights efforts of the 1960's and 1970s. Many brave Americans suffered personal intimidation and physical violence at the hands of their white neighbors for seeking access to the rights secured them by our Constitution. That progress has been made cannot be seriously doubted, but neither should it be taken for granted. I am proud to serve in the Congress during the presidency of President Barack Obama. I am also proud to be one of two black Congressmen from South Carolina. While I often disagree with my friend, Congressman Tim Scott (CD-1), our elections prove that voters in our state, both white and black, are increasingly willing to look to the content of one's character rather than the color of their skin when choosing a candidate, although I think it is rather safe to say that neither one of us could get elected in the other's District.**

**6.    In light of the progress we have made in race relations, I am very concerned that South Carolina's adopted redistricting laws, particularly Act 75 of 2011 drawing election districts for the United States Congress, is a substantial step backward for black voters in our state. I believe Act 75 is a discriminatory effort to unlawfully "pack" black voters into the Sixth Congressional District.**

**9.** I did not ask the General Assembly to increase the BVAP of the Sixth Congressional District. I also believe doing so is unnecessary to comply with the Voting Rights Act where the previous five elections demonstrate that a BVAP of 52 percent seems sufficient for black voters to elect their candidate of choice.

**10.** I believe the Congressional Redistricting plan is an intentional effort to decrease black voters' political influence in South Carolina outside of the Sixth Congressional District. I believe the General Assembly has packed as many black voters as possible into the Sixth District in order to prevent them from influencing elections in districts adjacent to the one in which I serve.

**12.** I also object to the manner in which the Congressional Plan trades white former constituents for new black constituents. In many of the areas where the new Congressional Plan engages in these trades it is completely unnecessary in order to accommodate the new Seventh Congressional district in the Pee Dee or to accommodate another redistricting goal like improving the shape or compactness of the district or keeping communities of interest intact.

**13.** For example, the adopted plan trades an area I previously represented in Orangeburg County for a different piece of geography in the southern part of Orangeburg County. The new area has a higher concentration of black voters. This is objectionable because I had cultivated relationships with many of the voters who were taken out of my district. This trade also does not serve any legitimate purpose since the new plan still divides Orangeburg County between the Sixth and Second Congressional Districts. Similarly, the Congressional Redistricting plan also trades white areas for black areas in Charleston and Berkeley County. This has the effect of making an already unusual looking protrusion into the Sixth District even more unusual as the adopted Sixth District now hooks around the eastern side of Berkeley County then hooks northward up the Charleston Peninsula.

**15.** My objections to Act 75 has nothing to do with the particular voters or areas of the state that I am happy to represent if I am fortunate enough to win another term in Congress. I have represented the Midlands, the Pee Dee and the Low County as a member of Congress and I have great affection for the people and places in each of these regions. However, the adopted Sixth District cannot represent the interests of any of these areas adequately if it only includes neighborhoods where black voters live.

**16.** I believe the adopted Congressional Plan harms my constituents, both black and white, by further separating them on the basis of race. Act 75 blatantly trades some of my white constituents for black constituents in what I believe is an intentional effort to re-segregate citizen politically. I believe

> **this is a step backwards for South Carolina. The purpose of the Voting Rights Act is to level the playing field for minority candidates and voters, not to re-segregate our society along strictly racial lines. Black voters want results on issues that matter in their daily lives. Because black voters are a minority in our state, they must, at some point, work together with white voters to elect representatives that both white and black voters agree will represent their interests. Packing black voting power into the Sixth Congressional District ensures this will never happen.**
>
> **17.     Any suggestion that the Voting Rights Act requires this type of segregation is an affront to the very purpose of the Voting Rights Act, and I encourage this Court to reject it. I believe South Carolina is demonstrating an ability to look beyond skin color in our politics.**

Plaintiffs submit that all of Congressman Clyburn's statements set forth above are admissible pursuant to Rule 701 of the Federal Rules of Evidence. Rule 701 permits lay witnesses to offer opinion testimony where the following circumstances are met.

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> **(a)** rationally based on the witness's perception;
> **(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> **(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. Those factors are all satisfied here. Congressman Clyburn has been a member of the United States House of Representatives since 1992. His opinions, set forth in the above paragraphs, are based on his own perceptions and involvement in South Carolina politics for more than two decades. His opinion is helpful, at least to some degree to determining the fact in dispute – whether race the primary consideration in redrawing Congressional districts, and particularly the Sixth Congressional District and the surrounding district. Finally, the opinions are in no way based upon scientific, technical, or other specialized knowledge within the scope of Rule 702. Plaintiffs ask the Court to overrule Defendant Harrell's objections to Congressman Clyburn's affidavit.

For the reasons set forth above, Plaintiffs respectfully ask the Court to reconsider its ruling on Defendant Harrell's objections to the affidavit testimony of Senator Bradley C. Hutto, Representative Mia Butler-Garrick and Congressman James Clyburn.

>Respectfully submitted,
>
>s/ Richard A. Harpootlian
>Richard A. Harpootlian (Fed. ID # 1730)
>rah@harpootlianlaw.com
>Graham L. Newman (Fed. ID # 9746)
>gln@harpootlianlaw.com
>M. David Scott (Fed. ID # 8000)
>mds@harpootlianlaw.com
>RICHARD A. HARPOOTLIAN, P.A.
>1410 Laurel Street
>Post Office Box 1090
>Columbia, SC 29202
>Telephone: (803) 252-4848
>Facsimile: (803) 252-4810
>
>ATTORNEYS FOR PLAINTIFFS

Columbia, South Carolina
February 29, 2012