1

1    UNITED STATES DISTRICT COURT
     DISTRICT OF SOUTH CAROLINA
2           COLUMBIA DIVISION

3    ------------------------------

4    VANDROTH BACKUS, et al.,              CV NO. 3:11-3120
                                           Columbia, SC
5            Plaintiffs                    March 1, 2012

6      -against-

7    THE STATE OF SOUTH CAROLINA,
     et al.,
8            Defendants                    BENCH TRIAL

9    ------------------------------

10

11          BEFORE:  HON. MARGARET B. SEYMOUR
         CHIEF UNITES STATES DISTRICT COURT JUDGE
                 HON. HENRY F. FLOYD
12       FOURTH CIRCUIT COURT OF APPEALS JUDGE
                HON. PATRICK MICHAEL DUFFY
13       SENIOR UNITED STATES DISTRICT COURT JUDGE

14          TRIAL TESTIMONY OF BAKARI SELLARS

15

16   APPEARANCES:

17

     FOR PLAINTIFFS:      RICHARD A. HARPOOTLIAN, P.A.
18                        BY:  RICHARD A. HARPOOTLIAN, ESQ.
                               M. DAVID SCOTT, ESQ.
19                             CHRISTOPHER KENNEY, ESQ.
                          1410 Laurel Street
20                        P.O. Box 1090
                          Columbia, SC  29202
21
     FOR DEFENDANT        SOWELL GRAY STEPP & LAFFITTE, L.L.C.
22   HARRELL:             BY:  ROBERT E. STEPP, ESQ.
                               ROBERT E. TYSON, JR., ESQ.
23                        1310 Gadsden Street
                          P.O. Box 11449
24                        Columbia, SC  29211

25

2

```
 1                          WILLOUGHBY & HOEFER, P.A.
                            BY:  BENJAMIN P. MUSTIAN, ESQ.
 2                               TRACEY C. GREEN, ESQ.
                            930 Richland Street
 3                          P.O. Box 8416
                            Columbia, SC  29202
 4
 5    FOR DEFENDANT         NEXSEN PRUET
      McCONNELL:            BY:  ANDREW A. MATHIAS, ESQ.
 6                               JAMES D. GALYEAN, ESQ.
                            P.O. Box 10648
 7                          Greenville, SC  29603
 8
      FOR OTHER STATE       J.C. NICHOLSON, III
 9    DEFENDANTS:           Assistant Attorney General
                            P.O. Box 11549
10                          Columbia, SC  29211
11
12    COURT REPORTER:       DANIEL E. MAYO, RDR
                            Certified Realtime Reporter
13                          901 Richland Street
                            Columbia, SC  29201
14
15
16              STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
17
18
19
20
21
22
23
24
25
```

3

1    JUDGE FLOYD:  All right.  Good morning.  A couple of

2    preliminary things.  Is there a Mr. Beam from The State

3    Newspaper in here?  Okay.  We let you have your computer in

4    here but you can not transmit it or take any photographs.  And

5    if we find out you did we will hold you in contempt.

6    MR. BEAM:  Yes, sir.

7    JUDGE FLOYD:  Okay.

8    JUDGE DUFFY:  But we don't want to do that, right?

9    JUDGE FLOYD:  I want to thank Judge Duffy for his

10   work in the pretrial effort.  I understand there may be a

11   couple of preliminary issues that we need to take up, because

12   apparently you all stayed up until midnight last night filing

13   things, and this morning, I understand.

14   JUDGE DUFFY:  I'll try to recall all of them and

15   comment on them.  If I miss anything y'all call it to my

16   attention.  Each side has asked or filed a motion to

17   reconsider regarding the rulings on the affidavits.  First, as

18   to the defendants' wish to add back entire affidavits of

19   certain witnesses and portions of others, I'll tell you it was

20   a close call but in considering it the first time I thought

21   about it along the lines you submitted it, but I think it's

22   most fair to both sides to exclude them in toto, so I'm going

23   to remain with that ruling.

24   As to the plaintiffs' objections, I will tell you I

25   gave more leeway to Senator Brad Hutto in allowing his

4

 1    testimony because of his position, and the things that you

 2    brought out in the motion to reconsider don't tempt me to go

 3    further than that.  So I'm going to stick with that ruling, as

 4    well.

 5            There were certain things that came up concerning

 6    qualifications of expert witnesses and methodology and things

 7    of that kind I told you we would take that up at trial.  I

 8    think when the witnesses are called we will have a proper voir

 9    dire and proper cross-examine and we will allow it to be

10    handled in that way.  And anything else, you all let us know

11    as we go.

12            Is there anything that I have not mentioned that

13    needs to be addressed prior?

14            MR. STEPP:  May it please the court, Bobby Stepp,

15    your Honor, for defendant Harrell.  A couple of housekeeping

16    matters.  We have designated and exchanged exhibits and I

17    think the most expedient thing, if the court would permit us,

18    is move the introduction of all the exhibits.  We have filed

19    those that could be filed and we submitted exhibit lists.

20    There were no objections by the plaintiffs to the defendants'

21    exhibits, so rather than having to sort of offer them and

22    proffer them and mark them and all that, I would just move

23    their introduction en masse.

24            I think we objected to a few of the plaintiffs'

25    exhibits and we have got a motion pending about that.  But

1    subject to those objections I will certainly not object to an

2    en masse introduction of the plaintiffs' evidence, either.

3            JUDGE FLOYD:  Any objection, Mr. Harpootlian?

4            MR. HARPOOTLIAN:  No, sir.  But, for the record, I

5    think primarily what they have objected to with us are

6    demonstrative maps that we designed based on the block files,

7    block files could be a data file.  Do you continue to object

8    to those?

9            MR. STEPP:  I don't have them in front of me, but I

10   need to protect my record, so yes.  Hold on.

11            (There was a pause in the proceedings)

12            JUDGE DUFFY:  We don't have a jury present so we can

13   be a little more informal than we usually would be.  But you

14   can put those things in and we can sort them out.

15            MR. HARPOOTLIAN:  Yes, your Honor.

16            MR. STEPP:  We withdraw our objections to maps on

17   block files.  We may be using some ourselves.

18            JUDGE FLOYD:  Let me say that since we're sitting as

19   a panel today, Judge Seymour and I agree with Judge Duffy's

20   rulings and adopt them.  Of course, we always have the right

21   before the issuance of a final order to change any ruling

22   that's been made in the case, and we will reserve that right.

23            As Judge Duffy said, this is a bench trial.  I think

24   all of you believe that we understand what's relevant, what's

25   admissible, what's not.  Throw your case up there, we will

1    sort it out.  And let's not get too technical here so we get

2    the thing over with.  We're shooting to file an order by

3    March -- by next Friday and that's going to be a real task.

4    So, Mr. Harpootlian, are you ready?

5         MR. HARPOOTLIAN:  Yes, sir, your Honor.  Let me, if I

6    could make just a brief statement, not an opening statement,

7    about how we're going to do this and make sure there's no

8    objection.  We intend on calling, based on the court's

9    previously rulings, two witnesses today and that would be our

10   case.  The first witness would be Representative Bakari

11   Sellars, the second witness would be our expert Dr. McDonald.

12        I want to make sure I understand that all of our

13   exhibits, all their exhibits are in so we don't need to go

14   through the process of authenticating things.  And, two, I

15   want to make sure we understand, that I understand, I'm sure

16   y'all understand but I want to make sure I have the same

17   understanding, that during this process because it is -- there

18   is no jury here, we may be allowed a little more leeway in

19   terms of how we proceed.  I know leading questions are not

20   normally allowed, but if it's getting to not something

21   critical if we can just cut to the chase it would help

22   immensely in terms of moving this forward.

23        We believe we can easily finish our case today.  I've

24   talked to Mr. Stepp, they intend on calling one witness, their

25   expert, tomorrow.  So we could even perhaps finish early

1    tomorrow.  And I understand the court wants this expedited and

2    we're going to attempt to try to do that.  Again, if I do

3    lead, I'm sure too much, Mr. Stepp will object.  But I'm going

4    to try to cut to the --

5            JUDGE FLOYD:  We will give you as much room as we

6    can.

7            MR. HARPOOTLIAN:  Yes, sir.  The judge is not a jury,

8    and y'all can certainly --

9            JUDGE FLOYD:  And your assumption about your exhibits

10   is correct.

11           MR. HARPOOTLIAN:  Right.  Thank you.

12           JUDGE FLOYD:  You may proceed.

13           MR. HARPOOTLIAN:  Bakari Sellars.  While he's walking

14   up there, Mr. Stepp reminds me, Mr. Chris Kenney who is an

15   associate in my firm, has been trying to get his 403

16   experience.  But with the scheduling order the court set, Mr.

17   Kenney was the one filing stuff at 1:00 o'clock this morning,

18   not me.  I would ask that since there's no opening statement

19   or closing statement that the court allow this to serve as a

20   403 for him.

21           JUDGE FLOYD:  We don't have a problem with that.

22           MR. HARPOOTLIAN:  Okay.  Thank you.

23           MR. KENNEY:  Thank you very much.

24           JUDGE DUFFY:  We will not suffer through those.

25           MR. HARPOOTLIAN:  I waived an opening statement just

Sellars – Direct                               8

1    to get his --

2                    (Bakari Sellars duly sworn)

3          MR. HARPOOTLIAN:  May it please the court.  May I

4    question from back here rather than going to the podium?  I

5    mean, I've just got a whole mess of stuff that --

6          JUDGE FLOYD:  That's fine.  We're not going to have

7    any trouble hearing you anyway.

8          MR. HARPOOTLIAN:  I'm going to speak up as loud as I

9    can.

10                      DIRECT EXAMINATION

11   BY MR. HARPOOTLIAN:

12   Q.  State your full name for the record, please.

13   A.  Bakari Sellars.

14   Q.  And, Mr. Sellars, where do you reside?

15   A.  Denmark, South Carolina.

16   Q.  And are you -- let's find out very briefly, did you attend

17   college?

18   A.  I did.  I went to Morehouse College.

19   Q.  Morehouse College.  And are you a member of the House of

20   Representatives of the state of South Carolina?

21   A.  I am.  This is my third term.

22   Q.  Your third term.  You're completing your third term this

23   year?

24   A.  Yes, sir.

25   Q.  So you were not a member of the legislature in 2002.

Sellars - Direct                                        9

1    A.  I was not.

2    Q.  Now, did you serve on the election law subcommittee of the

3    House of Representatives?

4    A.  I did and still currently do.

5    Q.  I'm sorry?

6    A.  I still currently do, correct.

7    Q.  And how about tell the court, and, again, I'm sort of

8    jumping ahead real quick, but there was a reapportionment

9    process considered by the House of Representatives this year,

10   correct?

11   A.  Correct.

12   Q.  And that includes the House of Representatives, the state

13   Senate and the Congressional plans.

14   A.  We did not deal with the state Senate, we just dealt with

15   the House of Representative and the Congressional plan.

16   Q.  You all voted on the state Senate plan.

17   A.  We did vote on the --

18   Q.  The subcommittee did not deal with that.

19   A.  We did not.

20   Q.  The House of Representatives and the Congressional plan.

21   A.  Correct.

22   Q.  When you say you dealt with it, what was the process?  Why

23   was there a subcommittee?  What -- how was that supposed to

24   work?

25   A.  It was supposed to be treated and it was treated like any

Sellars – Direct                    10

1    other bill that we passed in the House of Representatives.

2    Our committee met, we had a series of public hearings, eight

3    or nine public hearings.  We had some time after those public

4    hearings where we had a map room, and individuals were able to

5    go in and try to create what they wanted their districts to

6    be.  And then we created –– we drafted an amendment.  Well, an

7    amendment was drafted and it was treated like a bill and we

8    had the opportunity to amend that amendment.  It then went

9    from the subcommittee to the full committee, from the full

10   committee to the House floor.

11   Q.  Okay.  So let's talk a little bit about the public

12   hearings.  What kind of public hearings did you have?

13   A.  With went to Denmark, Aiken, Summerville, Greenville, we

14   went to different –– Myrtle Beach.  We went to different

15   locations around the state and solicited public input on the

16   lines that were being drawn.

17   Q.  And what kind of public input were you looking for?

18   A.  Well, we heard from everyone from service groups like the

19   NAACP and League of Women Voters, we heard from elected

20   officials, we heard from the Mayor of Anderson, we heard from

21   county council officials in Colleton, we heard from average

22   citizens across the state.

23   Q.  What were you wanting to hear?

24   A.  We wanted to hear about the principles in which we were

25   going to draw these districts.  We wanted to hear about

1  communities of interest, we wanted to hear about where

2  people -- where these communities of interest may have been.

3  We wanted to hear about where people felt the lines should

4  have been drawn.  So we were soliciting input from average

5  everyday South Carolinians, attempting to put these lines

6  together.

7  Q.  Okay.  And let's talk about this map room.  Tell me what

8  the map room was.

9  A.  The map room was located on the third floor of our House

10  Office Building.  It's a room in which all of our

11  technological equipment is, where staff was to help you draw

12  your lines, where we had a log that you had -- you had to sign

13  in and out of.  It was just a room full of computers and maps.

14  That's where we did our work.

15  Q.  The maps being drawn, was they somebody sketching them out

16  by hand or were computers being used?

17  A.  All computers.

18  Q.  All computers.  And was there staff?

19  A.  Yes, there were traditionally three staff, House staff

20  that were helping Emma Dean, Patrick Dennis and Thomas, I

21  can't recall his last name.  And the speaker staff may have

22  been in and out, but I didn't have any direct communication

23  with them.

24  Q.  But your characterization of this process of being able to

25  use the map room and this process of attempting to draw

Sellars - Direct                            12

1    districts using computers, was it good, was --

2    A.  I think that the process was sound.  I think that the

3    ability to go out and meet our constituents, the ability to go

4    in a map room, I think that it was all in good spirit.  I

5    think the process was very sound.

6    Q.  And as a result of this a bill was passed, and we will

7    come back to that in just a second.  Your House district is

8    number 90?

9    A.  It is.

10   Q.  Do you have any objection to how your House district --

11   A.  Not at all.  In fact, I look forward to serving the people

12   of Bamberg along with Colleton County.

13   Q.  Prior to this new reapportionment -- you're familiar with

14   the term BVAP?

15   A.  Correct.

16   Q.  And what does that stand for?

17   A.  Black voting-age population.

18   Q.  And did the black voting-age population in your district

19   increase or decrease as a result of the reapportionment plan?

20   A.  Decreased.

21   Q.  And what -- do you know what --

22   A.  I think it went down about four percent maybe.  I was not

23   a -- I was not above 50 percent at any time, I was about 48, I

24   think, 48, 49.  It was not --

25   Q.  About 44?

Sellars – Direct                    13

1    A.   I think about 44, 5.

2    Q.   So you were elected in a district which was not majority

3    African American.

4    A.   Correct.

5    Q.   And you now have a district which is not majority African

6    American.

7    A.   Correct.

8    Q.   Now, this process that y'all went through, the hearings,

9    the map room, the discussion, based on your participation in

10   that process was -- did race play any part, first of all, any

11   part in this process, consideration of race?

12   A.   Consideration of race was a predominant factor.  It was --

13   in many cases it was the only factor.

14   Q.   The only factor?

15   A.   In many cases.

16   Q.   And tell me why you believe that.

17   A.   I can recall a number of instances in which I proposed

18   amendments or other members proposed amendments and staff

19   would just point out to Chairman Alan Clemmons what the BVAP

20   would look like, voting-age population was of a particular

21   district, and Chairman Clemmons would object or move to table

22   that amendment.  There were three Republicans on the

23   committee, two African Americans, and immediately based on

24   that -- any decrease in BVAP immediately he would move to

25   table any amendment that was put forth and surrounding that

Sellars – Direct                            14

1   Amendment number 1 which he crafted.

2   Q.  Amendment number 1, please tell the court what Amendment

3   number 1 --

4   A.  Usually we draft bills, you go in your office and come up

5   with the wonderful dreams of what a bill should be and you put

6   in a bill.  In this case we didn't necessarily have a bill,

7   but Amendment number 1 was the vessel that appears before us

8   that --

9   Q.  How was that designed, do you know?

10  A.  I just -- you know, I was in the map room every day and I

11  was the person who would go in and attempt to talk with, you

12  know, staff, or even pull down what was being drawn daily.  I

13  recall one instance going in on a, I can't recall the date,

14  the log should be able to tell you, but I went in and it was

15  the day after Representative Clemmons and Harrison and Harrell

16  had been in, and the soon thereafter we had Amendment number

17  1.

18  Q.  Did you participate in drawing the Amendment number 1?

19  A.  No.

20  Q.  Do you know anybody that did?

21  A.  No.

22  Q.  And so it appears -- well, is there a name attached to 3?

23  A.  I believe it's Clemmons.

24  Q.  So Representative Clemmons, he is from where?

25  A.  Horry County.

Sellars – Direct                                    15

1   Q.  And he is white or African American?

2   A.  White.

3   Q.  And he is a Republican or Democrat?

4   A.  A Republican.

5   Q.  Okay.  And that 3, was that just the House or was that

6   House and Congress.

7   A.  No, it was just the House.  We treated Congress like a

8   separate bill.

9   Q.  That would have been a --

10  A.  That would have been a separate --

11  Q.  So let's talk about 3, which is just the House.  And you

12  indicated a process where you would propose amendments.  What

13  kind of amendments were you proposing?

14  A.  Various amendments.  You know, I recall I tried to

15  implement what we heard in public hearings.

16  Q.  Which was?

17  A.  Which, for example, Anderson County, the Mayor of Anderson

18  testified that he wanted to try to keep his community whole.

19  And the City of Anderson has a decent percentage of black

20  voting-age population, and I made efforts, many efforts, to

21  keep that community whole.  Instead, what was drawn was the

22  African American population in those districts was -- was

23  fragmented and put into various districts.  I specifically

24  recall many instances where we tried to deal with my colleague

25  Mia Butler's district and the fact she was able to win in a

Sellars – Direct                        16

1    non-majority district, and those efforts were rebuffed.  I

2    mean, there were a series of amendments.  I tried to deal with

3    my own district and had some dialogue with Lonnie Hosey, who

4    is another African American, a member of the African American

5    Black Caucus.  We addressed our district and that was

6    rebuffed.

7         Anything that would take a district, if you had a black

8    voting-age population of let's say 95 and you want to take it

9    to 94-and-a-half, that would be tabled.  They had a hard, fast

10   line, which I felt was incorrect, that they were not reducing

11   black voting-age population in any district regardless of how

12   high it was.  It was an attempt to resegregate.

13   Q.  What?

14   A.  Resegregate.

15   Q.  Okay.  And when the subcommittee was considering an

16   amendment by you or someone that would be proposing an

17   amendment which would reduce black voting-age population in a

18   district, even keeping it above 50, were any other criteria

19   considered such --

20   A.  No.

21   Q.  -- compactness or --

22   A.  No.

23   Q.  Communities of interest?

24   A.  No.  No, we did not deal with compactness, communities of

25   interest.  We did at some time deal with incumbency.  We did

1   not deal with the public comments or testimony that we heard.

2   We did a very good job of window dressing.  The process was

3   sound; however, when it came to the implementation the only

4   factor that was used was race.

5   Q.  Now, you indicated a moment ago that there was a process

6   where an amendment was proposed and you mentioned the name

7   Patrick Dennis.  Who is he?

8   A.  Patrick Dennis is our chief counsel of the judiciary

9   committee.

10  Q.  The judiciary committee?

11  A.  Correct.

12  Q.  And you indicated he would communicate some information --

13  A.  Any bill we put up, any amendment that we put up, it did

14  have the black voting-age population on it and Patrick would

15  highlight or just point, just giving information, purely -- he

16  was not making a decision, he was just purely giving

17  information to the chairman.  The chairman would then move to

18  table.  He had three votes, and it didn't matter what the

19  amendment was, if that black voting-age population went down a

20  percentage point he would --

21  Q.  And did you ever talk to Mr. Clemmons about this?

22  A.  At length.

23  Q.  And his reasoning for doing that --

24  A.  I talked to Mr. Clemmons.  I even talked to -- attempted

25  to talk to House counsel about this, and he did not have a

Sellars - Direct                    18

1    reason.  I felt as if he was perverting the law.  I even told

2    him that on numerous occasions.  But he did not -- he did

3    not -- he just said this is what he was going to do.

4    Q.  Mr. Clemmons did?

5    A.  Correct.

6    Q.  Did you attempt to discuss with him Mia Butler's district?

7    A.  I did.

8    Q.  And how she was getting reelected with a 31 percent

9    African American --

10   A.  And I went one step further.  Not only was she getting

11   reelected, there was a gentleman before her, Anton Gunn, who

12   had come very close to winning six years ago but did win four

13   years ago in a district that was that same makeup.  We talked

14   about there was -- even instances where I talked about a

15   coalition district where we pull case law and talk about

16   putting African Americans and minorities together to create

17   these majority-minority districts, I talked to counsel about

18   that.  We even had sidebars with counsel.

19   Q.  Counsel being who?

20   A.  That's where I get a little confused.  Counsel being

21   those -- the defendants.

22   Q.  The gentleman right here?

23   A.  The young guy with gray hair, yes.

24   Q.  That would be Bobby Stepp?

25   A.  Yes.

Sellars - Direct                          19

1    Q.  And you talked to -- attempted to talk to Mr. Stepp about
2    it?
3    A.  I did.  And everyone that we had as, quote-unquote, House
4    counsel, correct.
5    Q.  Did you get any answers from any of them?
6    A.  I really didn't.  I thought the travesty was that -- I
7    thought that the travesty was that there was a hard, fast line
8    which I felt was not rooted in anything, it was an attempt to
9    use race as a predominant factor to draw the districts that we
10   have now.
11   Q.  Now -- I'm sorry, we're having technical difficulties.  I
12   want to pull up the map.  Does the witness have a monitor he
13   can see?
14   A.  I do.
15   Q.  Let's talk a little bit about --
16          (There was a pause in the proceedings)
17   Q.  (MR. HARPOOTLIAN) Let me -- we're going to put up here
18   Amendment number 8, a map exhibiting the characteristics of
19   Amendment number 8.  Is that you?
20   A.  I believe so.
21   Q.  Pardon me?
22   A.  I believe so.
23   Q.  Okay.  I apologize to the court, our technical prowess is
24   not great.  If Mr. Kenney doesn't get this up in couple of
25   minutes I'm going to withdraw my earlier motion.

Sellars - Direct                                  20

1          (There was a pause in the proceedings)

2          MR. HARPOOTLIAN:  You know, in the old days we just

3    have a big old blowup and I'd show it to him.  Allegedly this

4    is supposed to work better.  I'm not quite sure about that.

5    We will see.

6          JUDGE DUFFY:  It's better when it works.

7          MR. HARPOOTLIAN:  I apologize to the court.

8    Q.   (MR. HARPOOTLIAN) Can you see the map?

9    A.   I can.

10   Q.   Does that represent Amendment number 8?

11   A.   It does.

12   Q.   And what -- this was your amendment?

13   A.   Correct.

14   Q.   And how does did differ from 3, the plan that was

15   produced?

16   A.   This actually is my district.  If you look in the green

17   it's House District 90.  HD90 is in the forest green, I

18   believe.

19   Q.   In the middle?

20   A.   In the middle.  I have a portion of Orangeburg County, the

21   western portion of Orangeburg County which I currently have,

22   to Norway, and then I go down to Colleton County.  And this

23   is -- in this amendment.  The reason being is because we heard

24   testimony from -- public input from the people of Barnwell,

25   because I currently have a very small portion of Barnwell, and

Sellars – Direct                    21

 1    they wanted to keep their community whole.  They wanted to

 2    have the same representative for the entire community instead

 3    of me representing 40 people -- 400 people, if that.  So I put

 4    this amendment up attempting to abide by the traditional

 5    principles of redistricting and I got agreement from Lonnie

 6    Hosey who represents District 91, which is a very good friend

 7    of mine and fellow African American member of the General

 8    Assembly.  We agreed, I took this amendment to Representative

 9    Clemmons --

10    Q.  One second.  I put a blue arrow up here.  This is part of

11    your -- what you propose in District 90, is that correct?

12    A.  Right.

13    Q.  And then that's Colleton County, that's Bamberg, and the

14    third top, what county is that?

15    A.  Orangeburg.

16    Q.  Orangeburg County.  Okay.  So the communities of interest,

17    you were trying to keep Barnwell whole.  Why is Barnwell in

18    here?

19    A.  I currently have 400 people in Barnwell, and in the redraw

20    I have a little bit more people, and in Amendment 1 I have a

21    slightly larger number of people in Barnwell.  And but after

22    discussions with Representative Hosey, who in fact is an

23    incumbent, long-serving member of ways and means, wanted to

24    actually keep Barnwell whole, we came up with this amendment.

25    Q.  And would you get Barnwell or would he?

Sellars – Direct                          22

1    A.  He would.

2    Q.  Okay.  So you took out your 400 votes of Barnwell and gave

3    it to Mr. Hosey.

4    A.  Correct.

5    Q.  Now, was there a discussion on this in front of the --

6    A.  Yes.

7    Q.  -- the subcommittee?

8    A.  Correct.

9    Q.  And I think we have a recording of that.  Can we play

10   that, please?

11   A.  Yes, sir.

12        MR. HARPOOTLIAN:  We don't have a transcript, do we?

13   Q.  You heard this played before, right?

14   A.  Right.

15   Q.  And this would be Mr. Clemmons.  This would be Exhibit

16   number 66RWT22017, May 23, 2011, at 2:05 to -- 2:05 to

17   2:09:05.

18        (There was a pause in the proceedings)

19        (Audio played)

20        MR. KENNEY:  I believe that's the wrong day.  I

21   apologize.

22        (There was a pause in the proceedings)

23        MR. HARPOOTLIAN:  I apologize.  This is going to take

24   a couple of seconds.  Your Honor, I have a transcript, I could

25   read portions of it, he can read a portion of it.  Do you have

Sellars – Direct                    23

1    an objection?

2              (There was a pause in the proceedings)

3              MR. HARPOOTLIAN:  This is it.

4              (Audio played)

5    Q.   (MR. HARPOOTLIAN) Is that you?

6    A.   Yes.

7         (Audio played)

8    Q.   Mr. Clemmons is about to respond to you?

9    A.   Maybe.

10        (Audio played)

11   Q.   So that is a discussion between you and Mr. Clemmons on

12   the record in the subcommittee about an amendment you made

13   that could keep Barnwell whole, is that correct?

14   A.   Correct.

15   Q.   And his response to you is that if you do that to make

16   that work you decrease Mr. Hosey's district --

17   A.   I took his district from 52-and-a-half to 53 percent or

18   50.1 -- 50.5, excuse me.

19   Q.   Okay.  To 50.67?

20   A.   Yes.

21   Q.   And he says you can't do that?

22   A.   Correct.

23   Q.   And you can't do that why?

24   A.   He didn't give a why in anything he did.  There was never

25   a why given in -- and my reason for attempting to ask our

Sellars - Direct                    24

1    hired counsel for a legal opinion and take a break was so that

2    we could actually get a why.  But that never was given.  The

3    only issue that Alan Clemmons ever had in his mind, as you

4    listen to the tape, he did not discuss public testimony, he

5    did not discuss communities of interest, the only thing he

6    talked about was race.  That's the only thing he ever talked

7    about.  That was his only basis for tabling anything that came

8    up in our subcommittee.

9    Q.   How many people were on the subcommittee?

10   A.   Five.

11   Q.   And you indicate two African Americans?

12   A.   Correct.  Karl Allen was there along --

13   Q.   Okay.  And the other members of this committee, when he

14   made a motion to table, is there any discussion?

15   A.   I never had any discussion with them.  It was rare.  Most

16   of my discussion, which if you listen to all six hours or

17   eight hours of tape, which got somewhat heated at times, was

18   with the chairman.

19   Q.   And when you indicated on the record, you said if you

20   balance that with what we heard this morning about the simple

21   fact of people wanted people to keep Barnwell County whole,

22   this line that you can't take black people's percentages down

23   is not actually what the law says, was there any response,

24   either on the record or off the record, about keeping Barnwell

25   County whole?

Sellars - Direct                          25

1    A.    There was public testimony about keeping --

2    Q.    I'm talking about from Mr. Clemmons when you said keep it

3    whole.

4    A.    No.  And even -- there was not even a comment from counsel

5    about the principles.

6    Q.    Okay.  Did you make Amendment number 13?

7    A.    Yes.

8    Q.    Okay.  Can we see Amendment number 13?

9    A.    This is my --

10   Q.    Do you -- how do you get those blue arrows off there?

11   There we go.  Do you recognize this map?

12   A.    Yes.  This is Joe Jefferson's district, I believe.

13   Q.    Which is district number what?

14   A.    Joe is 102.

15   Q.    Okay.  And what was -- what was your issue there?

16   A.    I mean, all of them were -- I mean, in many instances I

17   was trying to keep communities together, I was going to the

18   members, to the incumbent, listening to what they had to say,

19   because incumbency is a major issue, and listening to what we

20   heard in our public testimony and draft districts based on

21   that.

22   Q.    And what was your issue with communities of interest in

23   this district, do you remember?

24   A.    Yes.  I was -- I know that this one had to do with Patsy

25   Knight, as well.  She was 97, I believe, in Dorchester County.

Sellars – Direct                         26

1    And all I was -- all I was attempting to do on this map, all I

2    was attempting to do in this amendment, like I was trying to

3    do in many other instances, and I thought we were going to

4    have success but we never did, was keep communities of

5    interest together, areas that had been represented by

6    incumbents for a period of time who wanted to maintain their

7    representative, do that.

8        And the most ironic thing is that in my consideration race

9    wasn't a factor.  In drawing these maps race wasn't a factor.

10   I was cognizant of BVAP, understanding that we are a voting

11   rights state.  However, that was never the predominant factor.

12   But when we went to committee, regardless of what amendment I

13   put up, the only issue, nine times out of ten, just as you

14   heard on eight, the only issue that was discussed was race.

15   And I think that the most -- I think the most important thing

16   that Alan Clemmons continuously said was that if the BVAP went

17   down that it was a complete nonstarter.  So it shows his hard,

18   fast line.

19   Q.  Okay.  Now, you were present on May 24, 2011 at -- for a

20   subcommittee meeting.  This would be audio from Exhibit number

21   66, RWH022017.  How about if you can play that.  Listen to it

22   and what it is, okay?

23       (Audio played)

24   Q.  Is that Mr. Young speaking?

25   A.  Tom Young.

Sellars - Direct                    27

1    Q.  Representative Young?

2    A.  Yes.

3        (Audio played)

4    Q.  So the last thing we heard, Mr. Young was running the

5    meeting that day?

6    A.  No, they just took turns with me.

7    Q.  Okay.  Took turns with you.  Okay.  And Mr. Young

8    indicated that the law indicated that they could not decrease

9    a majority minority district below 50 percent?

10   A.  At all.

11   Q.  Ever?

12   A.  If it wasn't at 50 percent.  They could not reduce it at

13   all.

14         MR. STEPP:  Excuse me, Counsel.

15   Q.  (MR. HARPOOTLIAN) Was that Mr. Clemmons?

16   A.  That was both.  In the beginning it was Tom Young, in the

17   end it was Alan Clemmons.

18   Q.  Both were members of the committee?

19   A.  They were.

20   Q.  And their position was you could not decrease BVAP on any

21   African American district.

22   A.  Correct.

23   Q.  They did it to you.

24   A.  Well, you can not reduce it -- I don't know.  They made up

25   the rules as they went, but if it was above 50 percent you

Sellars - Direct                    28

1    could not reduce it at all.

2    Q.  At all.  Okay.  So that if it was a 90 percent African

3    American district could they reduce it to 89 percent?

4    A.  No, not at all.  It would be tabled immediately.

5    Q.  Tabled immediately.  Now, you are specifically talking

6    about Mr. Jefferson's district down in Berkeley County.  What

7    was -- do you remember what the specific issue was y'all were

8    talking about, why would you'd be reducing his --

9    A.  To allow African Americans in Dorchester County the

10   opportunity to choose a candidate of their choice.  What was

11   going to happen in Dorchester County in Patsy Knight's

12   district was that after the African Americans there who

13   elected her in all likelihood would not have the opportunity

14   to elect a candidate of their choice, so I was attempting to

15   reduce the black voting-age population in one district and

16   boost the BVAP in the other district.  And hoping not only the

17   African Americans in 102, in Joe Jefferson's district, have

18   the opportunity to elect him, but the African Americans in 97,

19   and there may be another district here, that's a while ago,

20   but especially 97 would continue to have the opportunity to

21   elect a candidate of their choice.

22   Q.  Okay.  Now, were you given during this process a copy of

23   the Department of Justice guidelines concerning the

24   redistricting under Section 5 of the Voting Rights Act?

25   A.  I had a notebook, I believe, that was in there.  It may

Sellars – Direct                              29

1    have been in there.

2    Q.  Okay.  And let me make sure I've got the copy.  Do we have

3    a marked copy?

4            MR. STEPP:  Defendant's Exhibit number 1.

5            MR. HARPOOTLIAN:  It's Defendant's Exhibit number 1

6    but also Plaintiff's Exhibit number 70.  We only have two

7    copies.

8            MR. KENNEY:  There's two up there.

9    BY MR. HARPOOTLIAN:

10   Q.  I'm going to hand the witness a copy.  This is taken from

11   Defendant's Exhibit number 1, it's RWH00594, 595, 596, and

12   597.  Now, this is part of a notebook you were given?

13   A.  Yes.

14   Q.  And who gave it to you?

15   A.  Staff and counsel may have helped create it.

16   Q.  And this was to be what the -- what was this to represent

17   to you?

18   A.  I guess it was the law that we were supposed to use to

19   draw the plan.

20   Q.  And on the first page, 595, it says Department of Justice

21   guidelines concerning redistricting under Section 5 of the

22   Voting Rights Act?

23   A.  Correct.

24   Q.  Let me take you back to page 0596, analysis of plans.  And

25   let me read a portion of it to you and see if there was any

1  explanation or whether that was applied.  It says, as noted

2  above there are two necessary components of the analysis of

3  whether a proposed redistricting plan meets the Section 5

4  standard.  The first is a determination that jurisdiction has

5  met its burden of establishing the plan was adopted free of

6  any discriminatory purpose.  The second is a determination

7  that the jurisdiction has met its burden of establishing the

8  proposed plan will not have a retrogressive effect.  Right?

9  A.  Correct.

10  Q.  And then it goes down to describe retrogressive effect on

11  the same page, second column, about two-thirds the way down.

12  An analysis of whether the jurisdiction has met its burden of

13  establishing the proposed plan would not result in a

14  discriminatory or retrogressive effect starts with a basic

15  comparison of the benchmark and proposed plans at issue using

16  updated voting census data in each.  It goes on to say, a

17  proposed plan, at the top of the next column, is retrogressive

18  under Section 5 if its net effect would be to reduce minority

19  voters', quote, effective exercise of the electoral franchise

20  when compared to the benchmark plan.  Right?

21  A.  Correct.

22  Q.  And then it goes on to say, in determining whether the

23  ability to elect exists in the benchmark plan and whether it

24  continues in the proposed plan, the Attorney General does not

25  rely on any predetermined or fixed demographic percentage at

Sellars - Direct                          31

1   any point in the assessment.  Rather, in the Department's view

2   this analogous determination requires a functional analysis of

3   electoral behavior within the particular jurisdiction or

4   election district.

5   A.   Correct.

6   Q.   Now, that point about retrogression, was this ever pointed

7   out --

8   A.   I pointed it out in our committee.  And the reason that I

9   pointed it out is because in most of my amendments, and not

10  all of my amendments, I actually used performance data.  I

11  didn't just use raw numbers, I talked to -- first I talked to

12  Representative Clemmons about this fixed number that he and

13  counsel came up with that they weren't going to go below and

14  that they had their own definitions that we kind of made up as

15  we went.

16      But then I started talking to them about performance data

17  and how African Americans and minority voters actually turned

18  out.  And just because you have a certain BVAP doesn't

19  necessarily indicate the performance.  So we went through this

20  whole analysis of performance and looked at performance

21  numbers in various districts.  However, I was the only person

22  that ever mentioned that in committee, and the only time that

23  it was mentioned was when I mentioned it, and it was never

24  used in any analysis on whether or not to table anything.

25      I think if you listen to the tape for hours upon hours the

Sellars – Direct                          32

1    only thing that they say when explaining a tabling motion as

2    to how you get rid of an amendment is race.  Race, race, and

3    more race.

4    Q.  So in terms of performance, or this criteria that the

5    Justice Department provides which –– let me read it again to

6    make sure that I'm using the right terms, because I will mess

7    it up.  It says, the Attorney General does not rely on any

8    predetermined or fixed demographic percentages.  Did your

9    committee in the House rely on any fixed or predetermined

10   demographic percentages?

11   A.  Yes.

12   Q.  Okay.  And you had this document, all members of the House

13   had this –– all the members of your committee had this

14   document, correct?

15   A.  Counsel had the document, yes, but nothing ever changed.

16   Q.  Did you question specifically this document?

17   A.  Yes.

18   Q.  And did you point that out to the other members of the

19   subcommittee?

20   A.  Yes.

21   Q.  And their response was?

22   A.  Race.  I mean, if the BVAP was lower this is what we're

23   going to do, table.  That was it.

24   Q.  Did they ever distinguish or explain how that was

25   consistent or inconsistent with the guidelines you got?

Sellars - Direct                              33

1    A.  No.  Before I -- my blood boiled even more, I attempted to

2    get some clarification from counsel off the record, and that

3    clarification never happened either.

4    Q.  So when you -- you proposed in this amendment to reduce

5    the BVAP, black voting-age population in Mr. Jefferson's

6    district?

7    A.  Correct.

8    Q.  Was he consulted on that?

9    A.  Yes.

10   Q.  Did he agree with that?

11   A.  Yes.

12   Q.  And the reason to reduce it was to keep --

13   A.  Kept communities whole.  We looked at incumbency,

14   protecting incumbency, and we looked at districts around him

15   and opportunity for African Americans, especially in 97, which

16   is a very poor rural area, encompasses Georgetown,

17   Hardeeville -- Hardeeville, excuse me, I can't remember which

18   one, and impacted the 9th District to allow them opportunity

19   to continue to elect the person of their choice.

20   Q.  So you considered turnout?

21   A.  Of course.  I used performance.

22   Q.  That would be the same thing.

23   A.  Um-hmm.

24   Q.  Compactness, was that an issue?

25   A.  Correct.

Sellars - Direct                    34

1    Q.   How about white crossover vote?  Did you look at that?

2    A.   We looked at white crossover vote.

3    Q.   And other minority voting of black voters?

4    A.   I looked at -- the legal term is coalition districts.

5    Q.   And communities of interest?

6    A.   My point in this amendment and communities of interest, my

7    point in this amendment was attempting to show counsel and

8    Alan Clemmons the fact that although you had a 40 percent

9    African American district, the performance thereof and

10   combined with other minority groups and white crossover vote,

11   you don't -- your African American elected officials will

12   still be -- African American elected officials or African

13   Americans in that district will have the opportunity to choose

14   the candidate of their choice.

15   Q.   All these things you mentioned and asked in your

16   amendment, this amendment and other amendments, were they ever

17   considered by or discussed by that subcommittee?

18   A.   No.

19   Q.   Was -- now the term retrogression, did you ever hear that

20   word?

21   A.   I used it a lot.  I don't know if I used it right, but I

22   used it.

23   Q.   Did they use it?

24   A.   Yes.

25   Q.   And when they said retrogression what did they mean?

Sellars - Direct                    35

1   A.  They used the term retrogression -- I heard the term used

2   in two ways.  One was a natural retrogression in which you

3   lost black population just over time.

4   Q.  Right.

5   A.  And one was a retrogression in which they would not allow

6   you -- we can go back to the 95 percent African American

7   district.  If you reduce that to 94.5 percent Alan Clemmons

8   would clearly state that was retrogression.  And I think Tom

9   Young stated that.

10  Q.  Their definition, 95 to 94-and-a-half, can you do that

11  legally?

12  A.  No.

13  Q.  And they said that that would not be allowed?

14  A.  I think the exact quote is probably that's a nonstarter.

15  Q.  That's a nonstarter.  Who said that?

16  A.  Alan Clemmons.

17  Q.  Now, did the House do any analysis either in subcommittee

18  or the House in general, did they do any analysis to indicate

19  what level of BVAP, black voting-age population, was necessary

20  to elect the African American candidate of choice?

21  A.  No.  They just used that hard number, they just used

22  census data.  That was only thing used in this process, census

23  data.  That's it.

24  Q.  Did they use performance data?

25  A.  No.

Sellars - Direct                                      36

1    Q.   No other minority group.

2    A.   It was as if we only have black people and white people in

3    South Carolina.

4    Q.   Are there any other minority groups in South Carolina?

5    A.   Yes.

6    Q.   And can they play a role in the election process?

7    A.   I hope they do.

8    Q.   Okay.  Was there any analysis done in any of this process

9    that would indicate the BVAP levels in the benchmark plan were

10   insufficient to elect a black candidate?  That is, when you

11   look at the benchmark plan was there any analysis done for

12   crossover voting?

13   A.   No.  No, there was no crossover voting in the upstate.  We

14   have very large percentages of Latino voters, there was no --

15   we didn't look at performance, we didn't look at crossover.

16   We didn't look at white crossover, especially in Richland

17   County where you have a lot of white crossover voting.

18   Q.   Mia Butler's district, for instance, was a 31 percent

19   African American district, it elected her twice, it elected

20   Anton Gunn, another African American once, and they increased

21   it to over 51 percent, correct?

22   A.   I thought that was a perfect example of the overall intent

23   of the process.

24   Q.   And did you discuss that with Mr. Clemmons?

25   A.   I actually discussed with Mr. -- I'm not sure if we had a

Sellars – Direct                          37

1   discussion.  I don't think her district was completely drawn

2   in subcommittee, but I did have a discussion with Chairman

3   Harrison about that.

4   Q.  Chairman Harrison being?

5   A.  Chairman Jim Harrison, chairman of the House Judiciary

6   Committee.

7   Q.  So the plan would come out of that subcommittee to the

8   full committee, and you had a discussion with Mr. Harrison

9   about that.  What was that discussion?

10  A.  It got -- it got heated.  I felt as if he was packing.  I

11  thought that was plain and simple.

12  Q.  What do you mean by packing?

13  A.  He was putting all African Americans he could find in Mia

14  Butler's district.

15  Q.  And his response to that was what?

16  A.  I can't remember.  It was probably no.  We're -- it was

17  his amendment, I believe.  I mean, the most amazing thing I

18  thought was that I had discussed this with Mia Butler, I had

19  discussed this with other African American people on our full

20  committee, and we were saying that, I mean, this was just

21  gross.  There was absolutely no need for them to do that to

22  her district.  I'm sure Mia Butler is comfortable with her

23  district now, I know she is comfortable with it and looks

24  forward to representing her people.  However, her district

25  before, it was big, it was very large.  But there was no

Sellars – Direct                    38

1   reason for them to go to 31 to 50.  I just thought that that

2   was just gross.  A conscious effort.

3   Q.  They were conscious they were doing that?

4   A.  Yes.

5   Q.  How does Amendment number 1 differ from what was finally

6   passed, in terms of were there more majority minority

7   districts in the final plan, and how did that happen?  For

8   instance, Mia Butler's district.

9   A.  I know there was at least one more majority minority

10  district, that was Mia Butler's district, and I'm pretty sure

11  they bumped -- I think they bumped it up from 48 to 49 percent

12  BVAP to over 50.

13  Q.  Any discussion on the floor about that?

14  A.  I was pretty much through with the process by the time we

15  made it to the floor.  I was a little bit put out by the tone,

16  tenor, the lack of counsel, all that stuff.  I was just

17  frustrated.

18  Q.  Now, let's talk about Congress for just a minute.

19  A.  Okay.

20  Q.  Was that different?  How --

21  A.  It was different.  It was a more abbreviated process, it

22  was a shorter process because of drawing Congressional maps

23  is -- the process is wrought with difficulty.  I tried to draw

24  mine, and because you have to get it down to the one or two

25  people there's no variance when you are drawing Congressional

Sellars – Direct                           39

1   maps.

2   Q.  And let me back up.  On the House plan there was a

3   variance of how much?

4   A.  2.5.

5   Q.  In either direction?

6   A.  So the magic number was 37,301.

7   Q.  The magic number of --

8   A.  Magic number of voters was 37,301.

9   Q.  But two-and-a-half above, two-and-a-half below?

10  A.  Right.

11  Q.  When you went to Congress it was?

12  A.  A lot.

13  Q.  I mean, it was one?

14  A.  Oh, one voter.  I can't remember what the numbers were,

15  but it was one voter, maybe two.

16  Q.  Okay.  And were you frustrated with the process?

17  A.  I was frustrated with the difficulty of the Congressional

18  process, yes.

19  Q.  And was it more or less tightly controlled than the House

20  plan?

21  A.  It was less.

22  Q.  Was race used in drawing the Congressional maps?

23  A.  Yeah.  I mean race was still a big issue.  Race was an

24  issue in particular in the Sixth District with my Congressman

25  Jim Clyburn.  I adore Congressman Clyburn and I think

Sellars - Direct                    40

1    Congressman Clyburn is a wonderful public servant, and I

2    thought as if he was -- and I am pretty sure he will tell you

3    he doesn't necessarily need 56, 57, 58 percent African

4    Americans in his district, and I wasn't taking him below 50 in

5    any of my redraws or amendments.  I may have taken him below

6    50 once or twice, but I felt we could put some African

7    American voters in other districts and allow African Americans

8    at the end of the day to elect the person of their choice.

9    Q.  And when you put them in other districts and you looked

10   around, were you attempting to keep communities of interest

11   together?

12   A.  Always.

13   Q.  Compact?

14   A.  Always.

15   Q.  All --

16   A.  What I would hope that you understand is that race was

17   never my predominant concern.  Race, ironically enough, was a

18   concern of Alan Clemmons.

19   Q.  Now, let's talk a little bit about the technical process

20   of drawing, not just of the Congressional maps but any of the

21   House maps.  When you pull up a map like we see here is any

22   data shown on the computer?

23   A.  Yes.

24   Q.  What data?

25   A.  People.

Sellars - Direct                    41

1    Q.  Number of people?

2    A.  Number of people.

3    Q.  Population.

4    A.  Number of black voters.

5    Q.  Number of black voters.

6    A.  Number of white voters.

7    Q.  Number of white voters.

8    A.  Number of other voters.

9    Q.  Black, white, and other?

10   A.  And then the percentages.

11   Q.  And percentages.  Other than race?

12   A.  And maybe precincts.  May have been precincts maybe.

13   Q.  Precincts?

14   A.  The name of the precincts.

15   Q.  But in terms of demographic data, what other data -- for

16   instance, was there any sort of -- partisan, how many Ds, how

17   many Rs?

18   A.  No.

19   Q.  Race?

20   A.  Race, yes.

21   Q.  Was the only data that appeared on the --

22   A.  Oh, yeah, race appeared in everything.

23   Q.  Whether it was the House or Congress you went to draw a

24   map and you moved it around, moved -- as you moved districts

25   around on the map or moved lines would the race numbers

Sellars - Direct                    42

1   change?

2   A.   Yes.

3   Q.   Okay.  Show you how many white and the BVAP.  Right?

4   A.   Correct.

5   Q.   Not partisan data.

6   A.   No.

7   Q.   How about the performance index?  I mean how many --

8   who --

9   A.   The only person that had performance data, that was me,

10  and I attempted to share but it didn't matter.

11  Q.   Was partisan data available in the map room?  Did they

12  have a separate listing of it somewhere, or performance data,

13  anything other than race, whereas --

14  A.   I can't answer that because I never saw it, so I don't

15  know.

16  Q.   Did you see it?

17  A.   No.  I don't know if it was available or not.

18  Q.   You are on the subcommittee.

19  A.   Yes.

20  Q.   Were you in the map room?

21  A.   Yes.

22  Q.   That was there where all the maps were drawn.

23  A.   Yes.

24  Q.   Did you ever see anything concerning the data other than

25  race?

Sellars – Cross                              43

1    A.  No, just race and numbers.

2    Q.  On the Congressional plan do you have an opinion as to

3    whether race was a predominant factor in drawing that?

4    A.  Race and total number of people, yes.

5            MR. TYSON:  Objection, your Honor.  He's soliciting

6    an opinion that the witness is not prepared to testify about

7    or capable of.

8            JUDGE FLOYD:  Overrule it.

9    Q.   (MR. HARPOOTLIAN) Was race a predominant factor?

10   A.  Yes.

11           MR. HARPOOTLIAN:  Beg the court's indulgence.

12           (There was a pause in the proceedings)

13           MR. HARPOOTLIAN:  Thank you, Representative Sellars.

14   Please answer any questions counsel might have.

15           JUDGE FLOYD:  Cross-examination.

16           (There was a pause in the proceedings)

17           MR. STEPP:  Your Honor, could I talk to counsel just

18   a moment?

19           (There was a pause in the proceedings)

20           MR. TYSON:  If it please the court.

21                       CROSS-EXAMINATION

22   BY MR. TYSON:

23   Q.  Good morning, Representative Sellars.  You know my name is

24   Rob Tyson, I represent Speaker Harrell and the House of

25   Representatives.  I'm going to be cross-examining you today.

Sellars - Cross                          44

1    I've got a handful of slides I would like to go through, if

2    possible, I'm talking about a dozen about them, and I've got

3    some questions I'm going to ask you.

4        I'm going to apologize to the court for the trying to look

5    at an outline and trying to take Mr. Harpootlian's questions

6    and get them back in.  It might not be as concise as it should

7    be, but I'm going to do my best that I can.

8        Let me just ask you quickly, you are an active member of

9    the Democrat party, correct?

10   A.   Yes.

11   Q.   And you've attended numerous Democratic caucus meetings?

12   A.   Every morning Tuesday morning.

13   Q.   And the chair of the Democrat party, Mr. Harpootlian, has

14   spoken at some of your caucus meetings?

15   A.   Not some, he's spoken at one this year.

16   Q.   Okay.  What was that about?

17   A.   It wasn't profound.

18   Q.   Redistricting related?

19   A.   No, it was actually about, oh, he was talking about -- no,

20   he was talking about running against Republicans.

21   Q.   How about last year at your caucus meetings throughout the

22   redistricting process --

23   A.   Yeah, last year we actually elected --

24   Q.   -- earlier in the year?

25   A.   We elected Dick last year, Mr. Harpootlian last year, and

Sellars - Cross                          45

1   he came and campaigned, as well.

2   Q.  Let me just make sure, I'm going to try to sum up

3   testimony.  If this isn't right, help me with it.  Really you

4   just wanted another plan, right?  You don't like the plan

5   that's out there, correct?

6   A.  I mean, my greatest beef is that I felt as if people -- a

7   lot of sweat and blood and tears went into the Voting Rights

8   Act, and I felt as if the irony was that Alan Clemmons used

9   the Voting Rights Act to resegregate what so many people

10  fought against.

11  Q.  And I heard you say that -- attribute those comments to

12  Representative Clemmons a number of times.  And as the judge

13  said earlier, I didn't stand up and object as you were putting

14  those words in his mouth, but let me just ask you again, what

15  was the vote on the House plan on the floor?  Do you recall

16  that?

17  A.  No.

18  Q.  I think it was over 85 members of the House voted for the

19  plan out of 124?

20  A.  Correct.

21  Q.  Okay.  So there are plenty of members in the House that

22  supported it, correct?

23  A.  There were many people who weren't involved in the process

24  at the level I was involved in.  But at the end of the day, I

25  mean, you want to be happy with the district you are in

Sellars – Cross                          46

 1  because, I mean, you represent these people.

 2  Q.  But your vote is no greater than theirs, is it?

 3  A.  Sometimes.  No, it's not.

 4  Q.  You get a vote, you get to hold up yes or no?

 5  A.  Yes.

 6  Q.  And the majority of people in the House voted for the

 7  plan, correct?

 8  A.  That's correct.

 9  Q.  And a large number of Democrats voted for the plan, too,

10  correct?

11  A.  That's correct.

12  Q.  And a large number of members of the Legislative Black

13  Caucus voted for the plan, too, correct?

14  A.  That is correct.

15  Q.  Okay.  So let me sum it back up.  Really you just don't

16  like the plan, but the other members of the House did like the

17  plan that's been approved by the General Assembly and been

18  precleared by the Department of Justice.

19  A.  I think that's a stretch to say they like it.  I think

20  some people tolerate it.

21  Q.  They voted aye, right?

22  A.  That doesn't necessarily mean you like something.  You can

23  tolerate it.

24  Q.  You talked about this performance analysis that you had

25  done.

1   A.   Correct.

2   Q.   Did you ever present any kind of data or spreadsheets or

3   anything like --

4   A.   Oh, I had.  I showed it to the members of the committee

5   when I proposed amendment -- my counsel, not -- I don't know

6   if I have an attorney in the room today, but my counsel, hired

7   by the Democratic Caucus, helped us come up with those

8   performance numbers and, yes, I did show that and showed it to

9   Alan Clemmons and showed it to other members of --

10  Q.   Did you ever present any analysis when Mr. Clemmons spoke

11  or put an amendment on the table and you say here,

12  Mr. Chairman, other members of the subcommittee, I'd like

13  to --

14  A.   I --

15  Q.   Hold on a second.  Did you ever say look at this analysis,

16  I performed this or members of the Democratic Caucus have

17  performed this, please take a look at this?  Did you say that?

18  A.   There were times when I did talk performance data, yes.

19  Q.   Did you -- but did you show them specific data, is what

20  I'm trying to ask you?  Did you ever present any specific

21  data?  I understood you have an opinion --

22  A.   I can not recall a specific instance, but I would say yes.

23  Q.   Okay.  I've read the transcripts and I couldn't find

24  anyplace where you offered anything into the record showing

25  any type of analysis besides what you're opining about now.

Sellars - Cross                    48

1    And that's what I'm trying to figure out, if I missed

2    something.

3    A.   I think what we just read was not an opinion.  In fact,

4    what I read was from the Department of Justice in which we had

5    a discussion about what was used and where we talked about

6    electoral behavior.  And I actually brought this up.  And if

7    you go back and listen to the record it was I who recited this

8    in committee, talking about performance data and other things

9    that should be used when creating these districts.  So you are

10   right, I may not have -- I may have had the information and

11   may not have shown the performance data, but I did articulate,

12   not opine, but articulated what was in our guidelines about

13   performance data and the need to use it.

14   Q.   And this is the Federal Register from February 9, 2011

15   that you are referencing?

16   A.   Correct.

17   Q.   And what is it titled?  Department of Justice, and then

18   what is the title?

19   A.   Guidelines concerning redistricting under Section 5 of the

20   Voting Rights Act.

21   Q.   Under what section of the Voting Rights Act?

22   A.   5.

23   Q.   Okay.  Who has to preclear plans pursuant to Section 5?

24   A.   The Department of Justice.

25   Q.   Okay.  And did they?

Sellars – Cross                           49

1    A.   I believe so.

2    Q.   So they didn't have any objections with the plans.

3    A.   I didn't read their opinions so I can't state whether or

4    not they had objections or not.

5    Q.   They didn't interpose any objections, did they?  That's

6    why we're here today, because we got approved plans.

7    A.   You are correct.

8    Q.   Okay.  And so if you look at the back of that page, too, I

9    just want to -- I think it's on the top of the -- in the

10   section that you were reading -- no, that's fine.  We'll just

11   leave it at that.  That doesn't have any relevance in today's

12   lawsuit, does it?

13   A.   What?

14   Q.   Whether the guidelines for Section 5 for the Department of

15   Justice, since the plans have been precleared, correct?

16   A.   I would think it has a lot of bearing on what we do.  Why

17   would it not?  It came from the Department of Justice, talks

18   about the standards that are used in creating maps, and today

19   we're talking about creating naps.  So I mean if somebody

20   wants to say we shouldn't use electoral behavior so be it, but

21   I think it's already stated that we should.

22   Q.   I understand.  It's just a simple question.  If these are

23   the rules under Section 5 that the Department of Justice

24   issued guidelines on, and now they have analyzed the House

25   plan and the Congressional plan and the Senate plan and they

1    interposed no objection, then wouldn't it be fair to say that

2    they felt like our plans met these guidelines, correct?

3    A.   I guess that's an opinion.  I can't refute that.

4    Q.   But they approved the plan.

5            MR. HARPOOTLIAN:  If it please the court, I enter an

6    objection.  The Department of Justice preclearance has a

7    certain weight, if you will.  It is not binding, it is not --

8    to ask this witness to say, well, DOJ said it was okay, that's

9    not what preclearance is.  And I don't know we even need to

10   get into that area.

11           MR. TYSON:  Thank you, your Honor.  I'll move on.

12   Q.   (MR. TYSON) Let me ask you about the redistricting, the

13   election law subcommittee that you were a member of.  Did you

14   do any preparation before you served on that committee?

15   A.   Yes.

16   Q.   What was that?

17   A.   I did -- went through our notebooks, attempted to study as

18   much as I could.  I learned a lot throughout the process.

19   Helped set up meetings, organize meetings, helped organize my

20   meeting in Denmark that we had at Voorhees College.  So we did

21   some groundwork for them.

22   Q.   Okay.  But as to the legal aspects of the Voting Rights

23   Act, did you study any aspects of that?

24   A.   I mean, I went to law school and I also, you know, I was

25   fortunate enough to graduate law school.  And my father was

Sellars - Cross                    51

1    director of African American studies for a period of time at

2    University of South Carolina.  So I was very familiar with the

3    Voting Rights Act.  And I did go back and brush up before

4    going in.

5    Q.  Okay.  Did you attend any seminars?

6    A.  No, I did not attend any seminars.  But I know seminars in

7    D.C. -- no, I did not.

8    Q.  How about the notebook the sub provided you?  Did you --

9    A.  We went -- you know, that's how I found this, I went

10   through it.

11   Q.  Okay.  I'm going to go through, if I can, the Powerpoint

12   and just -- these are straightforward questions I would like

13   to ask you about the subcommittee.  The first one that we

14   have, these are the criteria that were adopted by the

15   subcommittee, correct, or the first page of that, correct?

16   A.  We adopted these during our first meeting, much of which

17   was not recorded.

18   Q.  No, but the vote on the -- this is the criteria that you

19   approved, correct?

20   A.  Correct, but I'm --

21   Q.  And you voted for it.

22   A.  I did.

23   Q.  And let me just look at the first part that says these are

24   the guidelines and the criteria for the congressional and

25   legislative redistricting, right?

Sellars – Cross                         52

1    A.  Correct.

2    Q.  And these are with the guidelines that you were supposed

3    to use as members of the subcommittee as you drafted the

4    plans, correct?

5    A.  Correct.

6    Q.  And if I heard your testimony earlier, I believe you said

7    you don't think the subcommittee used these criteria.  Is that

8    a fair assessment of your --

9    A.  For the most part, correct.

10   Q.  Part correct?

11   A.  Yes, correct.

12   Q.  Okay.  So as we go through some of these examples, if I

13   show you areas where the subcommittee did use these criteria

14   would that surprise you?

15   A.  I mean, I can't answer that until you ask the question.

16   Q.  Okay.  Let's look at the first one, the constitutional

17   law.  Because redistricting plans shall comply with the

18   constitution, correct?

19   A.  I hope everything we do complied with the constitution,

20   correct.

21   Q.  How about the next page in the Powerpoint, Voting Rights

22   Act?  Redistricting plans shall comply with this, correct,

23   with the Voting Rights Act?

24   A.  Yes.

25   Q.  Okay.  And clearly the plans as adopted by the House and

Sellars - Cross                    53

1   the House and Congressional plans have met with Section 5,

2   they comply with Section 5 of the Voting Rights Act, correct?

3   A.   Okay.

4   Q.   Do you know if the complaint by Mr. Harpootlian and the

5   plaintiffs is about --

6   A.   I'm familiar with that, yes.

7   Q.   -- concerns Section 2?

8   A.   I'm familiar with that.  You asked about Section 5.

9   Q.   I know.  I'm saying -- okay.  And in this the next factor

10  you have, it says race may be a factor considered in the

11  creation of the plans, correct?

12  A.   Yes.

13  Q.   It can be a factor.

14  A.   It doesn't say it should be the only factor.

15  Q.   Correct.  And, in fact, it goes on and it says concerning

16  the plan, and if you flip to the next page it says and must

17  not unconstitutionally predominate over other criteria set

18  forth in these guidelines, correct?

19  A.   Correct.

20  Q.   And so as we talk about what predominate means, what would

21  your definition of predominate mean?

22  A.   My definition of predominate is every amendment that was

23  put up in that committee was tabled by Representative Alan

24  Clemmons based on race, and that was the predominant pervasive

25  factor.

Sellars - Cross                    54

1    Q.  By Representative Clemmons.

2    A.  And Representative Young, if you listened to the last

3    tape.

4    Q.  And that one amendment, he asked questions concerning what

5    the percentages of the black voting-age population in those

6    districts were, correct?

7    A.  In that tape we listened to, correct, and there was

8    absolutely -- and there was absolutely nothing else.

9    Q.  He asked about population, didn't he?

10   A.  He asked me about black voting-age population.

11   Q.  But he asked about population.  If we went on and played

12   the further part into the transcript and listened to it he

13   would then raise issues about population, right?

14   A.  The population had to be 37,301.

15   Q.  It had to be?

16   A.  Two-and-a-half percent in one direction.

17   Q.  That's what he was raising.  I mean that was his question,

18   he was making sure it was consistent, yes?

19   A.  Yes.  But it had to be consistent.

20   Q.  Let me step back.  If you had the benchmark plan where all

21   of the ideal districts you just testified a second ago that it

22   was 37,301, correct?

23   A.  Correct.

24   Q.  And so when we took the old lines and then we plugged in

25   the census data not every district was 37,301, was it?

Sellars - Cross                              55

1   A.   No.

2   Q.   Not every district was within two-and-a-half percent of --

3   up or down, correct?

4   A.   Correct.

5   Q.   So we had to go to population to get the districts within

6   deviation.

7   A.   Correct.

8   Q.   And that's what Tom Young's question was about, correct?

9   About population, making sure they were within deviation.

10  A.   Yes.  And I'm saying that my amendment was within

11  deviation.  That wasn't the reason he tabled the amendment.

12  The reason he tabled the amendment, if we listen to the tape,

13  was based on BVAP, or Alan Clemmons moved to table the

14  amendment was based on BVAP.  If you listen to any of the

15  tapes and you go back through and look at the reason that Alan

16  Clemmons tabled anything it wasn't based on population, it

17  wasn't based on anything else but black voting-age population.

18  Q.   And I am not arguing or trying to belabor that point,

19  Representative Sellars.  I'm trying to be clear, you said

20  Representative Young did that, and I'm saying if we go back

21  through the transcript, if Mr. Harpootlian would have played

22  further into the transcript we have a lot of discussion about

23  Mr. Young asking about population.

24  A.   Okay.

25  Q.   So there were other reasons besides sides race, was my

Sellars – Cross                        56

1    point.

2    A.   That's not accurate.   The only reason that -- only reason

3    we had the discussion and the only reason that the amendment

4    was tabled was based on race.   That part of the discussion had

5    no bearing on whether or not that amendment passed or not.

6    Q.   You don't know what Representative Horn thought about

7    that, do you?

8    A.   I know I was there and I know whether or not the amendment

9    passed or not.   And I know why it failed.

10   Q.   You know why Representative Clemmons voted for it,

11   correct, or what you --

12   A.   Motioned to table.

13   Q.   Correct.   And he gave reasons --

14   A.   The same reason.

15   Q.   He gave a reason.   He didn't give all the reasons, did he?

16   A.   All I know is what the man says.   I can't testify to

17   what's in his head.

18   Q.   Representative Horn didn't say anything on that amendment,

19   did she?

20   A.   She didn't say that he was wrong.

21   Q.   And Representative Young also had other questions besides

22   race or besides BVAP, correct?

23   A.   That had -- that was not substantive, though.   It was --

24   didn't have any bearing on whether or not that amendment

25   passed or not.

Sellars - Cross                          57

1   Q.  Let's go through here and we will talk about whether it

2   was substantive or not.  But let me make sure on this, race

3   must not predominate.  If there are other reasons besides race

4   that are considered by members of the subcommittee, by members

5   of the floor -- by members of the full committee or by the

6   members of the House, then race isn't going to predominate, is

7   it?

8   A.  I don't understand your question.

9   Q.  Okay.  We have got the criteria and we will move through

10  them in a few minutes.  Contiguous, equal population,

11  incumbency protection, and those things.  If those reasons are

12  mentioned, are referenced as why somebody voted one way or the

13  other for those, then race clearly couldn't have predominated,

14  right?

15  A.  I don't agree with that.  I mean, we got to a point now

16  where they were -- they used race to object to the first 20

17  amendments.  So there may have been a point when they switched

18  gears and used another reasoning, but I can't recall.

19  Q.  I'm just asking a simple question.  If there are reasons

20  that are raised besides BVAP, such as these other criteria

21  we're about to go through, then clearly race couldn't

22  predominate, right?

23  A.  I don't agree with that.

24          MR. HARPOOTLIAN:  Objection, your Honor.  He's asked

25  the question, it's been answered.

Sellars – Cross                    58

1        JUDGE FLOYD:  Sustained.

2        MR. HARPOOTLIAN:  Thank you.

3   Q.   (MR. TYSON) Let's go to the next page, please.  We got

4   the state constitution and the laws, right?

5   A.   Correct.

6   Q.   That was that criteria.  And then the next one, equal

7   population and deviation.

8   A.   Correct.

9   Q.   So you have -- and that's based on the census and what we

10  were just talking about, and that's the 37,301, correct?

11  A.   Yes.

12  Q.   Okay.  And then we go to the next page and we go the ideal

13  population, and that's the number, 37,301.  Correct?

14  A.   Yes.

15  Q.   And then you've got about halfway down it talks about

16  nevertheless, any overall deviation greater than five percent

17  equality, a district shall be justified when it's the result

18  of these other reasons.  Correct?

19  A.   Yes.

20  Q.   Okay.  But that's a criteria to look at population, right?

21  A.   Yes.

22  Q.   Okay.

23  A.   I mean, our amendment would be immediately ruled out of

24  order, they would not even be heard.  A point of order would

25  be made if your amendment did not fall within 2.5 one way or

Sellars - Cross                                    59

1    2.5 in another.  So you could not -- we would not even have a

2    discussion about an amendment that did not abide by this

3    because it would be ruled out of order.

4    Q.  Because it was a criteria that the subcommittee approved

5    that doesn't have anything to do with race.

6    A.  So any discussions we had about population on an

7    amendment, they were purely just discussions, they were not

8    substantive as to whether or not that amendment passed or not.

9    Because if there was an issue with this particular criteria

10   the amendment would immediately be ruled out of order.  I'm

11   sorry.  I didn't mean to mess up your screen.

12   Q.  That's all right.  But as to that, though, just -- the

13   population is a criteria that the subcommittee had to use, and

14   if it wasn't used, if it was out of whack, then it was out of

15   order and it never got brought up?

16   A.  Correct.

17   Q.  So it's consistent with this criteria, that the --

18   A.  Yes.

19   Q.  And then contiguity, congressional and legislative

20   districts shall be comprised of contiguous territory, right?

21   A.  Correct.

22   Q.  And you know of any district that is not contiguous?

23   A.  Not that I know of.  That's subjective, but not that I

24   know of.

25   Q.  It's subjective?

Sellars - Cross                              60

1   A.  I think you can -- we had a lot of districts that were

2   long and windy that some people would say were -- abided by

3   those principles, some people said they didn't.  But I can't

4   recall one, not one that sticks out.

5   Q.  Areas which meet only at the points of the adjoining

6   corners shall be considered --

7   A.  We have anything with a gap, you're right.

8   Q.  So we met that criteria, too.

9   A.  Yes.

10  Q.  And that's not race related.

11  A.  No.

12  Q.  How about compactness?  This is important, also, as a

13  criteria, correct?

14  A.  Yes.

15  Q.  Okay.  And but then the second sentence there talked about

16  bizarre shapes are to be avoided, correct?

17  A.  Yes.

18  Q.  And then it gives some exceptions, though, if you are not

19  able to comply with that for these variety of reasons,

20  correct?

21  A.  Yes.

22  Q.  And you haven't testified about anything that's any

23  bizarre shapes, have you?

24  A.  But we did see a bizarre shape in District 102.  In the

25  amendment we just looked up was a horseshoe and to me a

Sellars - Cross                    61

1   bizarre shape.  Joe Jefferson's district, if you actually go

2   back and look at it, it's a horseshoe.

3   Q.  Did it pass?

4   A.  Oh, it passed.  But I don't think that that necessarily

5   abided by the guideline, but it passed.  I mean, it's a

6   bizarre-shaped district.

7   Q.  And it's consistent with what it looked like the last

8   time, right?

9   A.  Yeah.  It was bizarre before.

10  Q.  Okay.  Let's go to the next slide.  Communities of

11  interest.  This first line says what?

12  A.  Communities of interest shall be considered in the

13  redistricting process.

14  Q.  Okay.  And then it lists below there a variety of factors

15  that are -- contribute to communities of interest.  Do you see

16  that?

17  A.  Yes.

18  Q.  Do you think that the subcommittee adhered to those, or

19  the full committee or the House?

20  A.  No.

21  Q.  Okay.  City boundaries?

22  A.  No.

23  Q.  Did you ever have any discussions about city boundaries?

24  A.  Yes.

25  Q.  Okay.  How about the City of Walterboro?

Sellars - Cross                    62

1    A.   Yes.

2    Q.   Is it whole inside the plan now?

3    A.   It is whole.

4    Q.   Okay.  And let me make sure that I understand.  I think

5    earlier you testified there was nothing you ever heard in a

6    public hearing that ever was implemented into this plan,

7    and --

8    A.   That's correct.

9    Q.   Okay.  And we went to public hearings, two that I went to,

10   the folks from Walterboro, they came out --

11   A.   They came to two meetings.

12   Q.   And what did they say?

13   A.   We want one representative in Colleton County because it's

14   33,000 people.

15   Q.   And as to Walterboro City, what did they say?

16   A.   After further discussion, especially with the mayor of

17   Walterboro, and in further discussions I had with him I said

18   the best we will be able to do is keep Walterboro whole, and

19   Walterboro is now whole.

20   Q.   What he did he testify to at --

21   A.   He wanted Colleton County to have one representative.

22   Q.   What did the mayor of Walterboro testify to?

23   A.   I can't recall.  If he testified to keeping Walterboro

24   whole, that would be accurate.

25   Q.   Okay.  So if he's testified to that and then the people at

Sellars - Cross                    63

1    the public hearing testified to that and that's in the final

2    plan are you sure your testimony earlier is still --

3    A.   That was their number one goal.  At the public hearing the

4    number one goal was to have one representative in Colleton

5    County.  And if you go back and listen to the first tape at

6    the first meeting that we had in Beaufort, that is what the

7    council said, they wanted one representative in Colleton

8    County.

9         Further, when I stated earlier today and Mr. Harpootlian

10   asked me was anything -- were the public hearings, and I

11   stated the public hearings were not implemented into the

12   process, we can go to Walterboro, but we can also go to

13   Anderson when the mayor of Anderson said he would like to keep

14   the City of Anderson whole, and that has a large African

15   American population.  And if you look at the plan today, is

16   the City of Anderson whole the answer to that question is no.

17   So I stand by what I said earlier.

18   Q.   Yeah, but there were other people at the public hearing

19   that said they wanted the City of Walterboro to be whole,

20   right?

21   A.   Yes.

22   Q.   And there were other people that said they wanted the

23   county to be whole, right?

24   A.   They wanted the county to be whole.

25   Q.   Not Colleton County, but many other people across the

Sellars - Cross                                    64

1    state wanted their county to be whole.

2    A.  I remember Colleton and Barnwell.

3    Q.  In all the public hearings, if you go through the

4    transcript, that is clear, that's what --

5    A.  I just remember those two.

6    Q.  And that would be a community of interest, right?

7    A.  I'm sorry?

8    Q.  That would be a community of interest.

9    A.  Yes.

10   Q.  And this, the plan that's been precleared by the

11   Department of Justice, has counties that are whole, or --

12   A.  Some.

13   Q.  Pardon?  Some, that's my point.  That is exactly my point.

14   We can't make all of this right, can we?

15   A.  I agree with you.  Because if we can't go back to single

16   member districts I agree with that.  My only point earlier was

17   that we didn't hear public testimony.  I don't recall public

18   testimony on all 46 counties, but what I do remember public

19   testimony on is Barnwell wanted to be whole, they're not

20   whole, the City of Anderson wanted to be whole, and the City

21   of Anderson is a unique case in there are a large percentage

22   of African Americans in the city, and in our plan those are

23   fragmented and placed in other districts.

24   Q.  Let me just ask you about that amendment, I think it was

25   the first one Mr. Harpootlian put up.  It was number eight,

Sellars - Cross                65

1   and it was the one about Barnwell County.  He didn't show you

2   down there the tip of it, did he?  Did he talk about what it

3   did to the County of Walterboro and the City of Walterboro?

4   Do you remember that?

5   A.   No, he didn't ask me.

6   Q.   What did it do to the City of Walterboro and the County of

7   Walterboro?

8   A.   It put me in Colleton County where I am now.  I was --

9   Q.   Split it?

10  A.   Colleton County was already split.

11  Q.   And they split more, correct?

12  A.   I don't know.  I mean, now Colleton County has four

13  representatives.  I believe in my amendment it had four

14  representatives.

15  Q.   But my point is, though, you were saying that Barnwell,

16  the citizens of Barnwell wanted something.

17  A.   Yes.

18  Q.   And that you wanted this and Representative Hosey wanted

19  something?

20  A.   Yes.

21  Q.   Correct?  Okay.  But when you have an amendment you don't

22  get to look at it in isolation, do you?  Because it affects

23  other areas.

24  A.   Correct.

25  Q.   So it's -- when your testimony is that we didn't follow

Sellars - Cross                            66

1   the people of Barnwell, we didn't listen to Representative
2   Hosey and his people, you failed to mention what it did to
3   Walterboro and how that went against the public input,
4   correct?
5   A.  But it maintained the consistency of what the plan does
6   now and what the plan was doing already, that that is
7   consistent.  If you are going to have four representatives in
8   Colleton County on Amendment 1, and in my amendment if we're
9   still going to have four representatives in Colleton County
10  you maintain that consistency.  And I went in with the premise
11  understanding that you can not make every county whole, but
12  where we could have a county -- and Colleton County has 33,000
13  people, Barnwell County is not, if we can keep Barnwell County
14  whole we should.  We did not do that.
15  Q.  And there are other reasons for that, correct?
16  A.  I don't know.  I didn't draw that.
17  Q.  No, but you know all the majority minority districts that
18  are there, correct?
19  A.  Yeah, we have a lot.
20  Q.  And you know of all the loss of population?
21  A.  Oh, yes.  My district was one that suffered.
22  Q.  Those had to be taken into account as you drew that,
23  right?
24  A.  Yes.  But if you -- even if you take that into account I
25  had the proper number of people, I was within deviation, we

1   found the people, so that wasn't an issue.

2   Q.  For you.

3   A.  For anybody.

4   Q.  But it would be for other districts.

5   A.  Which district?  I guess I can't ask a question.

6   Q.  You are saying we will go -- if you are talking about

7   Barnwell, if you picture an amendment and you say this --

8           MR. HARPOOTLIAN:  Your Honor, I hate to object.  This

9   is repetitive and argumentative.  I object.

10          JUDGE FLOYD:  Overruled.

11  Q.  (MR. TYSON) I'll just finish with that, Representative

12  Sellars.  The amendment that Mr. Harpootlian showed you on I

13  think it was Amendment 8 concerning Barnwell County, it didn't

14  also take into account the subcommittee's discussion or the

15  other full committee's discussion or the floor concern about

16  how it split Walterboro, did it?

17  A.  We talked about that in subcommittee.

18  Q.  And that's a reason, right, which is consistent with

19  communities of interest, that's my point.

20  A.  No, that was not the reason.  We just listened to the

21  tape.  The reason the motion was tabled was because I lowered

22  Lonnie Hosey's BVAP.  That was on the tape, that didn't come

23  from me.  And, in fact, the quote -- that quote from Alan

24  Clemmons was that this was a nonstarter based on the fact that

25  that lowered his BVAP.  It wasn't because of Colleton County,

1   it wasn't because of me, it wasn't because of public input or

2   any other guidelines.  There was one reason.  I'm not making

3   this up, there was one reason.

4   Q.  For Representative Clemmons.

5   A.  And no one else stated anything else.

6   Q.  Let me ask you then about your statement that I think you

7   said earlier that you are not sure anybody can come up with

8   one example of anything that we heard at the public comments

9   that was implemented.  Do you remember that testimony?

10  A.  Yes.

11  Q.  Okay.  How about the Denmark public hearing?  Were you

12  there?

13  A.  Yes.  A mile away from my House.

14  Q.  You know Mr. Alonzo Frazier?

15  A.  Yes.

16  Q.  He's from Allendale County, correct?

17  A.  Yes, I remember Mr. Frazier.  I know Mr. Frazier very

18  well.

19  Q.  Do you know what he testified to?

20  A.  I can't recall.

21  Q.  He said he wanted the Sixth Congressional District to dip

22  into Allendale County because he felt like Allendale had a lot

23  in common with the other Sixth District counties.  Do you

24  remember that?

25  A.  I do remember that.

Sellars - Cross                         69

1    Q.  Did the congressional plan as approved by the House and

2    Senate do just as he said?

3    A.  Well, let me narrow my statement down.  I don't think

4    anything that we heard in public testimony was used in the

5    creation of our House map.  Not congressional, but our House

6    district map.  And I'm actually very pleased that Allendale

7    County and Barnwell County, for that matter, are in the Sixth

8    District.

9    Q.  But if we went on through, if we talked about Terry Jowers

10   from Williston, and he wanted Barnwell to be included with

11   Beaufort in a congressional.  He didn't want that again,

12   right?  Do you remember that testimony?

13   A.  Yes.

14   Q.  And this was done, correct?

15   A.  Like I -- I'm not disagreeing with you.  I agree we used

16   public testimony in creating the congressional maps.

17   Q.  Let's go to the next slide, incumbent protection.

18   Reasonable efforts shall be made to ensure that incumbent

19   legislators remain in the current districts.  Was that abided

20   by?

21   A.  We did our very best to do that.

22   Q.  Okay.  So that was --

23   A.  It was very difficult, and I must commend especially Jim

24   Harrison for doing everything he could to abide by this

25   principle.

Sellars – Cross                                70

1    Q.  So that criteria that's in the plan that was approved by

2    the subcommittee has been abided by, correct?

3    A.  Oh, we –– this one was one that was very difficult, but I

4    have to give a lot of deference to Representative Harrison for

5    abiding by that.

6    Q.  And that's not race related, is it?

7    A.  Well, implementation thereof is –– it's difficult, because

8    you have –– for example, we had Denny Nelson who's in a

9    district with Robert Williams, and the problem that we have

10   was finding enough African Americans to lift BVAPs and the

11   population of the Pee Dee.  So the actual implementation of

12   this is race related.

13   Q.  Well, the population was the problem there, correct, it

14   wasn't race?

15   A.  But you just can't bring anybody into a district.  I mean,

16   they had to go find African Americans to put in the district.

17   Q.  Well, how about let's go to the upstate where we

18   collapsed –– a district was collapsed, correct?

19   A.  Yes.

20   Q.  Who were the House members that are now not in the same

21   district?

22   A.  Dan Cooper and Eric Bikas, former member Dan Cooper and

23   Eric Bikas.

24   Q.  Okay.

25   A.  And Tribble and –– and the guy next to him.

Sellars - Cross                    71

1    Q.  They are not African Americans, are they?

2    A.  No.

3    Q.  So the incumbent protection is not race related for that,

4    is it?

5    A.  No, but you had to take race into account when you were

6    dealing with Denny Wilson and Robert Williams.

7    Q.  On this incumbent protection language, that was important

8    to you, correct, that you offered an amendment?

9    A.  Yes.  I can't recall what my amendment was.

10   Q.  I think it went back to change the language, as I recall.

11   A.  Um-hmm.

12   Q.  Similar to what was in the criteria --

13   A.  It was in the criteria before.  But, like I said, that

14   part of the tape, it's not present.

15   Q.  Let's go to the next.  Here's the priority of the

16   criteria.  And this was the subcommittee's attempt to try to

17   establish what was important, correct?

18   A.  Yes.

19   Q.  Okay.  And so it's pretty clear that there are certain

20   things that the criteria has got to abide by, correct?

21   A.  Yes.

22   Q.  Voting Rights Act, correct?

23   A.  Yes.

24   Q.  Equality of population?

25   A.  Yes.

Sellars - Cross                           72

1    Q.  And the constitution.

2    A.  Yes.

3    Q.  Okay.  And then the last one is public input.  This one

4    was added, as I recall, subcommittee shall make reasonable

5    efforts to be transparent and allow public input into the

6    redistricting process.  And if I heard you earlier, you

7    commended the subcommittee for that part of the process.

8    A.  Yeah.  And in hindsight I would actually add a line at the

9    bottom that we actually have to use what the public says in

10   drawing the map, but we didn't.  The process, I don't have any

11   beef or any qualms with the process.  Again, I will state for

12   the record anytime I'm asked, Jim Harrison did a very good job

13   in making sure that the process was sound.

14   Q.  And we just went through some of the public comment that

15   was implemented in the plans, correct?

16   A.  In the Congressional plan.  You didn't give me any

17   implemented in the House plan.

18   Q.  How about let's go to the next one.  Here is your

19   criteria -- I mean here was your amendment to the criteria,

20   correct, 3.

21   A.  Huh?

22   Q.  This was your first amendment to the criteria.

23   A.  Oh, okay.

24   Q.  Do you recall that?  And if we just look at it, it's

25   essentially the same thing that the subcommittee put, right?

Sellars – Cross                    73

1    Communities of interest, incumbent, core constituencies,

2    correct?

3    A.   Yes.  Number three is what I really like.  Just added a

4    little clarity.

5    Q.   That's a constitutional problem, isn't it, absence of a

6    discriminatory purpose?

7    A.   Yeah.

8    Q.   And the subcommittee said that that was already

9    encompassed in the criteria, correct?

10   A.   I just don't think we wanted it spelled out in our

11   guidelines.

12   Q.   How about we look at the next one.

13   A.   Well, number four was also important.

14   Q.   Retrogressive effect.

15   A.   Packing the minorities in one or more districts, I think

16   that also this was not necessarily agreed to.

17   Q.   And do you recall the discussion from the subcommittee

18   member saying that that was already encapsulated in the other

19   criteria?

20   A.   I know we went -- I spoke for three hours on this and I

21   can't recall everything.

22   Q.   How about your next amendment?

23   A.   Which one?

24   Q.   I'm sorry.  Avoid partisan gerrymandering.

25   A.   Yep.

Sellars - Cross                    74

1    Q.  Is that a traditional redistricting criteria?

2    A.  Should be.  I'm not sure if it's traditional or not.

3    Q.  Why is that?

4    A.  You should avoid partisan gerrymandering when drawing your

5    map.  This isn't -- I mean, we're -- because we don't own

6    these seats, this isn't about us, it's about the people of

7    South Carolina and drawing boundaries that best reflect and

8    allow them to choose people that best serve them.

9    Q.  I understand that.  But isn't redistricting one of the

10   most partisan activity legislatures undertake?

11   A.  I would agree with you.  I think that the irony is that

12   this is the complete irony of me being here today.  I think

13   that Alan Clemmons used the Voting Rights Act and race to

14   partisan gerrymander.

15   Q.  I understand what you think about Mr. Clemmons,

16   Representative Clemmons, but there are 12 other members of the

17   House, correct?

18   A.  Well, there aren't 12 other members who actually drew the

19   plan.  That's just not the way it works.  That's not

20   realistic.

21   Q.  But the Democrats had a position on redistricting,

22   correct?

23   A.  We had amendments that we put up, correct.

24   Q.  Republicans had amendments that they liked, and they liked

25   plans, too, correct?

Sellars - Cross                    75

1    A.   It's what we have.

2    Q.   Okay.  How about the next amendment?  I mean Amendment

3    number 3.  That's to ensure transparency and public

4    disclosure, and that was taken care of, correct?

5    A.   Well, we had an issue -- no, that wasn't just public

6    disclosure, it was also sufficient time to review and

7    opportunity to comment prior to voting on the plan.  And my

8    fear was that we were going to put forth a plan and just run

9    it down and run it because we had like this time issue.  So I

10   was afraid the public would not be able to see what we were

11   doing and I wanted to make sure that we were -- I wanted to

12   make sure the public had the opportunity to see what we were

13   doing, and I actually wanted this process to be as transparent

14   as possible.

15   Q.   And it was, correct?

16   A.   I think there were some issues about time when people

17   could see the maps on line, but other than that -- the Senate

18   was extremely transparent.  The Senate had the website up and

19   all this other good stuff.  They were rocking and rolling over

20   there.  We kind of came along with the House.  I don't have

21   any qualms about transparency.

22   Q.   On the website all the House -- the plans and amendments

23   were put up on the --

24   A.   Um-hmm.

25   Q.   -- after they were approved, correct?

Sellars - Cross                              76

1   A.  The only thing we don't have is the three hours of

2   testimony that we had in which we talked about race,

3   incumbency, and things like that.  And that's just by accident

4   we don't have that.

5   Q.  And let me ask you about that.  I think at that meeting

6   there was an accident that the tape --

7   A.  There was Patrick Dennis made an accident.

8   Q.  And I think one of the members of the committee, or it

9   might have been counsel, said if you would like to submit

10  written comments to talk about -- to describe what you said in

11  these three hours that you were welcome to do it, correct?

12  A.  I just -- I mean, that was unrealistic and over

13  burdensome.  You wanted me to record three hours of comments I

14  just said, I thought that was unrealistic, so I just kept us

15  there a little longer and tried to regurgitate for the tapes

16  what I said.

17  Q.  Okay.  But those comments were then regurgitated.

18  A.  I couldn't get every point in, but I made an effort.

19  Q.  So that part of the process, I mean, eventually your

20  comments -- unfortunately the accident occurred and the tape,

21  somebody forgot to turn the tape machine on, but those

22  comments were then incorporated?

23  A.  I tried.

24  Q.  Okay.  Let me ask you about some of your amendments.  One

25  of the amendments, I think it was Amendment number 14 that you

Sellars - Cross                        77

 1  offered, and it was to include the Town of Latta in

 2  Representative Battle's district.  Do you recall that one?

 3  A.  If you have it.

 4  Q.  I don't have it here in front of me.  I'm sorry.

 5  A.  I don't -- I drew up a lot of amendments.  I don't

 6  necessarily recall it.

 7  Q.  You remember this one was also on the floor?  Do you

 8  remember that?

 9  A.  If I did something I may have done it for a member.  I

10  can't recall.  If you can show it to me that would help me

11  out, but if you don't have it, I don't have it.

12  Q.  All I had from it, we didn't have language, I guess it was

13  Representative Hayes wanted to take out some of his territory

14  that had been given to him in the Town of Latta and provide

15  that to --

16  A.  I can't comment on that.  I don't remember.

17  Q.  I was going back through the tapes and was listening to

18  your -- some of your testimony, and you were talking about an

19  amendment in York County involving Representative Moss and

20  Pope.  Do you recall that one?

21  A.  Do you have it?

22  Q.  I don't have the amendment.  I was going to see if I could

23  find the language.

24  A.  I'm not trying to be difficult, and I apologize, I just --

25  I mean, I don't want to speak something and not know.  I just

Sellars - Cross                                78

1    can't -- I really can't recall.  I did a lot of these.

2              MR. TYSON:  Excuse me, indulge me for a second.

3              (There was a pause in the proceedings)

4              JUDGE FLOYD:  How much longer will you be on your

5    cross?

6              MR. TYSON:  Ten minutes.

7              JUDGE FLOYD:  And --

8              MR. HARPOOTLIAN:  No more than five or ten minutes.

9              JUDGE FLOYD:  Let's take about a ten minute break and

10   wrap it up.  The court reporter does not have an easy job.

11   About ten minutes.

12             MR. TYSON:  Thank you, your Honor.

13             (A recess transpired)

14             JUDGE FLOYD:  I'll give a you a multiple choice

15   question.  I'm guessing you're all correct about your timing,

16   you will finish up about 12:15, 12:20.  We can break for an

17   hour at that point or we can get into the qualification

18   questions of your expert.

19             MR. HARPOOTLIAN:  Your Honor, Mr. Stepp and I were

20   just discussing that.  Our druther would be to break after

21   this witness and then take Dr. McDonald --

22             JUDGE FLOYD:  Straight through.

23             MR. HARPOOTLIAN:  -- straight through.

24             JUDGE FLOYD:  That's fine.  All right.  That's what

25   we will do.

1      MR. HARPOOTLIAN:  Thank you.

2      JUDGE FLOYD:  Mr. Sellars, you're back up.

3      THE WITNESS:  Yes, your Honor.

4      JUDGE FLOYD:  All right.

5  BY MR. TYSON:

6  Q.  Representative Sellars, I was talking to you about an

7  amendment between Mr. Pope and Mr. Moss and I have a

8  transcript of the full committee hearing on June 6th, and I'm

9  just going to ask you if it's all right we're just going to

10  read a couple of lines to you and see if this refreshes your

11  memory.

12      And it was an amendment the chairman, I guess full

13  committee, so Mr. Harrison says, I spoke to both of the

14  parties regarding this one and they think there's been an

15  agreement.  And that's -- then that's what -- that's that what

16  would happen here.  And then the chairman, says, okay, Mr.

17  Sellars, and you said, I've got a quick question.  We just

18  adopted an amendment that dealt with Representative Pope's

19  district, and I know it was a swap but I don't think it was

20  necessarily an even swap.  I just want to be sure that if we

21  adopt this amendment then not only Tommy, but Dennis, they

22  will all be within deviation.  Because I see that Amendment

23  29, if I'm not mistaken.  Do you recall that discussion?

24  A.  Not really.  But you have a transcript, okay.

25  Q.  It's a discussion about population --

Sellars - Cross                            80

1   A.   Yes.

2   Q.   -- the full committee was having, has nothing to do with

3   race, correct?

4   A.   The amendment passed, I believe.

5   Q.   And the prior page, when the amendment -- you were talking

6   about it, you described the amendment and said Mr. Moss and

7   Mr. Pope, Mr. Moss represents this district, Mr. Pope

8   represents House district number 47 and involves one community

9   of interest.  One community of common interest, an area called

10  the Philbert community, takes about 260 people from here and

11  moves those over there.  It's basically preserving a community

12  of interest.

13  A.   Who said that?  I said that?

14  Q.   Yes.

15  A.   That's in line with everything I have been talking all

16  morning, that I was attempting to use the traditional

17  redistricting principles, but I'm not certain that Clemmons or

18  some others on my committee were.

19  Q.   The full committee adopted that amendment, correct?

20  A.   Yes.

21  Q.   Okay.  So that criteria was abided by.  You raised the

22  issue and the full committee said yes, we agree with you, this

23  is a community of interest, which is in our criteria and we

24  need to adopt it and they adopted it, correct?

25  A.   Yes.

Sellars - Cross                    81

1   Q.   Okay.  Not race based?

2   A.   But, I mean, it's not race based because you are talking

3   about Moss and Pope.  Moss is a white Republican, Pope is a

4   white Republican.  It's not race based.  We weren't dealing

5   with African American elected officials, we're talking about

6   two districts where the African American population was very,

7   very low.  I mean, no, we didn't -- it wasn't a conversation

8   about race.  It wasn't -- it wasn't an issue.

9   Q.   That's right.  And if we -- let me move on in the

10  testimony.  You said something about the Congressional process

11  was a little bit --

12  A.   It was difficult.

13  Q.   And why was that?  What was different about it, or more

14  difficult about it?

15  A.   You have seven districts that you are drawing and you have

16  to actually get the districts down to the particular number,

17  do that number.  So it's very hard to draw those.  You

18  actually have to rub out voters on streets to get to the

19  deviation that's allowed by our federal courts.

20  Q.   But nothing was -- I'm sorry.  I thought your testimony

21  earlier was talking about the process of how the Congressional

22  plan was developed was different.

23  A.   It was different.  It was abbreviated.  I think he asked

24  me, and there was not as much care and guidance given to that

25  process by Alan Clemmons as it was with the House plan.

Sellars - Cross                                82

1    Q.  And there are 123 other members besides Mr. Clemmons,

2    right?

3    A.  Yes.

4    Q.  And they had an amendment they wanted to offer to the

5    Congressional plan, they had the opportunity to come in and

6    make that amendment, correct?

7    A.  We only had seven or -- I don't know.  We may have had 20

8    amendments, but by comparison we did not have a lot.

9    Q.  But the process was the same, is my point, correct?

10   A.  Very generically, yes.

11   Q.  Nobody was told they can't draw anything --

12   A.  No, no --

13   Q.  Nobody couldn't use --

14   A.  No, no --

15   Q.  The amendment couldn't be --

16        COURT REPORTER:  Excuse me.  Could you talk one at a

17   time, please.

18   Q.  Excuse me.

19   A.  I apologize.  I was talking over you.

20   Q.  The process was the same.

21   A.  The process was sound.  Everybody was allowed in the map

22   room, everybody was allowed to put up amendments.  I mean,

23   it's just the issue that if your amendment dealt with a

24   district where there was a person of color who represented a

25   large percentage of people with color, people of color, then

Sellars - Cross                                        83

1   that is when race became an issue, became the predominant

2   factor, whether or not it was the Congressional plan or House

3   plan.

4   Q.  Let me move on.  Yesterday in your deposition I asked you

5   a question about whether you had a conversation with the chair

6   of the South Carolina Democratic Party, Mr. Harpootlian.  Do

7   you recall that?

8   A.  Yes.

9   Q.  And you said, if you allow me to read from the transcript.

10  I said, when did you have that discussion?  And you said well,

11  when -- after he submitted his proposed map to the court.  So

12  I said, so after the lawsuit began?  And you said yeah.  I

13  said, what were those conversations?  You said, what was Chris

14  thinking when he drew the lines?  It was just -- there were a

15  lot, there were members who were concerned about whether they

16  were in their district.  And I was just making -- why I was

17  concerned, where I was in my district.  Do you remember that?

18  A.  Yeah, it was yesterday.

19  Q.  Okay.  And that I further say, and that was we're talking

20  about the submission by the plaintiffs in this case, correct?

21  A.  Yes.

22  Q.  Okay.  And so you didn't like the plan, and I think you

23  further, as you went on, you -- well, you --

24  A.  I never stated I didn't like the plan, did I?

25  Q.  I'm sorry, correct.  You said what was Chris thinking when

1    he drew the lines.  And Chris is -- who is Chris?

2    A.   The guy who was messing up the computers earlier.

3    Q.   Chris Kenney, a lawyer with Mr. Harpootlian, correct?

4    A.   Yes.

5    Q.   And so you reference him as drawing the alternative plan?

6    A.   I assumed.  It was an assumption.

7    Q.   And what was the problem again with that alternative plan

8    submitted by the plaintiffs?

9    A.   Well, I received a phone call from Chairman Harrison, who

10   called many members asking had we seen the plan.  He stated I

11   was in Lonnie Hosey's district.  He called me back 30 minutes

12   later and said I wasn't in Lonnie Hosey's district.  We

13   weren't in the same district, we were a hundred yards apart.

14   So I just called the person who submitted the plan and said

15   you know what's going on?  We -- he was off in New York or LA,

16   wherever Dick Harpootlian goes, and it was a very brief

17   conversation.  That was it.

18   Q.   Do you know whether any other -- in that alternative plan

19   how many other incumbents were paired against each other?

20   A.   I have no idea.  I haven't actually seen it.  I got a

21   phone call from Chairman Harrison telling me that.  I've never

22   seen it.

23   Q.   But you weren't comfortable with that plan, is that right?

24   A.   I'm comfortable now.  I'm in my own district.  I thought I

25   was in a district with Lonnie Hosey and that wasn't true.

Sellars – Cross                             85

1    Q.  Yesterday when we had the discussion, I think you

2    referenced when I asked the question about your potential

3    testimony today, you also referenced District 52, Laurie

4    Funderburk, and --

5    A.  Oh, yeah.

6    Q.  I asked you the question, I said, if you will beg my

7    indulgence again just to read through a couple of questions, I

8    said, what are you -- what do you plan to testify about the

9    Funderburk district and/or Boyd Brown?  And your response was,

10   I'm just going to have to go back and refresh my memory.  I

11   just remember that that was one of the districts in which we

12   talked about a population being placed in another district

13   that caused some issue.  Correct?

14   A.  Yes.

15   Q.  Okay.  Then my next question was, say that again.  And you

16   said yesterday, population that was a Democratic voting

17   population that was placed in another traditionally Democratic

18   district.  I believe that to be true.  Do you recall that?

19   A.  It was yesterday, yes.

20   Q.  So you were concerned about Democrats being swapped for

21   Democrats, right?

22   A.  No.  No, not at all.

23   Q.  That was what you said yesterday.

24   A.  No, you're misinterpreting what I'm saying.  You are

25   interpreting what I was saying.  I was saying Democrats being

Sellars - Cross                                  86

1    taken out of Laurie Funderburk's district, or people who have
2    a performance of voting Democratic and being placed in another
3    district, Boyd Brown's district, I believe.  I'm not saying it
4    wasn't a swap of any sort, it was just Laurie Funderburk's
5    district would become a very, very difficult district for the
6    incumbent to stay in.
7    Q.  Okay.  And that's based on what?
8    A.  Performance.
9    Q.  And what performance?  What analysis?
10   A.  Democratic performance, electoral performance.
11   Q.  Democratic performance?
12   A.  Democratic performance.  Or I mean Republican performance,
13   if you look at it in the --
14   Q.  Which is not race based, correct?
15   A.  I mean, you take a lot into account.
16   Q.  Okay.  Let me ask you about the City of Anderson.  You
17   referenced that and a discussion that you said the mayor had.
18   And I was going back looking through listening to the audio
19   tapes, and this was involving District 23.  Do you remember
20   that, Representative Dillard?
21   A.  That's -- why would we be talking about the City of
22   Anderson and Chandra Dillard?  Dillard's in Greenville.
23   Q.  I guess because there was an amendment offered, number 27,
24   and it was on May 24 of the hearing.  And when you were
25   debating, again if you will allow me, and while y'all were

1   debating in the subcommittee, debating and/or affecting these

2   districts, do you remember stating that you wanted to make a

3   district more competitive?

4   A.   Okay.

5   Q.   And then, I'm not sure, I think it was Representative

6   Young, I couldn't tell which one it was on the tape, it might

7   have been Representative Clemmons --

8            MR. HARPOOTLIAN:  Your Honor, again, I understand

9   we're being given wide latitude.  It seems to me counsel is

10  testifying now.  He can ask this witness if he remembers this,

11  but to say I've read this and it says that or I listened to

12  this, it says that, we have attempted to transcribe some of

13  these tapes, they are very difficult to understand.  So I

14  ask -- I object to him stating.

15           (There was a pause in the proceedings)

16           JUDGE FLOYD:  I would allow you all were under the

17  gun, in terms of taking a deposition yesterday.  However, I

18  would sustain Mr. Harpootlian's objection.  You can ask the

19  question you want.  If he gives you an answer different from

20  the deposition then you can impeach him with the deposition.

21           MR. TYSON:  Thank you, your Honor.

22           JUDGE FLOYD:  And I know you are trying to move it

23  along.

24           MR. TYSON:  Thank you, your Honor.

25  Q.   (MR. TYSON) Let me just ask, do you remember that

Sellars - Cross                        88

1    discussion about that amendment, I think it's Amendment 24,

2    excuse me, involving Representative Dillard as she moved down

3    into Henderson?

4    A.  I don't recall.

5    Q.  Okay.  Let me ask you about District 116, Representative

6    Robert Brown?

7    A.  Okay.

8    Q.  And you testified earlier about natural retrogression?

9    A.  Yes.

10   Q.  And let me make sure I understand that.  His benchmark

11   black voting-age population was approximately 42 percent, is

12   that right?

13   A.  When you say benchmark --

14   Q.  The benchmark plan when the old district -- when the

15   census data was put into it, that it was in the low 40s?

16   A.  Yes.  He was -- when it was drawn originally in early

17   2000, or whenever the map was drawn, it was 48.  But when you

18   looked at his district using new census numbers it was at 42.

19   Q.  And then in the House plan out of full committee and

20   subcommittee what happened to his black voting-age population?

21   A.  It went down.

22   Q.  Okay.  And did you offer an amendment to increase his

23   black voting-age population?

24   A.  I'm not sure.

25   Q.  But if you did, would that be okay?

Sellars – Cross                                         89

1    A.  To increase his black voting-age population?

2    Q.  Right.

3    A.  Yes.

4    Q.  But not to decrease it.

5    A.  I'm having a hard time following your train of questions

6    here.

7    Q.  Okay.  Representative Brown let's say, I don't have the

8    numbers right here, I think it was 42.2 percent is where he

9    was in the benchmark plan of his black voting-age population.

10   Then when the plan came out of full committee it was lower

11   than 40 percent or I -- I mean lower than the 42 percent.

12   A.  Correct.

13   Q.  And you offered an amendment to get it back up to the

14   42 percent, correct?

15   A.  I think.  I can't recall.  I may have.

16   Q.  And my question was is that okay while in the same breath

17   you've testified it's not okay to decrease BVAP in other

18   places.

19   A.  I testified that it's not okay to decrease BVAP in other

20   places?

21   Q.  You have characterized, if I'm -- let me try this again.

22   Representative Clemmons, you have said that he had a hard and

23   steadfast line.  I believe this was your testimony?

24   A.  Yes.

25   Q.  About any amendment that lowered BVAP.

Sellars - Cross                                90

1    A.  Correct.

2    Q.  That that wouldn't work.

3    A.  Correct.

4    Q.  Okay.  But my question is you've got an amendment to

5    increase BVAP.

6    A.  Correct.

7    Q.  Okay.  And are you okay with that, whether we get to lower

8    it here or raise it here with those inconsistencies?

9    A.  How is that -- that's not inconsistent.

10   Q.  How so?

11   A.  Because Representative Clemmons had a hard, steadfast line

12   you can not lower BVAP in districts that were above

13   50 percent.  It's kind of apples and oranges, because all I

14   was trying to do was raise Robert Brown's BVAP through an

15   amendment, and his BVAP was 48 and it dipped down to 42.  I

16   think we passed it at 40, and all I was trying to do was raise

17   it.  I don't understand how that's inconsistent.

18   Q.  So you are offering an amendment just based solely on race

19   to increase his BVAP, correct?

20   A.  I was offering an amendment to increase his BVAP, yes,

21   sir.  I mean, race was a predominant factor in what we were

22   doing.

23   Q.  For the amendment that you --

24   A.  No, no, the process.

25   Q.  Let me ask you, I think Mr. Harpootlian asked you about

Sellars - Cross                    91

1    something and you characterized some examples if a district
2    was in the high 90s, I think you testified that if it was
3    lower just a small percentage point then that would have been
4    objected to by Representative Clemson.
5    A.    Correct.
6    Q.    But there's no district like that, is there?
7    A.    No.  We do have districts that are -- Grady Brown's
8    district is 68, maybe.  It's very, very high.  And, you know,
9    attempting to take anything out of that district was a
10   problem.  You looked at some of my original county colleagues,
11   Rich Hart, Todd Rutherford, Leon Howard.  We had Joe Neal, we
12   had all these districts.  I mean, and, you know, any
13   opportunity we had to maybe give African Americans in other
14   districts a chance to choose a -- a person of their choice was
15   just rejected.
16   Q.    But that is in the hypothetical that you were discussing.
17   I just wanted to be sure there's nothing like that in the
18   House plan or any House districts, correct?
19   A.    90?
20   Q.    Yep.
21   A.    There may be one 90, I don't know.  I can't answer that
22   for a fact.  Jerry Govan is pretty high, too.
23   Q.    You are talking about electing a candidate of choice.
24   District 79, you know that district?
25   A.    I know 90 and 91.

1  Q.  Representative Mia Butler Garrick?

2  A.  Yes.

3  Q.  Okay.  And that's not her district, though, is it?  I mean

4  it's the people's district.

5  A.  The people of South Carolina's district.

6  Q.  And you made -- I think you testified earlier that you

7  were opposing or that you did not like what the House did to

8  that district.

9  A.  Correct.

10  Q.  And what were your reasons?

11  A.  Because I did not agree with the fact that they were

12  taking a district that was 30 percent African American and

13  making it 50 percent African American strictly using numbers

14  when they did not look at electoral performance.  Because what

15  performance numbers would have shown you, white crossover

16  voters, other minority groups, what performance would have

17  shown you is that Anton Gunn probably should have won six

18  years ago but he won -- he probably should have six years ago

19  but he won four years ago, and Mia Butler was elected and then

20  reelected, I think.  So we had African Americans that were

21  elected in a 31 percent district, 30 percent district.  There

22  was no need.  And it was a conscious effort by Jim Harrison

23  and others to pack that district.

24  Q.  Let me ask you, talking about performance numbers, did you

25  do any analysis concerning that?

Sellars - Cross                                93

1    A.  Oh, an analysis was done.

2    Q.  I asked the question did you do any of that.

3    A.  Oh, no, I didn't do any of the analysis myself.  I don't

4    do math well.

5    Q.  When you testified earlier that she was the candidate of

6    choice, that was your opinion, that's not based on any

7    factual --

8    A.  That is based on the facts.

9    Q.  And how --

10   A.  It's based on the fact they chose her.  Every November and

11   every June we have elections, we are held accountable through

12   elections, and they chose her and she was the candidate of

13   choice.

14   Q.  Do you know whether Representative Butler Garrick has ever

15   had opposition in the Democrat primary?

16   A.  I don't know.  If you don't have opposition apparently the

17   constituency is happy in what you are doing.  So, again, they

18   choose you.

19   Q.  But you haven't done any analysis to determine whether she

20   was the candidate of choice, is that correct?

21   A.  Yes, I have done analysis to prove she's a candidate of

22   choice.  Every November she won her election and -- Anton Gunn

23   had a primary, I believe, I think he had a primary, and he had

24   a general election.  And he had a green party, a blue party, a

25   Republican, and Anton Gunn won and he was the candidate of

Sellars – Cross                           94

1   choice.

2   Q.  Did he have any democratic opposition in the primary to

3   determine whether he was the Democratic minority's candidate

4   of choice?

5   A.  He may have.  I think he did, actually.  He did.  I think

6   he had a primary both times.  I can't recall.  But I do know

7   he won his election.

8   Q.  He won his election, but do you have any analysis as to

9   whether he was the candidate of choice?

10  A.  Yes.

11  Q.  And that is just simply the election results.  That's the

12  only analysis you have?

13  A.  That's the only analysis you can do when you determine

14  somebody's -- the choice candidate.

15  Q.  And you know this lawsuit is about a bunch of statistical

16  evidence supporting or not supporting candidates of choice,

17  correct?

18  A.  I don't -- I don't do math -- I don't do math well.

19          MR. TYSON:  Your Honor, if I can hand up this case,

20  please, pass it up.

21          MR. HARPOOTLIAN:  Which case is it?

22  Q.  (MR. TYSON) Representative, I wanted to ask you, you were

23  talking about you were the only one -- I think you called it a

24  perversion of law, is what the subcommittee was doing, is that

25  correct?

Sellars - Cross                    95

1    A.   Yes.

2    Q.   And I think you said earlier you were the only one that

3    had any law, is that correct?

4    A.   I said that on tape.

5    Q.   And you said it yesterday and in your deposition, too.

6    A.   Okay, yes.

7    Q.   Because I thought when I asked you what were some of the

8    problems with the process, and you said you expected to

9    testify about the perversion of law --

10   A.   I said there was no problems with the process but there

11   was some issues that I had which I considered to be

12   perversions of law, correct.

13   Q.   All right.  And then I think Mr. Harpootlian discussed or

14   played this tape of you handing this case up.  Do you recall

15   that testimony a few minutes ago?

16   A.   Yes.

17   Q.   And it was the Howe versus Armor case, 1991 district court

18   case from the Eastern District of Ohio?

19   A.   Yes.

20   Q.   Okay.  And did you know that that case has over a dozen

21   negative citing references?

22   A.   I don't have any -- okay, I don't have it in front of me

23   or the little red flags beside it, so I don't know.

24   Q.   Did you know that of those, the dozen references, it was

25   declined to be followed or rejected in over a dozen

Sellars – Cross                                      96

1    jurisdictions?

2    A.  Okay.

3    Q.  So when you were citing this is the law, I've got law,

4    everybody, I've got law, had you done the research to

5    determine whether it was good law or not?

6    A.  I just want you to understand the context, that we did

7    have counsel in the room, you and others were in the room, and

8    nobody stated that I was actually in fact incorrect.

9    Q.  And then the Fourth Circuit case has declined to accept

10   it.  Did you know that when you offered it up?

11   A.  I did not know that when I offered it up.

12   Q.  Well, and then you just said that counsel failed to

13   mention anything to you.  Do you recall somebody asking you

14   about the case Bartlett versus Strickland at that hearing?

15   A.  I don't recall that.

16   Q.  Okay.  2009 U.S. Supreme Court, and somebody suggested

17   that to you and they asked you to read that.  Do you recall

18   that?

19   A.  I probably did read it.  I don't know.  I don't recall.

20   Q.  But let me just -- a couple of more questions to finish

21   up.  Part of the process after the plan was precleared by --

22   the plans were precleared by the House it was submitted to the

23   Department of Justice for preclearance, correct?

24   A.  Yes.

25   Q.  And you testified I think yesterday in your deposition

Sellars - Cross                    97

1   that you were interviewed by the Department of Justice.

2   A.   I was.

3   Q.   Correct?  And I think you said yesterday, and if my

4   testimony is -- if my characterization of your testimony is

5   not completely accurate let me know, but I think you said all

6   of the things and the problems that I've told you in your

7   deposition is what I told the Department of Justice.

8   A.   I believe that to be accurate.  I may have left some

9   things out, but for the most part --

10  Q.   And so the testimony you provided today presumably would

11  have been similar type of discussion that you provided to the

12  Department of Justice?

13  A.   Probably not on this micro level.  I mean, today we were

14  able to actually talk about amendments, look at amendments,

15  and listen to the recorded testimony so we could actually get

16  to clear view of what I felt to be a wrong done by the

17  representatives.

18  Q.   Yesterday at your deposition you said they had listened to

19  all of those tapes, right?

20  A.   I believe they did.  They told me that they had.

21  Q.   So they heard all of your testimony.

22          MR. HARPOOTLIAN:  If it please the court, your Honor,

23  the Department of Justice's analysis, approval, is irrelevant

24  to this judicial inquiry.  There's an executive branch, you

25  are the judicial branch.  I hesitated to object to this

 1    before, but we keep going into what he told DOJ, what DOJ did

 2    to do a Section 5 analysis, and that's it.  And that's --

 3    we're here on Section 2 and a constitutional violation.  So

 4    the fact that he told them is one thing, the fact that's an

 5    inference that they didn't do anything about it is irrelevant

 6    to these proceedings.  I object.

 7            MR. TYSON:  Your Honor, if I can just respond to it.

 8    You will recall Mr. Harpootlian showed Representative Sellars

 9    the Section 5 guidelines of the Department of Justice and he

10    testified about that for ten minutes.  I was responding to the

11    Department of Justice inquiry as raised by Mr. Harpootlian.

12            JUDGE FLOYD:  Gentlemen, I think we have heard enough

13    about that issue from both sides.

14            MR. TYSON:  Thank you, your Honor.  I failed -- Mr.

15    Stepp wrote me a note.  I would like to introduce and mark as

16    an exhibit the case that we handed up, please, as the next

17    exhibit.

18            JUDGE FLOYD:  All right.

19    Q.   (MR. TYSON) Representative Sellars, let me just ask,

20    isn't it accurate to say the House and Congressional plans as

21    enacted are plans that you would not have enacted if you had

22    been in the majority party, is that correct?

23    A.   I don't know.  Me being in the majority party now is just

24    a dream, so I can't say that to be a fact.

25    Q.   Let me just finish, have you given us every possible

Sellars – Redirect                99

1    reason why you think race predominated?

2    A.   To the best of my ability.  I mean, if you asked more I

3    probably may come up with more examples.  But, I mean, right

4    now that's --

5         MR. TYSON:  Representative Sellars, thank you for

6    your patience.

7         THE WITNESS:  Thank you, Mr. Tyson.

8         JUDGE FLOYD:  Redirect?

9         MR. HARPOOTLIAN:  Briefly.

10                   REDIRECT EXAMINATION

11   BY MR. HARPOOTLIAN:

12   Q.   Representative Sellars, I believe you indicated the first

13   three hours of this committee hearing with the tape were not

14   taped for some -- somebody didn't hit the right button?

15   A.   Correct.

16   Q.   And there's no nefarious purpose?

17   A.   No, no.  In fact, Patrick is awesome, so there is no

18   nefarious purpose.

19   Q.   So a lot of what was said in that subcommittee, how many

20   hours is there of subcommittee recordings?

21   A.   Of that meeting?

22   Q.   Of any -- all the meetings put together.

23   A.   I have no idea.  It's a bunch.

24   Q.   But this was the initial meeting.

25   A.   Correct.

Sellars - Redirect                    100

1    Q.  And so you've indicated that you have made many statements

2    about your problems with the process.

3    A.  Yes.

4    Q.  And those were not recorded.

5    A.  No.

6    Q.  But you summarized them for us here today.

7    A.  Yes.

8    Q.  You were asked about a number of the criteria that were

9    listed in the standards adopted by the House subcommittee that

10   you were going to use in the process.  You would agree with

11   all those standards, would you not?

12   A.  Yes.

13   Q.  The question I have of you is were they followed?

14   A.  No.

15   Q.  Okay.  And I guess the one last question I have is this:

16   There was some debate about keeping cities and counties --

17   A.  Whole, communities of interest.

18   Q.  Whole.  Do you have an opinion as to whether or not that

19   was used as a proxy for race in some instances?

20   A.  I mean, that's a good question.  I think that -- and not

21   abiding by those principles, the reason they didn't abide by

22   the principles had a lot to do with race.  Keeping the City of

23   Anderson whole would have allowed African Americans in

24   Anderson County to elect a person of their choice.  And that

25   was not going to happen.

Sellars - Redirect                    101

1   Q.  And he asked you about Mia Butler and Anton Gunn's

2   district.

3   A.  Correct.

4   Q.  And you determined that Mia Butler was candidate of choice

5   but she got elected.

6   A.  Yes.

7   Q.  Now that district -- she is African American, I believe

8   she's seated right back here, isn't she?

9   A.  Yes, sir.

10  Q.  And she's an African American?

11  A.  Yes.

12  Q.  The district is 31 percent African American?

13  A.  Yes.

14  Q.  So is it -- is it a reach to say that non-African American

15  voters voted for her in substantial numbers for her to win?

16  A.  That's not a reach.

17          MR. TYSON:  I object to that, your Honor.  There's no

18  statistical evidence for him to support such a --

19          THE WITNESS:  Yes --

20          MR. HARPOOTLIAN:  I went to Clemson but I don't think

21  this is complicated math.  31 percent African American, you've

22  got to get 51 percent to win.

23          JUDGE FLOYD:  The question has been asked and

24  answered.

25          MR. HARPOOTLIAN:  Thank you.

Sellars - Redirect                    102

1          JUDGE FLOYD:  It's in the record.

2          MR. HARPOOTLIAN:  Yes, sir.

3   Q.   (MR. HARPOOTLIAN) So is that how by your analysis she's a

4   candidate of choice?

5   A.   Yes, using my fundamental mathematical skills.

6   Q.   Right.  Now, there's been a discussion that this Amendment

7   1 passed with a majority of the members of the House voting

8   for it, correct?

9   A.   Yes.

10  Q.   In terms of amendments to that plan, were a majority of

11  them done in subcommittee or on the floor?

12  A.   Subcommittee.

13  Q.   The vast majority?

14  A.   Overwhelming majority.

15  Q.   So the modifications to that plan were done in

16  subcommittee, and were they -- were they introduced by members

17  of the subcommittee or by other members?

18  A.   They had to be introduced by members of the subcommittee.

19  Q.   I'm sorry?

20  A.   They had to be introduced by members of the subcommittee.

21  Q.   And so that would be you and four others, correct?

22  A.   Yes.

23  Q.   Did the white members of that committee introduce the

24  majority of amendments or did -- to Amendment 1, or did you

25  and your African American --

Sellars - Redirect                    103

1    A.   Karl Allen and I.

2    Q.   And so in this process we have two African Americans and

3    three non-African Americans, three white folks, right?

4    A.   Yes.

5    Q.   And the tension in that committee is between the white

6    folks and the black folks.  Is that an oversimplification?

7    A.   It's between Representative Clemmons and I.

8    Q.   Okay.  White and black?

9    A.   Yes.

10   Q.   And race -- was any criteria other than race ever

11   discussed between you two in terms of the amendments being

12   made?

13   A.   The amendments that were tabled, to my recollection, were

14   all tabled based on BVAP and race.

15   Q.   Now, and maybe I have asked this before, I want to make

16   sure because of a question by defense counsel.  Were there

17   any -- was there any statistical analysis shown to you of

18   what's called racial bloc voting in that process?

19   A.   Shown to me by --

20   Q.   By Mr. Clemmons or any staff member.

21   A.   No.

22   Q.   How about any sort of analysis, partisan analysis, D

23   versus R?

24   A.   No.

25   Q.   Any sort of racially polarized analysis?

Sellars - Redirect                                104

1    A.   No.

2    Q.   Did the House have any sort of demographics expert, any

3    sort of voting rights expert at that stage?

4    A.   Well, we retained the Wyche firm, House caucus.  But you

5    mean the Democratic Caucus or the House as a whole?

6    Q.   The House as a whole, Mr. Clemmons or Mr. Harrison?

7    A.   Oh, yeah, we had attorneys.

8    Q.   You had lawyers, but did you have any demographics expert?

9    A.   We had a map -- professional map drawer, but that was it.

10   Q.   Right.  Let me make sure that -- I want to make sure I

11   understand this.  Prior to passing the plan in the House did

12   Dr. Brunell -- did you ever hear that name?

13   A.   No.

14   Q.   Did you ever meet with a Dr. Brunell?

15   A.   Don't know who that is.

16   Q.   Today, as you sit here today do you know who that is?

17   A.   Mm-mmm.

18   Q.   Okay.  Thank you.

19           THE WITNESS:  Thank you.

20           JUDGE FLOYD:  All right.  Thank you, Representative

21   Sellars.  You may step down.  Any reason he can't be released

22   from his subpoena?

23           MR. HARPOOTLIAN:  No, sir, not from plaintiff.

24           JUDGE FLOYD:  All right.  Thank you.  We'll break for

25   lunch, and be back here right at 1:30.  As you know, we're

1    going to go until 6:00 o'clock tonight.  So that's our plan.

2         MR. HARPOOTLIAN:  If necessary.

3         JUDGE FLOYD:  If necessary.

4         (A recess transpired)

5         JUDGE FLOYD:  Yes.

6         MR. HARPOOTLIAN:  We're ready to go whenever you are.

7         JUDGE FLOYD:  All right.  I understand methodology is

8    challenged in this case?

9         MR. STEPP:  Yes, your Honor.  Before we even get

10   there I've got a housekeeping matter, if the court would hear

11   that.  This morning we had a conversation about admitting the

12   exhibits, and I want the record to be clear, one of the

13   exhibits that was on the plaintiffs' prior list was Dr.

14   Engstrom's report, and the court's already granted a motion in

15   limine on that, so I didn't want my statement this morning to

16   be a waiver of the benefit of that order, which we assume is

17   still in place.  Secondly --

18        MR. HARPOOTLIAN:  May I address that?  We don't

19   intend on introducing Dr. Engstrom's report.  However, it will

20   be one of the items that this witness relies on in giving his

21   opinion.  That, I mean it's obviously hearsay, but we believe

22   under the rules we will deal with that when this comes up.

23        MR. STEPP:  I just want to make it clear that my

24   saying all the exhibits are not including Dr. Engstrom's

25   report.

1          Now, the second thing, housekeeping, is that it's

2    come to my attention that after we reconvened this morning the

3    plaintiff filed supplemental exhibits, which I was unaware of

4    at the time we had the colloquy earlier this morning, one of

5    which is Plaintiffs' Exhibit 69.  That's Dr. McDonald's

6    supplemental tables, what I call a supplemental report.

7    There's a motion pending as to that.  So I'm certainly

8    reserving our objection to that, which I understand the court

9    will take up during the course of Dr. McDonald's examination.

10         Another thing on here are election results, this is

11   Exhibit number 71, election results summary generated from

12   public data and the House preclearance submission.  I haven't

13   had time to look at that.  I want to reserve the right to pose

14   an objection if I think there's any reason why the summary

15   doesn't fairly and accurately depict the data.  I have no idea

16   at this point, so I just want to reserve an objection on that,

17   if I might.

18         Same thing with the demonstrative maps of House

19   amendments and demonstrative shape files of silhouette images.

20   Again, I have no reason to think those are not accurate but I

21   would like to reserve the right to object in the event

22   anything comes to our attention that would suggest they were

23   not, one or more of them are not.  And I think the others we

24   don't have a problem with.

25         JUDGE FLOYD:  Now, let me make myself clear for the

1    court.  We will put Dr. McDonald up here and you go through

2    your examination with him.  They have noted an objection to

3    the methodology, but we are going to deal with the methodology

4    during -- we're not going to give you a ruling today, but we

5    will deal with it in the order, as to whether we put any

6    credence to his testimony or not.  So that we can move it

7    right along.

8         MR. STEPP:  All right.  Well, Mr. Mustian is going to

9    do Dr. McDonald's cross-examination, and we were planning to

10   in the voir dire examination do some examination that we think

11   would be in aid of the position we have taken with respect to

12   both his initial report and the supplemental report.  So we

13   will just make that record.  My understanding is y'all will

14   rule on that later, is that correct?

15        JUDGE FLOYD:  Right.  But you are going to do it

16   through -- during the cross.

17        MR. STEPP:  Part in voir dire and part in cross.  We

18   do want to raise -- go into those subjects on voir dire.  I

19   guess we thought you would consider the motion then.  If you

20   don't want us to do that we will do it whatever way you want.

21        MR. HARPOOTLIAN:  Your Honor, of course, our position

22   would have been during voir dire, methodology, is he qualified

23   to testify based on his qualifications, has he been qualified

24   before.  The methodology, obviously, we can argue about

25   whether this methodology is valid or not.  But, again, in the

1  interest of time given all other factors is he qualified as an

2  expert, and they can take that on cross and we would address

3  it a little bit on direct.  Just to not repeat things.

4         JUDGE DUFFY:  To make the record complete, we granted

5  you all Monday to supplement the record so you can tell us how

6  you think the proof conformed to your various theories.  So

7  y'all can still do that.  So far as the reports are concerned,

8  the supplemental report, take all that up with the witness

9  while he's on the stand.  The same way you go about voir

10 diring the witness, just do it through cross-examination.

11 Fair enough?

12         MR. HARPOOTLIAN:  Yes, sir.

13         MR. STEPP:  Thank you.

14

15

16         I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter.

17

18 Date:  3-5-12                    s/  Daniel E. Mayo

19

20

21

22

23

24

25