# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

Vandroth Backus, Willie Harrison Brown,  )    Case No.: 3:11-cv-03120-PMD-HFF-MBS
Charlesann Buttone, Booker Manigault,  )
Edward McKnight, Moses Mims, Jr.,  )
Roosevelt Wallace, and William G. Wilder,  )
on behalf of themselves and all other  )
similarly situated persons,  )
      )
            Plaintiffs,  )
      )
      v.  )
      )
The State of South Carolina,  )
"Nikki" R. Haley, in her capacity as  )
Governor, Ken Ard, in his capacity as  )
Lieutenant Governor, Glenn F. McConnell,  )
in his capacity as President Pro Tempore  )
of the Senate and Chairman of the Senate  )
Judiciary Committee, Robert W. Harrell, Jr.,  )
in his capacity as Speaker of the House of  )
Representatives, James H. Harrison, in his  )
capacity as Chairman of the House of  )
Representatives' Judiciary Committee,  )
Alan D. Clemmons, in his capacity as  )
Chairman of the House of Representatives'  )
Election Law Subcommittee, Marci Andino,  )
in her capacity as Executive Director of the  )
Election Commission, John H. Hudgens, III,  )
Chairman, Nicole S. White, Marilyn  )
Bowers, Mark Benson, and Thomas  )
Waring, in their capacity as Commissioners  )
of the Elections Commission,  )
      )
            Defendants.  )
      )

---

## Post-Trial Memorandum of Defendant Robert W. Harrell, Jr.

---

## Introduction

Speaker Robert W. Harrell, Jr., is entitled to judgment based on the law and evidence presented in this case. Plaintiffs lack standing to maintain their alleged racial gerrymandering claims against all but House districts 59, 82, 102, 103, and Congressional district 6. Plaintiffs cannot prevail under Section 2 of the Voting Rights Act because they have not shown or even contended, as Section 2 requires, that minority voting strength is diluted under the Redistricting Plans. The alleged failure to create crossover districts, even if true, is not a violation of Section 2 under Supreme Court or Fourth Circuit precedent because it does not constitute the dilution of minority voting strength. Finally, Plaintiffs have not met their demanding burden of proving intentional discrimination in violation of the Fourteenth and Fifteenth Amendment claims because they have failed to prove that the State abandoned compliance with traditional redistricting principles; subordinated those principles to racial considerations; or unlawfully discriminated against a minority group.

## Argument

**A.    Plaintiffs Lack Standing to Challenge as Racially Gerrymandered any Districts About Which They Complain Other Than House Districts 82, 83, 103, and Congressional District 6, and They Also Lack Standing Under Section 2 of the Voting Rights Act.**

The Article III requirement of standing is as important in redistricting as it is in any other case. *Sinkfield v. Kelley*, 531 U.S. 28, 29-31 (2000) (per curiam); *Bush v. Vera*, 517 U.S. 952, 958 (1996); *United States v. Hays*, 515 U.S. 737, 744 (1995). Among other things, standing requires that a plaintiff show a particularized injury as opposed to a generalized grievance against governmental action. *Hays*, 515 U.S. at 743 ("The rule against generalized grievances applies with as much force in the equal protection context as in any other."). A plaintiff who resides in an allegedly racially gerrymandered district has standing to challenge that district. *Id.*

1

at 745; *see also Vera*, 517 U.S. at 958. But when a "plaintiff does not live in such a district, he or she does not suffer those special harms, and any inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference." *Id*. to the Plaintiff must prove standing. *Id*.

Plaintiffs allege[1] that they live in the following House and Congressional districts under the newly-adopted redistricting plans:

| Plaintiff | House District | Congressional District |
|-----------|----------------|------------------------|
| Backus | 59 | 7 |
| Brown | 67 | 5 |
| Buttone | 103 | 7 |
| Manigault | 102 | 1 |
| McKnight | 101 | 6 |
| Mims | 82 | 2 |
| Wallace | 62 | 7 |
| Wilder | 119 | 1 |

Notwithstanding their residency, however, Plaintiffs actually challenge a host of districts as having been racially gerrymandered: House districts 12, 23, 25, 49, 57, 59, 64, 70, 74, 76, 77, 79, 82, 91, 102, 103, 109, 111, 113, 121, and 122, and Congressional district 6.[2] But when Plaintiffs' districts of residence are compared to the districts in controversy about which they have actually produced evidence, Plaintiffs have standing to challenge only House districts 59, 82, 102, and 103 and Congressional district 6.[3] They lack standing to challenge any of the other districts

---

[1] [*See* Sec. Am. Compl. (ECF No. 122) ¶¶ 8-15.]

[2] Plaintiffs also challenged House districts 55, 61, 66, and 93 in the Complaint, but did not make any argument or present any evidence at trial regarding those districts. Thus, Speaker Harrell is entitled to judgment as a matter of law as to the challenges against these districts.

[3] Plaintiffs made no argument and presented no evidence regarding any other districts in which any of them reside. Thus, Plaintiffs have no claim against House districts 62, 67, 101, or 119, and no claim against any Congressional district other than district 6.

identified in their complaint because none of the Plaintiffs lives in any of those other districts, and none of them is aggrieved under Section 2.

**B.     Plaintiffs Have Failed to Allege or Prove a Cognizable Section 2 Claim Under the Governing Precedent of *Thornburg v. Gingles* and *Bartlett v. Strickland*.**

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). The *Gingles* decision established the necessary elements of a claim under Section 2 of the Voting Rights Act, and relates to the present case in two ways. First, *Gingles* should be applied to the allegations and facts to determine whether Plaintiffs have pleaded or proved a claim under Section 2. Second, *Gingles* is also crucial in understanding why it was legally necessary for the General Assembly to create majority-minority districts in certain areas.

**(1)    *Plaintiffs have not established the* Gingles *preconditions and, indeed, disavow any intention to prove the existence of those standards.***

With respect to the first consideration, a minority group must allege and prove a Section 2 violation by showing through a preponderance of the evidence that it satisfies the following threshold requirements:

> *First*, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. . . . *Second*, the minority group must be able to show that it is politically cohesive. . . . *Third,* the minority must be able to demonstrate that the white majority votes sufficiently as a block to enable it—in the absence of special circumstances . . . to defeat the minority's preferred candidate.

*Id*. at 50-51 (emphasis added) (footnote and internal citations omitted). These factors are critical because "a Section 2 claim cannot proceed unless all three *Gingles* pre-conditions are satisfied." *Cousin v. Sundquist*, 145 F.3d 818, 823 (6th Cir. 1998); *Voinovich v. Quilter*, 507 U.S. 146, 158

(1993) (disposing of the plaintiffs' Section 2 claim without analyzing the first *Gingles* precondition, since the court found that plaintiffs had failed to meet the third precondition); *Growe v. Emison*, 507 U.S. 25, 40-41 (1993) ("Unless [the three *Gingles* factors] are established, there neither has been a wrong nor can be a remedy."). "[T]he failure of a minority group to satisfy all of the *Gingles* preconditions means that it cannot sustain a claim under Section 2 that the challenged electoral practice 'impede[s] the ability of minority voters to elect representatives of their choice.'" *Hall*, 385 F.3d at 426 (quoting *Gingles*, 478 U.S. at 48).

Thus, as interpreted by *Gingles* and its progeny, the essence of a Section 2 claim is that minority votes were diluted through the failure to create a majority-minority district when the three *Gingles* conditions were present. There is no such contention in this case and, in fact, Plaintiffs readily acknowledge that they do not seek the creation of additional majority-minority districts. [*See id*. at 17-18.] Rather, they seek to reduce the number of majority-minority districts in favor of additional majority-white districts. [*See* ECF No. 81.] Thus, there is no evidence that the General Assembly failed to create additional majority-minority districts required by *Gingles.* The first role that *Gingles* plays here is to show that Plaintiffs' Section 2 claim has no merit.

*Gingles* is also relevant to understanding why it was legally necessary for the General Assembly to create majority-minority districts in certain areas. Because it could easily be a violation of Section 2 *not to* create a majority minority district, the General Assembly was required to do so when the *Gingles* conditions were present. Compliance with the Voting Rights Act was one of the redistricting criteria adopted by the House, and was in any event required by law. Consequently, creating "*Gingles*" districts where possible was a mandate under which the House and the General Assembly as a whole were operating. Plaintiffs' argument ignores

Section 2 completely and depends upon the erroneous premise that the legislature had a choice whether to raise the BVAP in certain districts.

Plaintiffs compound their error by arguing that the "destruction" of coalition districts was for a racial purpose unconnected to compliance with the Voting Rights Act. They have, however, failed to prove any unlawful racial motivation for the Redistricting Plans or for the General Assembly's retention and maintenance of majority-minority districts throughout the state. Plaintiffs allege that the Redistricting Plans unconstitutionally pack black voters into certain districts in order to prevent black voter influence in adjoining districts and thereby discriminate on the basis of race. Plaintiffs assert that in the challenged districts, the black voting age population is higher than is legally required to allow the minority group an equal opportunity to elect candidates of their choice.

Plaintiffs did not, however, present any credible evidence to support their theory that the BVAP in the challenged districts exceeded the level necessary to give African Americans an equal opportunity to elect a candidate of their choice. To the contrary, the only evidence proffered by the Plaintiffs in this case as to what percentage of black population was needed to provide African Americans an equal opportunity to elect a candidate of their choice was acknowledged by their expert to be flawed. [*See, e.g*., McDonald Test., Tr. pp.158-59.] Moreover, Plaintiffs did not present any evidence that additional opportunity districts could be created by withdrawing black population from the challenged districts. Plaintiffs failed to produce any analysis demonstrating that a crossover district could have been created to allow black voters to elect a candidate of their choice with the assistance of white crossover vote.

**(2)** ***The House was required to draw majority-districts that meet the* Gingles *standards*.**

While *Gingles* tells us the circumstances under which majority minority districts must be drawn, *Bartlett v. Strickland,* 556 U.S. 1 (2009), addresses the second factor set forth above and tells us what level of minority voting age population is necessary. Plaintiffs argue that it was a violation of the Voting Rights Act and the Constitution for the House to have increased the BVAP in districts in which black incumbents had previously been elected. Plaintiffs have repeatedly criticized the House for not having done any racial bloc voting or electability analyses prior to adopting the plans for the House and for Congress.[4] But when the mandate of *Bartlett* is considered, it is clear that the compliance with Section 2 required nothing less than the creation of majority-minority districts in South Carolina where the *Gingles* factors exist.

*Bartlett* involved a claim virtually identical to the present case. There, the State of North Carolina asserted that it was necessary to create certain majority-minority districts to comply with Section 2, but the *Bartlett* plaintiffs asserted that Section 2 protected their right to reside in districts in which minority voters could elect candidates of their choice with help from voters of the majority who crossover to support the minority group's preferred candidate. *Bartlett*, 556 U.S. at 13. The Supreme Court expressly rejected Plaintiffs' contention: "[A] party asserting [Section] 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." *Bartlett*, 556 U.S. at 19-20. The Court held that the imposition of a bright line 50% test provides "workable standards and sound judicial and legislative administration . . . [and] draws clear lines for courts and legislatures alike." *Id.* at 17. To require otherwise not only "would place courts in the untenable position of predicting many political variables and tying them to race-based assumptions," but also would

---

[4] Nor did the Plaintiffs produce any case law requiring the General Assembly to conduct such analyses while drawing election districts.

expand the scope of Section 2 to "protect any possible opportunity or mechanism through which minority voters could work with other constituencies to elect their candidate of choice." *Id.* at 20.

As expressed by the Fourth Circuit in *Hall v. Virginia*,

> [m]inority voters have the potential to elect a candidate *on the strength of their own ballots* when they can form a majority of the voters in some single-member district. When the voting potential of a minority group that is large enough to form a majority in a district has been thwarted by the manipulation of district lines, minorities may justly claim that that their 'ability to elect' candidates has been diluted in violation of Section 2. On the other hand, when minority voters, as a group, are too small or loosely distributed to form a majority in a single-member district, they have no ability to elect candidates of *their own* choice, but must instead rely on the support of other groups to elect candidates. Under these circumstances, minorities cannot claim that their voting strength—that is the potential to independently decide the outcome of an election—has been diluted in violation of Section 2.

*Hall*, 385 F.3d at 430 (emphasis in original) (footnote omitted). Thus, "[a] redistricting plan that does not adversely affect a minority group's potential to form a majority in a district, but rather diminishes its ability to form a political coalition with other racial or ethnic groups, does not result in vote dilution 'on account of race' in violation of Section 2." *Id.* at 431 (footnote omitted).

It is therefore clear that minority voters have no right to the preservation or creation of crossover districts under Section 2. It also is clear that in order to comply with Section 2, a jurisdiction must draw districts that contain a numerical majority of the protected racial group if the *Gingles* factors are present. Anything less will not satisfy the mandate of *Gingles*. Plaintiffs' contentions that the State was unjustified in restoring certain majority-minority districts are directly contrary to law. Given that the House had to draw numerical majority districts in areas where the *Gingles* factors are present, Plaintiffs' criticism that the House did not do any prior racial bloc voting analysis is likewise unfounded. Because the issue is whether a numerical and

compact majority-minority district can be drawn, there is no reason to try to determine levels of electability at less than 50% BVAP.

**(3)    *Compliance with the Voting Rights Act is not limited to avoiding retrogression under Section 5 and also includes drawing majority-minority districts under Section 2 if the* Gingles *factors are present.***

Plaintiffs have made much ado about the requirement of Section 5 of the Voting Rights Act, but have consistently failed to take the mandate of Section 2 into account and, in fact, confuse the requirements of Section 5 and Section 2. As the Supreme Court has stated:

> The inquiries under §§ 2 and 5 are different. Section 2 concerns minority groups' opportunity "to elect representatives of their choice," 42 U.S.C. § 1973(b) (2000 ed.), while the more stringent § 5 asks whether a change has the purpose or effect of "denying or abridging the right to vote," § 1973c. In *LULAC,* we held that although the presence of influence districts is relevant for the § 5 retrogression analysis, "the lack of such districts cannot establish a § 2 violation." The same analysis applies for crossover districts: Section 5 "leaves room" for States to employ crossover districts, but § 2 does not require them.

*Bartlett*, 556 U.S. at 24-25 (case citations omitted). Under Section 5, a redistricting plan has an impermissible effect only if it "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States*, 425 U.S. 130, 141 (1976). Retrogression also "necessarily implies that the jurisdiction's existing plan is the benchmark against which the 'effect' of voting changes is measured." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 478 (1997).

Whether a proposed change has an impermissible effect under section 5 is determined by comparing the existing voting scheme with the scheme that would result from the proposed changes. *See City of Lockhart v. United States*, 460 U.S. 125, 132-35 (1983). Thus, to obtain preclearance from the Department of Justice ("DOJ") under Section 5, the South Carolina General Assembly had to maintain in the new House plan at least the 21 majority-minority districts in the benchmark plan, [*see* Defs'. Exh. 8, RWH 002032,] and at least one majority-

minority district in the Congressional plan, [*see* Defs.' Exh. 22, RWH 023519,] or otherwise be able to show that the adopted plans did not diminish the ability of black voters to elect candidates of their choice. Additionally, the adopted plans had to pass the other criteria adopted by DOJ, *see* 28 C.F.R. §51.54(a), including the Department's consideration and evaluation of "overconcentrated" and "fragmented" minority populations.

In contrast, the question under Section 2 is whether minority groups have the ability to elect a candidate of choice. Section 5 does not compel the creation of any more majority-minority districts than previously existed, but Section 2 does exactly that if the *Gingles* factors exist. *See Bartlett*, 556 U.S. at 23-24. As more fully discussed above, the analysis of this question is informed by the standards set forth in the *Gingles*, *Bartlett*, and—at least in this Circuit—*Hall* decisions. The gist of this analysis, however, is whether a minority group can form a majority in a single-member district; whether the minority group is politically cohesive; and whether there is racial bloc voting. *See Bartlett*, 556 U.S. at 11 (discussing *Gingles*, 478 U.S. at 50-51).

The adopted plan contains 30 majority-minority districts, nine more than in the benchmark plan under the 2010 Census but only one more than in the benchmark plan under the 2000 Census. [Defs.' Exh. 8, RWH 002042–46]. The adopted Congressional plan contains one majority-minority district, the same as in the benchmark plan under the 2000 and 2010 Census counts. [Defs.' Exh. 22, RWH 023527–30]. In considering these additional districts, it is important to note that this Court, in *Colleton County Council v. McConnell*, 201 F. Supp. 2d 618 (D.S.C. 2002), found that the cores of many of the districts in question in this case "are located in areas that satisfy the *Gingles* test." *Id.* at 656-57 (identifying House districts 12, 23, 25, 31, 41, 49, 50, 51, 57, 59, 62, 64, 66, 70, 73, 74, 76, 77, 82, 91, 95, 101, 102, 109, 111, 113, 116, 121,

and 122 as Section 2 districts). Therefore, in addition to avoiding retrogression under Section 5, the General Assembly was required by Section 2 to create majority-minority districts in which a compact minority group could elect its candidates of choice.

**C.    Plaintiffs Have Failed to Meet Their Burden of Proof under the Fourteenth and Fifteenth Amendments.**

Plaintiffs also challenge the House and Congressional Redistricting Plans under the Fourteenth and Fifteenth Amendments alleging that certain districts comprise unconstitutional racial gerrymanders and that the Redistricting Plans dilute the voting power of a minority group. Their attack, relying solely on Dr. McDonald's review of the geographic and demographic data of the plan, speculates that race was the predominant motive in revising these districts. While Defendant Harrell concedes that race was necessarily *a* factor in formulating the plans in order to comply with the Voting Rights Act, the record is devoid of any evidence demonstrating that race predominated in this process. To the contrary, the record clearly reflects that race was but one factor considered along with many other traditional redistricting principles. Plaintiffs therefore have failed to meet their burden of proof.

**(1)    *The record does not support Plaintiffs' claim either inferentially or otherwise*.**

McDonald's opinion must be analyzed in the context of the issue for which it is offered. To prevail in a claim for racial gerrymandering, "Plaintiffs must show that a facially neutral law is unexplainable on grounds other than race." *Easley v. Cromartie*, 532 U.S. 234, 241-42 (2001) ("*Cromartie II*") (internal quotations omitted). "To invoke strict scrutiny, [Plaintiffs] must show that the State has relied on race in *substantial* disregard of customary and traditional redistricting practices." *Chen v. City of Houston*, 206 F.3d 502, 506 (5th Cir.2000) (citing *Miller*, 515 U.S. at 928 (O'Connor, J., concurring)). A plaintiff must further show that a redistricting scheme was implemented with a "discriminatory intent or purpose." *Village of Arlington Heights v.*

*Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265 (1977). Thus, a racial gerrymandering claim is cognizable only if such discriminatory intent is established. *Lodge v. Buxton*, 639 F.2d 1358, 1363 (5th Cir. 1981), *aff'd sub nom. Rogers v. Lodge*, 458 U.S. 613 (1982).[5] Moreover, Plaintiffs have alleged that racial identification correlates highly with political affiliation. Therefore, the Plaintiffs have the high burden of proving that the General Assembly's motive "was predominantly racial, not political," *Cromartie II* at 241, and is "unexplainable on grounds other than race." *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (quoting *Arlington Heights,* 429 U.S. at 266).

"Strict scrutiny does not apply merely because redistricting is performed with consciousness of race." *Bush v. Vera*, 517 U.S. 952, 965 (1996); *see also Miller v. Johnson*, 515 U.S. 900, 916 (1995) (legislatures "will…almost always be aware of racial demographics"). "Strict scrutiny applies where redistricting legislation . . . is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional redistricting principles. *Vera*, 517 U.S. at 958 (internal quotations and citations omitted). In other words, for strict scrutiny to apply,[6] traditional redistricting criteria— such as compactness, contiguity, maintaining cores of districts, and respect for political subdivisions or communities of interest—must be subordinated to race. *Id.* at 959, 963. "Where these or other race-neutral considerations are the basis for redistricting legislation, and are not

---

[5] Further, Representative Sellers' testified that his primary problem was with the Election Laws Subcommittee Chairman, Alan Clemmons and not the other 123 members of the House or 46 Senators. Even if Representative Sellers' contentions about Representative Clemmons were correct, which Speaker Harrell in no way concedes, those motives cannot be imputed from Representative Clemmons to other members of the General Assembly.

[6] The *Colleton County* court determined that even if strict scrutiny applied, "compliance with the Voting Rights Act is a compelling state interest [and] states are afforded a very narrow ability to further that interest through the consideration of race." *Colleton County*, 201 F.Supp.2d at 639.

subordinated to race, a state can defeat a clam that a district has been gerrymandered on racial lines." *Miller*, 515 U.S. at 915-916 (internal quotation marks, footnotes, and citation omitted). Thus, the issue is not whether race was a factor, but whether other principles were so subordinated to race that the plans are explainable only in terms of race. Plaintiffs' burden here is a "demanding" one. *Id.* at 928 (O'Connor, J., concurring). They, "not the defendants, [ ] must first establish that the legislature subordinated traditional race-neutral districting principles." *Montiel v. Davis*, 215 F. Supp.2d 1279, 1287-88 (S.D. Ala.) (three-judge court). To assist the trier of fact, therefore, an opinion as to the predominant factor must address and exclude other possible reasons for the configuration of the adopted districts.

Even a casual analysis of the testimony of Dr. McDonald or Representative Sellers reveals that the redistricting plans do not meet this standard. Plaintiffs offered Dr. McDonald as an expert qualified to assist the Court in determining whether race was the predominant factor in the creation of the adopted plans for the House and Congress. Prior to trial, McDonald's opinion was challenged by Defendant Harrell pursuant to *Daubert v. Merrell Pharmaceuticals*, 509 U.S. 579 (1993) and its progeny on the ground that a) he did not actually know what the purpose or intent of the General Assembly was; b) he had not considered or even attempted to consider other racially neutral factors that may have motivated the General Assembly in drawing the new lines; and c) the lacked any information on those other factors to offer an opinion about them. [ECF No. 109.] That motion remains pending. Nothing that Dr. McDonald did after it was filed or at trial puts him in any better position to offer an informed opinion about the predominant factor in the redistricting process, however. In fact, his trial testimony shows that his opinion is uninformed, illogical, and abjectly speculative.

First, Dr. McDonald admits that he does not know the actual reason for anything that the General Assembly did in adopting the House and Congressional plans. [*See, e.g.,* McDonald Test., Tr. p.190.] This admission alone highlights the conjectural nature of his testimony and should disqualify him from offering an opinion at all. Moreover, Dr. McDonald's reasoning is logically flawed, which renders his conclusion invalid. It is as if Dr. McDonald reached a conclusion, then refused to review any evidence that might change or impact that conclusion lest he change his mind. It is axiomatic that in order to exclude the influence of factors other than race, one must be aware of all of the existing factors and not simply a few selected by the challenger. Otherwise, it would be impossible to eliminate all of the possible motivations other than race unless the expert knows what those are so he can rule them out on some rational basis. *See Shaw*, 509 U.S. at 643 (holding plaintiff must show redistricting plan is "unexplainable on grounds other than race"). Here, Dr. McDonald failed to consider anything other than race. [*See, e.g.,* McDonald Test., Tr. pp.173, 174.]  It is therefore not surprising that he concluded that race was the predominant factor.

This is best illustrated by his opinion that race was the motivating factor *every* time there was *any* change in the BVAP of *any* district. Regardless of how small the resulting difference, Dr. McDonald divines a racial reason to the exclusion of every other possible reason for the modification. Thus if two hypothetical precincts were exchanged between neighboring districts, Dr. McDonald would conclude that race was the reason for that exchange even without knowing whether other reasons existed, such as a desire by neighboring incumbents to include certain geography in their districts for political rather than racial reasons. The absurdity of this "analysis" is highlighted by direct evidence of geography swaps that did not result in any change to the BVAP of the district, such as House district 70 that began and ended at 60.8%. Under Dr.

McDonald's logic model, these changes were done for racial reasons alone, even though there was no racial effect. As pointed out by Dr. Brunell in his trial testimony,[7] McDonald's opinion is not the result of statistical analysis or supported by any empirical evidence. It is simply a guess that is not based on sufficient information to render it helpful to the trier of fact in this case. The Court therefore should exclude his testimony on this issue.

Dr. McDonald's subsequent opinion that, because of purported violations of traditional redistricting principles, race predominated is similarly flawed. Dr. McDonald opined that these shifts in population made the districts less compact. However, Dr. McDonald performed only a visual determination of compactness [*See, e.g.,* McDonald Test., Tr. pp.169-70, 172,] that, at best, is a subjective analysis that appears to be predetermined by his "conclusion" that race predominated. Such an opinion is not helpful to the trier of fact and is incapable of scientific repetition. Additionally, many of the districts Dr. McDonald speculated were less compact were shown by Defendant Harrell to be the result of adding in oddly shaped census blocks—which are not under the control of the state of South Carolina—or by following political subdivision boundaries such as municipalities or precincts. [*See, e.g.,* McDonald Test., Tr. pp.188, 195, 197, 211-12; *see also* Aff. of Patrick G. Dennis, ¶¶ 47-68.]

Dr. McDonald also opines that Defendants did not respect political subdivision boundaries citing the need to keep counties and municipalities whole. However, Dr. McDonald acknowledged that he had not considered the House's criteria of maintaining precincts as whole, which explains the race-neutral reason for many of the challenged shifts. [*See, e.g*., McDonald Test., Tr. pp.178-79, 205-06, 214-226; Dennis Aff. ¶¶ 40-46.] Finally, Dr. McDonald stated that the House did not respect the cores of the districts appearing to suggest that districts should only

---

[7] The transcript of Dr. Brunell's testimony is unavailable at this time.

grow or shrink depending on their population needs and any shifting of lines beyond this need violates this principle. [*See, e.g*., McDonald Test., Tr. pp.164, 219.] In this regard, Dr. McDonald misapprehends the fundamental requirements of redistricting, including that all districts may have to shift in order to balance the population of all districts. [*See, e.g*., McDonald Test., Tr. pp.166-67, 218; Brunell Test. (Tr. unavailable).] Notwithstanding this misunderstanding, Patrick Dennis, testified by affidavit that the cores of the challenged districts were largely the same as in the Benchmark plan and that substantial amounts of the original population contained within the Benchmark Districts remained unaffected. [Dennis Aff. ¶¶ 47-68.]

Perhaps the biggest weakness in Dr. McDonald's evidence, however, is his admitted failure even to know about, much less consider the redistricting criteria adopted by the House. [*See, e.g*., McDonald Test., Tr. pp.175-77.] A review of the record created in this case demonstrates that "[s]everal factors other than race were at work in the drawing of the districts." *Vera*, 517 U.S. at 963. The South Carolina House of Representatives proposed, debated, and adopted guidelines and criteria to be used in redistricting the Congressional and House districts. [Defs.' Tr. Exh. 8, RWH 002047–52.] As set forth therein, the House considered, not only the Plans' compliance with the U.S. Constitution and the Voting Rights Act, but also achieving equal population for the districts, contiguity, compactness, communities of interest, and incumbency protection. [*See id*.] The challenged districts all maintain the cores of the existing districts, move certain district lines to abide by precinct, county, or municipal boundaries, protect incumbents, and reflect the protection of communities of interest. [Dennis Aff. ¶¶ 47-68; *see generally*, Def. Trial Exhs. 11, 23]. As Dr. Brunell testified, those criteria are racially neutral, rational, and reflect traditional redistricting principles. [Brunell. Test. (Tr. unavailable).]  There is ample evidence that the adopted redistricting plans for both the House and Congress are

consistent with these criteria. Because McDonald failed to take them into account, he cannot exclude their influence on the redistricting process, and therefore cannot credibly offer an opinion that race predominated over them.

Furthermore, the anecdotal evidence that race was the predominant factor is outweighed by the substantial evidence presented by Defendant Harrell that non-racial criteria and purposes governed the redistricting process. In the areas identified by Plaintiffs as constituting a racial gerrymander, Patrick Dennis explained that these shifts resulted in the maintenance of various political subdivisions, including precinct, municipality, and precinct boundaries; were the consequence of population needs in the affected district as well as adjoining and regional districts; and respected and maintained areas that have similar interests including neighborhoods, subdivisions, parks, and other communities. Importantly, Dr. McDonald did not actually consider any factors other than the demographics and geographic composition of the districts. [*See, e.g*., McDonald Test., Tr. p.173.] Specifically, he did not review the record established by the House in this process prior to rendering his initial opinion and therefore was unable to testify if certain shifts could have been made to respect these other non-racial traditional redistricting principles. [*See, e.g*., McDonald Test., Tr. p.174.] He also testified that he—and, thus, the Plaintiffs—did not know whether certain districting changes involved the maintenance, protection, or joining of communities of interest. [*See, e.g*., McDonald Test., Tr. pp.177, 180-81, 199, 203, 209-10.] Consequently, the Plaintiffs failed to demonstrate that race predominated over these other principles and Dr. McDonald's opinion in this regard is, therefore, unsupported by the evidence or by reason and amounts to pure speculation.

(2)     ***Plaintiffs fail to present a legitimate alternative for the Court's consideration.***

Finally, Plaintiffs failed to present a legitimate alternative plan for the Court's consideration. When race and politics overlap, a redistricting plaintiff has an additional burden:

> Where majority-minority districts . . . are at issue and where racial identification correlates highly with political affiliation, the party attacking the legislatively drawn boundaries must show at least that the legislature could have achieved its legitimate political objectives in alternate ways that are comparably consistent with traditional redistricting principles. That party must also show that those districting principles would have brought about significantly greater racial balance.

*Cromartie II* at 258. Because Plaintiffs acknowledge there is a high correlation in the voting age population between race and political affiliation, [*see* Am. Compl. (ECF No. 6) ¶ 41,] they therefore were required to produce districting alternatives that are comparably consistent with traditional redistricting principles and that could have brought significantly greater balance while still achieving legitimate political objectives.

In response to the Court's order, Plaintiffs submitted alternative plans modifying all 124 House districts and all 7 Congressional districts. Plaintiffs now conceded that they did not expect these plans to be adopted by the Court. This no doubt is because their proposals violate many more traditional redistricting principles than do the Redistricting Plans adopted by Defendants. [*See generally* McDonald Test., Tr. pp.228-39.] First and foremost, Plaintiffs' House plan haphazardly eradicates incumbent members throughout the State. At least 28 members are paired together under Plaintiffs' proposal, creating 15 districts with no resident incumbent. Of the paired incumbents, six minority members are drawn together, resulting in the unavoidable outcome that at least three minority candidates of choice could not be elected. An additional four minority members are drawn into districts with four white House members (two Democrat, two Republican). It is a serious flaw for a plan to have excessive incumbent pairings—especially

when compared to the plan actually adopted by the legislature—and Plaintiffs' proposed plan should be rejected on that basis alone. *Vera*, 517 U.S. at 965 ("[W]e have recognized incumbency protection, at least in the limited form of 'avoiding contests between incumbent[s], as a legitimate state goal.").

In addition, Plaintiffs' plan violates more political subdivision boundaries than the House Redistricting Plan, directly contradicting Plaintiffs' stated position in this case. Plaintiffs' House plan contains 38 county splits (at least one more than the House Plan); only eight whole counties (at least one less than the House plan); 626 split precincts (201 more than the House Plan); and only 1,496 whole precincts (201 less than the House Plan). [Def. Exh. 35, p.28.] Furthermore, Plaintiffs' House plan results in districts that are not as equipopulous as Act 72 and have an overall deviation of 9.97%. *Id.*; *see also Chapman v. Meier*, 420 U.S. 1, 26-27 (1975) ("[A] court-ordered reapportionment plan of a state legislature . . . must ordinarily achieve the goal of population equality with little more than de minimis variation.")

More importantly, Plaintiffs' House and Congressional Plans clearly violate both Section 2 and Section 5 of the Voting Rights Act., which renders them useless from the outset. The Benchmark House Plan had 21 majority-minority districts and the Benchmark Congressional Plan had one majority-minority district based upon the 2010 Census. Notwithstanding Plaintiffs assertion that Section 5 does not require districts which have fallen below the 50% threshold to be reestablished as majority-minority districts, Plaintiffs proposal *reduces* the number of House majority-minority districts from 21 to 18 and the number of Congressional majority-minority districts from one to none. It is clear that these plans are retrogressive under any theory of Section 5 compliance because they indisputably would "decrease . . . the absolute number of representatives which a minority group has a fair chance to elect." *Ketchum v. Byrne*, 740 F.2d.

1398, 1402 n.2 (7th Cir. 1984). In fact, Plaintiffs' expert merely "hoped" that such a plan would be considered non-retrogressive and would be one that the United States Department of Justice would administratively preclear. [McDonald Test., Tr. p.252.]  An expert who hopes for a result is not an expert whose testimony is helpful to the trier of fact. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert").

Plaintiffs also dismantle historic majority-minority districts, thereby directly violating the *Gingles* requirements and resulting in a Section 2 violation. Nor can Plaintiffs assert that the districts that have been taken below the 50% threshold still allow minorities the opportunity to elect candidates of their choice because Plaintiffs a) admittedly did not perform any analysis as to racial block voting or racially polarized voting which would enable them to opine as to what level of black voting age population would allow minorities to elect a candidate of choice; and b) presented no expert testimony or other evidence that would suggest reducing these districts below 50% would perform. Rather, Plaintiffs suggest that "the bright-line majority-in-a-district rule" should be relaxed and invite the Court to "build castles in the air" on the hopes that the districts will continue to elect candidates of the minority group's choice at a lesser percentage. *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 394 (S.D.N.Y. 2004) *aff'd*, 543 U.S. 997 (2004) (*quoting McNeil v. Springfield Park Dist.*, 851 F.2d 937 (1988)). There is simply no evidence to suggest that the Court should take this path and reverse the progress made by the Voting Rights Act on mere speculation.

## Conclusion

Speaker Harrell is entitled to judgment against Plaintiffs for the reasons set forth above and in other memoranda and documents filed with this Court. Therefore, this Court should enter judgment against Plaintiffs and in favor of Speaker Harrell and all other Defendants.

Respectfully submitted,

**SOWELL GRAY STEPP & LAFFITTE, L.L.C.**

Robert E. Stepp
Fed. I.D. No.: 4302.
rstepp@sowellgray.com
Robert E. Tyson, Jr.
Fed. I.D. No.: 7815
rtyson@sowellgray.com
1310 Gadsden Street
Post Office Box 11449
Columbia, South Carolina 29211
(803) 929-1400
-and-

**WILLOUGHBY & HOEFER, P.A.**

By:    s/ Tracey C. Green
Benjamin P. Mustian
Fed. I.D. No.: 9615
bmustian@willoughbyhoefer.com
Tracey C. Green
Fed. I.D. No.: 6644
tgreen@willoughbyhoefer.com
930 Richland Street
Post Office Box 8416
Columbia, South Carolina 29202
(803) 252-3300

Columbia, South Carolina
March 5, 2012