THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| **VANDROTH BACKUS, WILLIE HARRISON BROWN, CHARLESANN BUTTONE, BOOKER MANIGAULT, EDWARD MCKNIGHT, MOSES MIMS, JR, ROOSEVELT WALLACE**, and **WILLIAM G. WILDER**, on behalf of themselves and all other similarly situated persons, | ) ) ) ) ) ) ) ) ) | **Case No.: 3:11-cv-03120-HFF-MBS-PMD** |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Order** |
| **THE STATE OF SOUTH CAROLINA, NIKKI R. HALEY**, in her capacity as Governor**, GLENN F. MCCONNELL**, in his capacity as President Pro Tempore of the Senate and Chairman of the Senate Judiciary Committee**, ROBERT W. HARRELL, JR**, in his capacity as Speaker of the House of Representatives, **MARCI ANDINO**, in her capacity as Executive Director of the Election Commission; **JOHN H. HUDGENS, III**, Chairman, **NICOLE S.WHITE, MARILYN BOWERS**, **MARK BENSON**, and **THOMAS WARING**, in their capacities as Commissioners of the Elections Commission, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

_____

Before HENRY F. FLOYD, United States Circuit Judge, MARGARET B. SEYMOUR, Chief District Judge, and PATRICK MICHAEL DUFFY, Senior District Judge.

_____

Judge Duffy wrote the opinion, in which Judge Floyd and Chief Judge Seymour concurred.

_____

PATRICK MICHAEL DUFFY, Senior District Judge:

This matter was tried without a jury beginning on March 1, 2012. The Court—having heard the arguments, read the submissions of counsel, and considered the evidence, including courtroom testimony, deposition testimony, affidavit testimony, and exhibits—enters judgment for Defendants based on the following findings of fact and conclusions of law.

## **INTRODUCTION**

### I.    Factual Context

Ten years ago, this Court was forced to take on the "unwelcomed obligation" of devising redistricting plans in the face of an impasse arising from the veto of plans passed by the legislature in 2001. *Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 623 (D.S.C. 2002). In 2003, the General Assembly enacted legislation that modified the Court's plan for the House and Senate. These enacted plans and the *Colleton County* plan for Congress were used through the 2010 elections and serve as the Benchmark plan for this current litigation. Between the 2000 and 2010 censuses South Carolina experienced significant population growth—the state's total population grew from 4,012,012 to 4,625,364. As a result of this population growth, South Carolina's House and Senate districts became malapportioned and needed to be redrawn. Additionally, South Carolina gained a Congressional seat, necessitating the drawing of new Congressional election districts. The South Carolina General Assembly enacted Act 72 of 2011 ("House plan") and Act 75 of 2011 ("Congressional plan") to replace South Carolina's prior districts.[1] After these plans were enacted by the legislature and signed into law by Governor Haley, the House and the Senate submitted the plans to the United States Department of Justice for administrative preclearance pursuant to section 5 of the Voting Rights Act, 42 U.S.C. §

---

[1] Additionally, the Senate enacted Act 71 of 2011 ("Senate plan"). The Senate plan was originally part of this litigation. However, both the Plaintiffs and Plaintiff-Intervenor Senator Dick Elliot have voluntarily dismissed claims related to the Senate plan.

1973c.  The Department of Justice granted preclearance to the plans, at which point the plans became effective.  The requirement of administrative preclearance from the Department of Justice is limited to certain jurisdictions, such as South Carolina, that have a history of racial discrimination and is limited to a review of whether the Attorney General interposes any objection under section 5.  While preclearance is a necessary and important step for those jurisdictions covered under section 5, it is limited in scope to administrative approval that the particular redistricting plan is not retrogressive under section 5 of the Voting Rights Act.

### II.  Procedural History

On November 11, 2011, Plaintiffs Vandroth Backus, Willie Harrison Brown, Charlesann Buttone, Booker Manigault, Roosevelt Wallace, and William G. Wilder ("Plaintiffs") initiated this declaratory judgment action. Plaintiffs filed an amended complaint on November 23, 2011, seeking declaratory and injunctive relief under section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, 42 U.S.C. § 1983, Article I, section 2 of the United States Constitution, and the Fourteenth and Fifteenth Amendments to the United States Constitution.  Edward McKnight and Moses Mims were added as Plaintiffs in the amended complaint.

Defendants filed various motions to dismiss and the Court held a hearing on those motions on January 19, 2012.  At the hearing, the Court granted several of the motions, but denied the motions to dismiss for failure to state a claim.  However, the Court ordered Plaintiffs to submit a clarification of claims, identify the districts at issue, and submit alternative redistricting plans.  Plaintiffs filed those clarifications on January 26, 2012.  With the consent of Defendants, Plaintiffs filed their second amended complaint on February 15, 2012.

After discovery and various pre-trial motions, the Court held a trial in Columbia on March 1-2, 2012. Pursuant to the Court's order and agreement of the parties, the trial was abbreviated by the use of affidavits and deposition testimony.

### III.    Plaintiffs' Allegations

First, Plaintiffs allege, as to both the House and Congressional plans, a Fourteenth Amendment racial gerrymandering claim, as provided in *Miller v. Johnson*, 515 U.S. 900 (1995). Second, Plaintiffs assert a violation of section 2 of the Voting Rights Act as to both the House and Congressional plans. Third, although it is not abundantly clear, Plaintiffs seem to assert a vote-dilution claim under the Fourteenth Amendment. Finally, Plaintiffs assert that the plans violate the Fifteenth Amendment.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), and 2201(a), and the suit is authorized under 42 U.S.C. § 1983. The three-judge panel has been properly appointed by the Chief Judge of the Fourth Circuit Court of Appeals pursuant to 28 U.S.C. § 2284.

### II.    Overview of  Fourteenth Amendment racial gerrymandering claim

Plaintiffs assert that the House plan and the Congressional plan violate the Equal Protection Clause of the Fourteenth Amendment. There are two types of equal protection claims that challenge the use of race in reapportionment: racial gerrymandering claims and vote-dilution claims. These claims are "analytically distinct." *Miller*, 515 U.S. at 911 (internal quotation marks omitted). The Court turns first to Plaintiffs' racial gerrymandering claim under the Fourteenth Amendment.

The essence of a racial gerrymandering claim is that states may not use race as the predominant factor in separating voters into districts. *Id.* at 916. Laws that classify citizens

based on race are constitutionally suspect and therefore subject to strict scrutiny, and racially gerrymandered districting schemes are no different, even when adopted for benign purposes. *Shaw v. Hunt* (*Shaw II*), 517 U.S. 899, 904-05 (1996). This does not mean that race cannot play a role in redistricting. *Miller*, 515 U.S. at 916. Legislatures are almost always cognizant of race when drawing district lines, and simply being aware of race poses no constitutional violation. *See Shaw II*, 517 U.S. at 905. Race may be a factor in redistricting decisions, but not the predominant factor. *See Easley v. Cromartie*, 532 U.S. 234, 241 (2001). In other words, only when race is the "dominant and controlling" consideration in drawing district lines does strict scrutiny apply. *See Shaw II*, 517 U.S. at 905.

Plaintiffs may prove that race was the predominant consideration in a variety of ways. At times, reapportionment plans may contain district lines that are so bizarre or highly irregular on their face—both by their geographic appearance and their demographic makeup—that they cannot be rationally understood as anything but an effort to separate voters based on race. *Shaw v. Reno* (*Shaw I*), 509 U.S. 630, 646-47 (1993). But bizarreness with regard to shape, although relevant, is not required to establish a racial gerrymandering claim. *Miller*, 515 U.S. at 915. Circumstantial evidence of a district's shape and demographics is only one way of proving a racial gerrymander. *Id.* at 916. Plaintiffs may also establish a racial gerrymandering claim through the use of "more direct evidence going to legislative purpose that [indicates] race was the predominant factor." *Id.* To prove that race was the predominant factor, Plaintiffs must always prove that the legislature subordinated traditional race-neutral principles—such as compactness, contiguity, and respect for political subdivisions or communities—to race as the primary consideration for drawing district lines. *Id.*; *see also Easley*, 532 U.S. at 241 (recognizing that plaintiffs who challenge a legislature's use of race as a criterion in redistricting

5

must show, at a minimum, that it subordinated traditional race-neutral districting principles to racial considerations).  Defendants may disprove that race was the predominant factor by demonstrating that legislative decisions adhered to traditional race-neutral principles.  *Miller*, 515 U.S. at 916.

If a plaintiff establishes that the legislature used race as the predominant factor in redistricting, the redistricting scheme will be subject to strict scrutiny.  *See id.* at 920.  Strict scrutiny requires the State to prove that its redistricting scheme is narrowly tailored to achieve a compelling governmental interest.  *Id.*  Remedying past discrimination may serve as such a compelling state interest, but the State must provide strong evidence of the harm being remedied. *See id.* at 922.  Compliance with federal antidiscrimination laws alone will not always serve as a compelling governmental interest.  *Id.* at 921.  The prior three-judge panel in *Colleton County* determined that "compliance with the Voting Rights Act is a compelling state interest." *Colleton Cnty.*, 201 F. Supp. 2d at 639.  It held that "[i]f there is a strong basis in evidence for concluding that creation of a majority-minority district is reasonably necessary to comply with the Act, and the race-based districting substantially addresses the violation, the plan will not fail under Equal Protection analysis."  *Id.* (internal quotation and citations omitted).

Plaintiffs have standing to assert racial gerrymandering claims only if they "live in the district that is the primary focus of their . . . claim" or they provide specific evidence that they "personally . . . have been subjected to a racial classification."  *United States v. Hays*, 515 U.S. 737, 739 (1995).  Absent specific evidence showing that they were injured, such plaintiffs do not have standing to bring a racial gerrymandering claim.  *Id.*  It is not enough for plaintiffs to allege that they reside in a district adjacent to a racially gerrymandered district and that the racial composition of their district would have been different absent the racial gerrymander.  *Id.* at 746;

*see also Sinkfield v. Kelley*, 531 U.S. 28, 30 (2000) (per curiam) (recognizing in *Hays* that the plaintiffs' "failure to show the requisite injury . . . was not changed by the fact that the racial composition of their own district might have been different had the legislature drawn the adjacent majority-minority district another way"). Plaintiffs cannot assert a generalized grievance and must show that they have been personally denied equal protection. *See Hays*, 515 U.S. at 743-44.

Plaintiffs have failed to introduce specific evidence that they have been personally subjected to a racial classification. Therefore, in assessing Plaintiffs' evidence as it relates to their Fourteenth Amendment racial gerrymandering claim, the Court will consider only those districts in which a Plaintiff resides.

### III.    Plaintiffs have failed to establish that race was the predominant factor in either the House or Congressional redistricting plans.

Plaintiffs failed to establish that race was the predominant factor used in drawing the district lines in either the House plan or the Congressional plan because their evidence did not support any of the following: (a) the reapportionment plans contained district lines that were so bizarre or highly irregular on their face that they cannot be rationally understood as anything but an effort to separate voters based on race; (b) the legislature subordinated traditional race-neutral redistricting principles to race; or (c) any legislative purpose indicating that race was the predominant factor. In contrast, Defendants were able to disprove that race was the predominant factor by demonstrating that their decisions adhered to traditional race-neutral principles.

#### i.    Race-neutral traditional redistricting principles

The Court in *Colleton County* identified race-neutral principles traditionally adhered to in South Carolina redistricting. *Colleton Cnty.*, 201 F. Supp. 2d at 646-49. They include (1) recognizing communities of interest; (2) preserving the cores of existing districts; (3) respecting

political boundaries, such as county and municipal boundaries, as well as geographical boundaries; and (4) keeping incumbents' residences in districts with their core constituents. *Id.* at 647. In this regard, the South Carolina House Elections Laws Subcommittee adopted Guidelines and Criteria For Congressional and Legislative Redistricting. Those guidelines and criteria require compliance with United States Supreme Court decisions on Constitutional law and the Voting Rights Act of 1965. *See* Def. Harrell Ex. 1, 2011 Guidelines and Criteria For Congressional and Legislative Redistricting, ¶¶ I-II. Specifically, the criteria explain that to comply with United States Supreme Court decisions, race can be a factor, but cannot be the predominant factor or be considered in a way that would subordinate the other criteria. *Id.* The criteria also provide the standard for population deviations in any plan: "the number of persons in Congressional districts shall be nearly equal as is practicable" and as to the House of Representatives, "efforts should be made to limit the overall range of deviation to less than five percent, or a relative deviation in excess of plus or minus two and one-half percent for each South Carolina House district." *Id.* at ¶ IV, b-c. Additionally, contiguity, compactness, protection of communities of interests, and incumbency protection were all provided for in the criteria:

**V. Contiguity**
Congressional and legislative districts shall be comprised of contiguous territory.

**VI. Compactness**
Congressional and legislative districts shall be compact in form and shall follow census geography. Bizarre shapes are to be avoided except when required by one or more of the following factors: (a) census geography; (b) efforts to achieve equal population, as is practicable, or (c) efforts to comply with the Voting Rights Act of 1965, as amended. . . .Compactness will be judged in part by the configuration of prior plans. . . .Compactness will not be judged based upon any mathematical, statistical, or formula-based calculation or determination.

**VII. Communities of Interest**

. . . the Elections Laws Subcommittee, the House Judiciary Committee, and the South Carolina House of Representatives will attempt to accommodate diverse communities of interest to the extent possible.

**VIII. Incumbency Protection**
Incumbency shall be considered in the reapportionment process. Reasonable efforts shall be made to ensure that incumbent legislators remain in their current districts. Reasonable efforts shall be made to ensure that incumbent legislators are not placed into districts where they will be compelled to run against the incumbent members of the South Carolina House of Representatives.

*Id.* at ¶¶ V-VII. In addition to promulgating theses criteria, the Subcommittee also established a priority among them should there be a conflict:

**IX. Priority of Criteria**
a. In establishing congressional and legislative districts, all criteria identified in these guidelines shall be considered. However, if there is a conflict among the requirements of these guidelines, the Voting Rights Act of 1965 (as amended), equality of population among districts, and the Unites States Constitution shall be given priority.

*Id.* at ¶ IX, a.

At trial, Plaintiffs introduced Dr. Michael P. McDonald, Associate Professor of Government and Politics at George Mason University, as their expert in this matter. Dr. McDonald opined that the General Assembly used race as the predominant factor in drawing twenty House districts and the Sixth Congressional District. In reaching this conclusion, his analysis followed essentially a two-step approach. First, broadly speaking, he identified districts that exchanged populations in a manner that resulted in a district experiencing a net increase in black voting age population (BVAP) or maintaining its BVAP. He reasoned that race must have been a factor in these changes. Second, after determining that race was a factor in these changes, he examined whether traditional race-neutral redistricting principles were subordinated. If they were, he concluded that race was the predominant factor.

9

Even granting Dr. McDonald the inference that race must have been a factor in changes involving exchanges of areas of low BVAP for areas of high BVAP, he did not convincingly demonstrate that the General Assembly subordinated traditional race-neutral reasons to race. The Court is of the opinion that Dr. McDonald relied on incomplete information when reaching his determination that traditional race-neutral principles were subordinated.  He neglected to consider important sources of information in reaching his conclusion.   More problematic, however, is that he failed to consider all the traditional race-neutral principles that guide redistricting in South Carolina.  As a result, his opinion that race predominated is incomplete and unconvincing.

Throughout his cross-examination, Dr. McDonald admitted various sources of information that he failed to consider.  For example, he conveyed the impression that he did not thoroughly review the House record surrounding the redistricting process.  *See* McDonald Trial Tr. 174.  Nor did he examine precinct lines to see whether changes were made to avoid splitting precincts.  *Id.* at 178-79.

Particularly troubling is his admission that he failed to consider the guidelines and criteria that the General Assembly devised for the redistricting process, which, as we explained, contained guiding race-neutral principles.  *Id.* at 175, l. 11.  Dr. McDonald also neglected to review the prior three-judge panel's decision in *Colleton County*, even though it contained a discussion of the traditional race-neutral principles that guide South Carolina redistricting.  *Id.* at 175, l. 8.  These latter two sources of information are important for understanding what the General Assembly professed to be following and what courts have recognized as legitimate traditional race-neutral principles for redistricting in South Carolina.   Yet Dr. McDonald considered neither.

10

Dr. McDonald's failure to consult this information resulted in his rendering an opinion without considering all the race-neutral principles that have traditionally guided redistricting in South Carolina. For example, Dr. McDonald admitted that he did not consider whether the General Assembly sought to keep communities of interest—as defined by economic, social, cultural, and historical ties, political beliefs, or voting behavior—intact. *Id.* at 176-77. Recognizing communities of interest is a traditional race-neutral redistricting principle in South Carolina. *Colleton Cnty.*, 201 F. Supp. 2d at 647. Dr. McDonald also conceded that he did not consider incumbency protection, partly because he does not believe it is a race-neutral redistricting principle. McDonald Trial Tr. 179, ll. 17-18. Yet courts have recognized incumbency protection as a traditional race-neutral redistricting principle in South Carolina. *Colleton Cnty.*, 201 F. Supp. 2d at 647. Because Dr. McDonald did not consider all of the traditional race-neutral principles that guide redistricting in South Carolina, the Court is unconvinced by his opinion that the General Assembly subordinated them to race.

On cross-examination, he admitted that all he considered in his analysis were geographic and demographic data and election results. McDonald Trial Tr. 173, ll. 12-18. This information is, of course, highly relevant. But it cannot form the sole basis for determining that traditional race-neutral principles were subordinated to the use of race in drawing district lines, unless it is so highly irregular or bizarre on its face as to be unexplainable on any ground other than race, *see Shaw I*, 509 U.S. at 646-47. As the Court will later explain, that is not the case here. By so narrowly limiting the sources of information that he examined and failing to consider all of the traditional race-neutral principles that guide redistricting in South Carolina, Dr. McDonald was unable to provide the Court a reliable opinion that the General Assembly subordinated traditional race-neutral principles to race.

###### ii.     Irregular shape

Plaintiffs also object to the "irregular and bizarre" shapes of districts in the adopted plan. Plaintiffs, primarily through Dr. McDonald's testimony, have criticized the shapes of the districts they challenge and have alleged that the shapes can be explained only as the result of the legislature's attempts to pack the BVAP into particular districts.   "[T]he Supreme Court has made clear that '[t]he Constitution does not mandate regularity of district shape'; rather, for strict scrutiny to apply, 'traditional districting criteria must be subordinated to race.'" *Fletcher v. Lamone*, No. RWT-11cv3220, 2011 WL 6740169, at *13 (D. Md. Dec. 23, 2011) (emphasis omitted) (quoting *Bush v. Vera*, 517 U.S. 952, 962 (1996) (plurality opinion)) (internal quotation marks omitted).

Defendants, however, illustrated race-neutral reasons for the irregular looking shapes in the challenged districts.  For example, respecting existing political boundaries where possible, such as county lines and old district boundaries, was one common race-neutral reason for the irregular looking shape of the districts.  House District 59 is illustrative. In that district, Dr. McDonald took issue with the addition and subtraction of population from the district and the resulting shape.  He opined that such a shape could be explained only by the use of race as a predominant factor.   On cross-examination, Defendants' counsel questioned Dr. McDonald about the map of House District 59, and Dr. McDonald admitted that the adopted district's shape reflects attempts by the House to respect former district boundaries, precinct boundaries, and county boundaries when possible.  *See* Dr. McDonald Trial Tr. 216, ln. 17 & 219, ln. 4.  The evidence submitted by Defendants shows that this same effort was made with regard to the other challenged districts and is a race-neutral explanation for why the particular shapes were

necessary.  Another common race-neutral explanation was that the census blocs were kept whole and those blocs have irregular shapes.

Moreover, the Court has reviewed the redrawn districts and compared them to the preexisting districts under the Benchmark plan.  The redrawn districts are not so bizarre or highly irregular on their face that race can be the only rational explanation for them.  Accordingly, more convincing evidence beyond their geographic appearance and demographic makeup is necessary to persuade the Court that race predominated in drawing them.

### iii.  Legislative purpose

Plaintiffs have also failed to prove any legislative purpose that indicates race was the predominant factor.  In support of their claim that the legislature intentionally discriminated against African-Americans, Plaintiffs offer affidavit testimony of United States Congressman James E. Clyburn, South Carolina House of Representatives member Mia Butler Garrick, and South Carolina Senator C. Bradley Hutto.  Each affidavit discusses the particular elected official's experiences during the redistricting process.  All three of them share the position that an African-American candidate of choice can be elected in particular districts without the district being a majority-minority district, and that BVAP is too high in many districts under the approved plans.  However, despite these assertions and beliefs, they do not offer any convincing proof that race predominated in the General Assembly's drawing of the relevant House and Congressional districts.

In addition to these affidavits, Representative Bakari Sellars of the South Carolina House of Representatives testified at trial that the General Assembly intentionally packed African-Americans into voting districts and made redistricting decisions based solely on race rather than traditional race-neutral redistricting principles.  Representative Sellars serves on the Election

Law Subcommittee, which worked extensively in developing the House and Congressional plans. According to Representative Sellars, race was not only the predominant factor in developing these plans, but was often the only factor. Sellars Trial Tr. 13, ll. 12-13. He testified that the Subcommittee relied on predetermined demographic percentages and described how it would table amendments that lowered BVAP in a district. *See id.* at 32. During his testimony, Plaintiffs played a number of recordings depicting the tabling of such amendments after discussion concerning their effect on the district's BVAP. Representative Sellars particularly singled out the chairman of the Subcommittee as concerned solely with an amendment's effect on BVAP, even accusing him of using race to create a partisan gerrymander. *See, e.g.*, *id.* at 13, 24, 26, 74, 89.

The Court first recognizes that Representative Sellars testified as to only two specific districts in which Plaintiffs lived—House District 102 and the Sixth Congressional District. Although he provided testimony and Plaintiffs played recordings relating to other specific districts, no Plaintiff lived in them. As a result, for the reasons previously explained, Plaintiffs lack standing to challenge those districts.

In any event, the Court finds that Representative Sellars's testimony is insufficient to show that race predominated in creating the House and Congressional plans. Representative Sellars did not demonstrate that his colleagues subordinated traditional race-neutral principles to race when drawing the districts in which Plaintiffs live. At times, he made generalized statements that they did so, but he never provided any in-depth explanation as to where or how. Although Representative Sellars testified that House District 102 had a bizarre horseshoe shape, he admitted that its shape was consistent with how it looked under the Benchmark plan. *Id.* at 61, l. 9. At other times, Representative Sellars applauded the General Assembly for abiding by a

14

number of specific race-neutral criteria, such as incumbency protection, *id.* at 69-70, and, as relating to the Sixth Congressional District, public testimony, *id.* at 69.  In the absence of any meaningful explanation or analysis as to how traditional race-neutral principles were subordinated to race, the Court declines to credit his opinion that race predominated.

Moreover, although Representative Sellars ascribed race as the motivating factor for a few specific legislators, particularly those serving on the Subcommittee with him, we are reticent to impute such motivations on the General Assembly, or even the Subcommittee, as a whole. One representative may table an amendment for reasons relating to BVAP, while other representatives may table the same amendment for reasons unrelated to BVAP.  Statements by individual legislators are certainly probative, but they do not necessarily reflect the motivations of the body as a whole or even a majority of it.

In sum, although Representative Sellars's testimony strongly suggested that race was a factor in drawing many districts lines, it failed to demonstrate that race predominated over traditional race-neutral principles in the districts in which Plaintiffs reside.

Therefore, after reviewing all of the testimony and evidence offered by Plaintiffs, the Court finds that Plaintiffs have failed to present any evidence tending to prove a legislative purpose indicating race was the predominant factor or any other racial discrimination by the legislature.

### iv.    Conclusion

In the end, Plaintiffs have failed to prove that race was the predominant factor in creating the House and Congressional plans.  They focused too much on changes that increased the BVAP in certain districts and not enough on how traditional race-neutral principles were subordinated to race in making those changes.  This approach risks ignoring that race might have

been an unintended consequence of a change rather than a motivating factor. Moreover, it ignores that race can be—and often must be—a factor in redistricting. For South Carolina, a covered jurisdiction under the Voting Rights Act, federal law requires that race be a consideration. The General Assembly had to consider race to create districts that complied with federal law, which it did. The Court's task is to ensure that, in drawing the districts, the General Assembly did not rely on race at the expense of traditional race-neutral principles. Because Plaintiffs have failed to demonstrate that race predominated over traditional race-neutral principles, the Court is satisfied that the General Assembly did not overly rely on race in a manner that runs afoul of the Fourteenth Amendment. Accordingly, the Court holds that Plaintiffs have failed to prove a Fourteenth Amendment racial gerrymandering claim.

### IV.    Overview of Section 2 of the Voting Rights Act

Congress enacted § 2 of the Voting Rights Act of 1965 to effectuate the guarantees of the Fifteenth Amendment. *Voinovich*, 507 U.S. at 152. Section 2 provides that states may not impose or apply electoral voting practices or procedures that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). It further provides a totality-of-the-circumstances test for establishing such a violation:

> A violation . . . is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State . . . are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 1973(b). As the text of this provision indicates, the focus of § 2 is on the effect that the apportionment scheme has on the opportunity for members of a political minority to elect

16

representatives of their choice. *See Voinovich*, 507 U.S. at 155. Congress, in revising this provision in 1982, expressly repudiated an intent requirement that had previously applied. *Thornburg v. Gingles*, 478 U.S. 30, 43-44 & n.8 (1986).

The Supreme Court has set forth three "necessary preconditions"—commonly known as the "*Gingles* factors" or "*Gingles* preconditions"—that a plaintiff must satisfy to prove that an apportionment scheme impairs minority voters' ability to elect representatives of their choice. *Id.* at 50-51. They are as follows: "(1) The minority group must be 'sufficiently large and geographically compact to constitute a majority in a single-member district,' (2) the minority group must be 'politically cohesive,' and (3) the majority must vote 'sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.'" *Bartlett v. Strickland*, 556 U.S. 1, 11 (2009) (plurality opinion) (quoting *Gingles*, 478 U.S. at 50-51). These factors apply whether the § 2 challenge is to a multimember district or a single-member district. *Growe v. Emison*, 507 U.S. 25, 40-41 (1993). "Unless these points are established, there neither has been a wrong nor can be a remedy." *Id.* The Supreme Court, in no uncertain terms, has held that "[i]n a § 2 case, only when a party has established the *Gingles* requirements does a court proceed to analyze whether a violation has occurred based on the totality of the circumstances." *Bartlett*, 556 U.S. at 11-12.

In *Bartlett v. Strickland*, the Supreme Court addressed whether the failure of an apportionment scheme to create crossover districts may form the basis of a § 2 violation. *Id.* at 6. A plurality[2] answered in the negative—failing to draw districts to create or preserve crossover

---

[2] Justice Kennedy authored the plurality opinion, which Chief Justice Roberts and Justice Alito joined. Justice Thomas, joined by Justice Scalia, wrote a separate opinion concurring in the judgment. They asserted that § 2 does not authorize vote-dilution claims at all. *Bartlett*, 556 U.S. at 26 (Thomas, J., concurring in the judgment). Because the plurality opinion reaches the judgment on the narrowest grounds, this Court treats it as controlling. *Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position

districts does not give rise to a cognizable § 2 claim. *Id.* at 25-26. In so holding, the plurality emphasized that plaintiffs must satisfy the *Gingles* preconditions to state a § 2 claim. *Id.* at 11-12. It then held that the first *Gingles* precondition—which mandates that "[t]he minority group . . . be 'sufficiently large and geographically compact to constitute a majority in a single-member district,'" *id.* at 11 (quoting *Gingles*, 478 U.S. at 50)—requires that "the minority population in the potential election district is greater than 50 percent," *id.* at 18-20. In other words, plaintiffs alleging a § 2 violation must prove that the alleged vote-dilution practice prevented the creation of an election district that would have contained a majority of minority voters. *See id.* If they are unable to make that showing, they cannot satisfy the first *Gingles* precondition and therefore cannot state a § 2 claim. *See id.*[3] The Fourth Circuit had previously reached the same conclusion. *See Hall v. Virginia*, 385 F.3d 421, 430-31 (4th Cir. 2004).

The plurality opinion in *Bartlett*, however, left open the issue of whether proof that a legislature engaged in intentional discrimination when it drew lines to prevent the creation or preservation of crossover districts could form the basis of a cognizable § 2 claim. Although the plurality held that a § 2 violation could not arise from the simple failure to create or preserve a crossover district, it noted that the "case [did not] involve allegations of intentional and wrongful conduct." 556 U.S. at 20. It expressly reserved the issue of whether allegations of intentional discrimination would affect the analysis. *Id.* ("We therefore need not consider whether intentional discrimination affects the *Gingles* analysis."). And it instructed that its "holding does not apply to cases in which there is intentional discrimination against a racial minority." *Id.*

---

taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (plurality opinion))).

[3] The plurality also recognized that "[i]n areas with substantial crossover voting it is unlikely that the plaintiffs would be able to establish the third *Gingles* precondition—bloc voting by majority voters." 556 U.S. at 24. "It is difficult to see how the majority-bloc-voting requirement could be met in a district where, by definition, white voters join in sufficient numbers with minority voters to elect the minority's preferred candidate." *Id.* at 16. The plurality expressed concern that if it "dispense[d] with the majority-minority requirement, the ruling would call in question the *Gingles* framework the Court has applied under § 2." *Id.*

Plaintiffs in this case have alleged that the General Assembly engaged in intentional discrimination in drawing the House and Congressional district lines in a manner that prevents the creation or preservation of crossover districts.

### V.    Plaintiffs' Section 2 claim fails as to both the House and Congressional plans

The Court need not decide what effect proof of intentional discrimination has on § 2 claims asserting that a redistricting body failed to preserve or create crossover districts. Plaintiffs have failed to prove intentional discrimination.  Just as they have failed to demonstrate that race as opposed to race-neutral reasons drove the General Assembly's redistricting decisions, they similarly have not demonstrated that the General Assembly intended to pack African-American voters into districts to prevent the creation or preservation of crossover districts.  In the absence of any proof that the General Assembly intentionally discriminated in creating the House and Congressional plans, Plaintiffs' § 2 claim is foreclosed by *Bartlett* and *Hall*.  Under both cases, to satisfy the first *Gingles* precondition, Plaintiffs had to demonstrate that minority voters would form a majority in a potential election district but for the challenged districting practice.  Plaintiffs have not shown that, absent the districting scheme imposed by the House and Congressional plans, African-Americans could form a majority of voters in another potential district.  As a result, they have failed to prove a § 2 violation.

### VI.    Plaintiffs' Fourteenth Amendment vote dilution claim fails

The essence of a vote dilution claim under the Fourteenth Amendment is "that the State has enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities.'"  *Miller*, 515 U.S. at 911 (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 66 (1980) (plurality opinion)).  Viable vote dilution claims require proof

that the districting scheme has a discriminatory effect and the legislature acted with a discriminatory purpose. *Washington v. Finlay*, 664 F.2d 913, 919 (4th Cir. 1981).

To prove discriminatory effect, a plaintiff must show that the redistricting scheme impermissibly dilutes the voting rights of the racial minority. *Id.* Broadly speaking, this requires proof that the racial minority's voting potential "has been minimize[d] or cancel[led] out or the political strength of such a group adversely affect[ed]." *Id.* (alterations in original) (citations omitted) (quoting *Mobile*, 446 U.S. at 66, 84) (internal quotation marks omitted). Plaintiffs alleging vote dilution must offer "a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice." *Reno v. Bossier Parish Sch. Bd.* (*Reno I*), 520 U.S. 471, 480 (1997). That is because "the very concept of vote dilution implies—and, indeed, necessitates—the existence of an 'undiluted' practice against which the fact of dilution may be measured." *Id.* Justice Souter has explained that "[w]hile the [benchmark] is in theory the electoral effectiveness of majority voters, dilution is not merely a lack of proportional representation and . . . the maximum number of possible majority-minority districts cannot be the standard." *Reno v. Bossier Parish Sch. Bd.* (*Reno II*), 528 U.S. 320, 367 (2000) (Souter, J., concurring in part and dissenting in part) (citation omitted). Instead, an inquiry "into dilutive effect must rest on some idea of a reasonable allocation of power between minority and majority voters; this requires a court to compare a challenged voting practice with a reasonable alternative practice." *Id.* at 367-68.

To prove discriminatory purpose, the plaintiff does not need to advance direct evidence of discriminatory intent. *Rogers v. Lodge*, 458 U.S. 613, 618 (1982). Instead, "discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Id.* (quoting *Washington v.*

*Davis*, 426 U.S. 229, 242 (1976)) (internal quotation marks omitted). Relevant factors to consider and weigh include the following: (1) whether bloc voting along racial lines exists; (2) whether minorities are excluded from the political process; (3) whether minority voter registration is low; (4) whether elected officials are unresponsive to the needs of minorities; (5) whether the minority group occupies a depressed socioeconomic status because of inferior education or employment and housing discrimination; (6) the historical backdrop leading to the passage of the redistricting legislation; (7) "the specific sequence of events leading up to the challenged decision"; (8) whether the redistricting body departed from the normal procedural sequence for passing redistricting legislation; (9) whether the voting strength of a cohesive minority group has decreased or "retrogressed"; and (10) whether district boundaries have been manipulated to adjust the relative size of minority groups, including instances of "packing." *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, No. 11-5065, 2011 WL 4837508, at *3 (N.D. Ill. Oct. 12, 2011).

Plaintiffs have failed to prove that the General Assembly acted with a discriminatory purpose. There is no convincing direct evidence indicating that the General Assembly drew the district lines for the purpose of diluting Plaintiffs' voting strength. Nor do the totality of the facts yield an inference that the General Assembly acted with such a discriminatory purpose.

More importantly, Plaintiffs have failed to prove a discriminatory effect. They offered no evidence demonstrating how the House and Congressional plans dilute their votes. Although they offered alternative plans, they did not provide any analysis or explanation demonstrating how their plans show that the House and Congressional plans dilute minority votes, particularly their votes. There was no expert testimony describing how the House and Congressional plans minimized or cancelled out minority voting potential. Dr. McDonald asserted that certain

21

districts in the plans contain a higher BVAP than necessary to elect a representative of choice, but that does not demonstrate dilution. He did not provide any testimony about the relative voting strength of the allegedly packed African-American voters if they had been placed in another district. Simply put, Plaintiffs have offered only allegations of packing based on increases in certain districts' BVAP and have not shown that the increase in BVAP in those districts diluted the voting strength of African-American voters.

### VII. Plaintiffs' Fifteenth Amendment claims

Plaintiffs assert a vote dilution claim and a racial gerrymandering claim under the Fifteenth Amendment. It is unclear whether vote dilution claims are cognizable under the Fifteenth Amendment. In recent decisions, the Supreme Court has emphasized that it has never recognized such a claim. *See, e.g.*, *Reno II*, 528 U.S. at 334 n.3 (majority opinion) ("[W]e have never held that vote dilution violates the Fifteenth Amendment."); *Voinovich v. Quilter*, 507 U.S. 146, 159 (1993) ("This Court has not decided whether the Fifteenth Amendment applies to vote-dilution claims; in fact, we never have held any legislative apportionment inconsistent with the Fifteenth Amendment."). In light of these decisions, circuits are split on whether vote-dilution claims are cognizable under the Fifteenth Amendment. *Compare Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000) ("Indeed, the Supreme Court has rejected application of the Fifteenth Amendment to vote dilution causes of action."), *with Page v. Bartels*, 248 F.3d 175, 193 n.12 (3d Cir. 2001) ("We simply cannot conclude that the Court's silence and reservation of these issues clearly foreclose[] Plaintiffs' Fifteenth Amendment claim . . . .").

Even if vote-dilution claims exist under the Fifteenth Amendment, the Fourth Circuit has recognized that they are essentially congruent with vote-dilution claims under the Fourteenth Amendment. *Washington*, 664 F.2d at 919. Both require proof of discriminatory purpose and

discriminatory, or dilutive, effect. *Id.* For the same reasons that Plaintiffs have failed to prove a Fourteenth Amendment vote-dilution claim, they have failed to prove a Fifteenth Amendment vote-dilution claim.

Plaintiffs' Fifteenth Amendment racial gerrymandering claim relies on *Gomillion v. Lightfoot*, 364 U.S. 339 (1960). In *Gomillion*, the state legislature redrew the city lines defining Tuskegee, Alabama. *Id.* at 341. Prior to the revision, the city lines formed a square shape. *Id.* After the redrawing, the city lines constituted a "strangely irregular twenty-eight-sided figure." *Id.* The effect of the redrawing was to remove all of the city's 400 African-American voters, except four or five, from the city. *Id.* This effectively denied the removed citizens the right to vote in municipal elections. *Id.* Not a single white voter was removed. *Id.* Some of the removed African-American voters challenged the legislation redrawing the lines. *Id.* The Court, emphasizing that the redrawing of the lines disenfranchised the African-American voters with respect to municipal elections on the basis of race, held that the plaintiffs had stated a cognizable claim under the Fifteenth Amendment. *See id.* at 346-48.

"Laws violate the Fifteenth Amendment if their purpose and effect are to discriminate against people on the basis of race/ethnicity with respect to their *ability* to vote." Gary D. Allison, *Democracy Delayed: The High Court Distorts Voting Rights Principles to Thwart Partially the Texas Republican Gerrymander*, 42 Tulsa L. Rev. 605, 622 (2007) (emphasis added). One commentator has warned that courts must differentiate between Fourteenth and Fifteenth Amendment racial gerrymandering claims. Henry L. Chambers, Jr., *Colorblindness, Race Neutrality, and Voting Rights*, 51 Emory L.J. 1397, 1431 n.139 (2002). Racial gerrymandering runs afoul of the Fifteenth Amendment when it denies racial minorities the ability to vote at all in an election based on their race, as occurred in *Gomillion*. *Id.* Fourteenth

Amendment racial gerrymandering claims do not necessarily result in the denial of the right to vote.  *See id.*  Instead, the harm under the Fourteenth Amendment involves the State using racial classifications generally.  Under Fourteenth Amendment claims, "[t]he voter is allowed to vote, albeit in a different district than she prefers."  *Id.*  Because Plaintiffs have offered no evidence, nor have they argued, that any Plaintiff was denied the ability to vote, the Court finds that the House and Congressional plans do not violate the Fifteenth Amendment.

<u>**CONCLUSION**</u>

Therefore, judgment is entered in favor of the Defendants as to all of Plaintiffs' claims. Having entered judgment in Defendants favor, all pending motions are moot.

PATRICK MICHAEL DUFFY
United States District Judge

**March 9, 2012**
**Charleston, SC**